**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSE MANUEL VEGA FRANQUI, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-00734-RBW |
| | ) | |
| SYRIAN ARAB REPUBLIC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS AND
ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES**

COME NOW, the Plaintiffs, by and through counsel, Joshua M. Ambush, of the Law Offices of Joshua M. Ambush, LLC, and hereby file this Plaintiff's Motion in Opposition to Libyan Defendant's Motion to Dismiss and Accompanying Memorandum of Points and Authorities.

Plaintiff has shown sufficient, conclusive facts for this court to establish jurisdiction over Libyan Defendants, and equitable tolling principles apply to toll the statute of limitations on Plaintiff's claims, which are timely as a result.

In support of this Motion in Opposition to Defendants' Motion to Dismiss, Plaintiffs respectfully refers this Court to the attached Memorandum of Points and Authorities, Affidavit of Joshua M. Ambush, and proposed Order.

Respectfully submitted,

*/s/ Joshua M. Ambush*

_____
Joshua M. Ambush (Md. Bar # 27025)
Law Offices of Joshua M. Ambush, LLC
Hilton Plaza

1726 Reisterstown Road
Suite 206
Baltimore, Maryland 21208
410-484-2070
410-484-9330 (facsimile)
joshua@ambushlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Plaintiffs' Motion in Opposition to Defendant's Motion to Dismiss and Accompanying Memorandum of Points and Authorities was delivered *via* electronic filing and/or first class mail postage prepaid, to Thomas J. Whalen, Esquire, Mark A. Johnston, Esquire, Eckert Seamans Cherin & Mellott, LLC, 1747 Pennsylvania Avenue, N.W., Twelfth Floor, Washington, D.C. 20006; Wendy West Feinstein, Eckert Seamans Cherin & Mellott, LLC, U.S. Steel Tower, 44th Floor, 600 Grant Street, Pittsburgh, PA 15219, this 17th day of December, 2007.

*/s/ Joshua M. Ambush*
_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSE MANUEL VEGA FRANQUI, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-00734-RBW |
| | ) | |
| SYRIAN ARAB REPUBLIC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION IN OPPOSITION
TO  DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

(This page intentionally left blank; Memorandum continues on page 15)

# TABLE OF CONTENTS

**Page**

I.  **INTRODUCTION**                                                      15

II. **STATEMENT OF FACTS**                                               15

    a.  BACKGROUND                                               15

    b.  DEFENDANT'S SPONSORSHIP AND MATERIAL
        SUPPORT OF TERRORISM                                  16

III. **STATUTORY FRAMEWORK**                                            16

IV. **PLAINTIFF'S ARGUMENTS**                                           20

    a.  PLAINTIFF HAS SUBJECT MATTER JURISDICTION
        OVER DEFENDANTS BECAUSE LIBYA WAS
        ADDED TO THE STATE-SPONSOR OF TERRORISM
        LIST FOR BROAD SUPPORT OF INTERNATIONAL
        TERRORISM                                             20

        i.  DEFENDANT'S RELIANCE ON ROEDER IS
            MISPLACED, AS *ROEDER* IS NOT AKIN TO
            THE CASE AT BAR, AND HELPS PLAINTIFFS'
            CASE                                          23

    b.  LIBYA'S DESIGNATION TO THE STATE-SPONSOR
        OF TERRORISM LIST AROSE FROM THE U.S.
        GOVERNMENT'S EFFORTS TO TRACK AND
        DOCUMENT ITS MATERIAL SUPPORT OF
        TERRORISM OVER MANY YEARS                             26

        i.  LIBYA WAS ADDED TO THE STATE-SPONSOR
            OF TERRORISM LIST FOR REPEATED
            SUPPORT OF TERRORIST ACTS                     29

        ii. THE U.S. GOVERNMENT BEGAN TO TRACK
            LIBYAN AID AND  SUPPORT TO TERRORIST
            GROUPS AS FAR BACK AS 1969                    32

iii.  THE U.S. GOVERNMENT DESIGNATED LIBYA
      ON THE LIST OF STATE SPONSORS OF
      TERRORISM FOR REPEATED ACTS OF
      TERRORISM THAT INCLUDED THE LOD
      AIRPORT MASSACRE OF 1972_____  35

iv.   LIBYAN AID FOR TERRORIST ACTIVITY WAS
      NOT LIMITED TO THE PLO OR THE PFLP, BUT
      ALSO SUPPORTED THE BSO_____  36

c.  GENERAL CONCLUSORY ALLEGATIONS WHICH
    ESTABLISH LIBYA'S MATERIAL SUPPORT TO
    TERRORIST SUFFICIENTLY ESTABLISH THAT
    LIBYA PROXIMATELY CAUSED THE TERRORIST
    INCIDENT AT LOD AIRPORT_____  38

    i.   LIBYA ACTIVELY AND OPENLY PROVIDED
         MATERIAL SUPPORT AND RESOURCES TO
         TERRORIST GROUPS_____  39

    ii.  LIBYA CANNOT CLAIM SOVEREIGN
         IMMUNITY, SINCE IT HAS PROVIDED
         MATERIAL SUPPORT TO TERRORIST GROUPS
         AND PROXIMATELY CAUSED TERRORIST
         ATTACKS_____  47

d.  PLAINTIFF'S CLAIMS ARE NOT BARRED BY
    STATUTE OF LIMITATIONS PRINCIPLES DUE TO
    THE EQUITABLE TOLLING OF DEFENDANT'S
    SOVEREIGN IMMUNITY UNDER § 1605(f)_____  48

    i.   ANY CALCULATION OF THE STATUTE OF
         LIMITATIONS MUST INCLUDE EQUITABLE
         TOLLING PRINCIPLE_____  49

    ii.  THE FSIA IS MODELED AFTER THE TVPA,
         WHICH REQUIRES THAT EQUITABLE
         TOLLING PRINCIPLES COUNT AGAINST THE
         LIMITATIONS PERIOD_____  52

    iii. THE FULL 10 YEAR LIMITATIONS PERIOD
         MUST BE ARRESTED FOR EQUITABLE
         TOLLING PRINCIPLES_____  54

e.  EXTENDING THE LIMITATIONS PERIOD FOR
    PLAINTIFFS, FOR ONLY A "REASONABLE TIME"
    UNDER *VINE*, IS UNREASONABLE_____ 56

        i.  PLAINTIFF FILED THEIR CLAIMS WITHIN A
            "REASONABLE PERIOD" AFTER EQUITABLE
            TOLLING EXPIRED AND THE STATUTE OF
            LIMITATIONS BEGAN_____ 57

        ii.  A SOVEREIGN'S IMMUNITY DOES NOT COUNT
             AGAINST THE FSIA LIMITATIONS PERIOD
             WHICH GAVE PLAINTIFFS 10 YEARS, OR UNTIL
             APRIL 2006, TO FILE THEIR CLAIMS_____ 60

**V.  LIBYAN DEFENDANT'S MOTION TO DISMISS SHOULD BE
     DENIED_____ 63**

# TABLE OF AUTHORITIES

## CASES

**Case**                                                                                          **Page(s)**

*Adair v. Johnson*,
    216 F.R.D. 183 (D.D.C. 2003) _____ 55

*Allen v. Chicago Transit Authority*,
    317 F.3d 696 (7th Cir. 2003) (Posner, J.) _____ 54

*American Pipe & Construction, Co. v. Utah*,
    414 U.S. 538 (1974) _____ 59

*Arce v. Garcia*,
    434 F.3d 1254 (11th Cir. 2006) _____ 49, 53, 57

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) _____ 16

*Atchison, Topeka & Santa Fe Ry. Co., v. I.C.C.*,
    851 F.2d 1432 (D.C.Cir.1988) _____ 59

*Baker v. Great Socialist People's Libyan Arab Jamahiriya*,
    2006 WL 3208662 (D.D.C.2006) _____ 19, 60

*Baker v. Henderson*,
    150 F. Supp. 2d 17 (D.D.C. 2001) _____ 55

*Beverly Enters., Inc. v. Herman*,
    50 F. Supp. 2d 7 (D.D.C. 1999) _____ 18

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) _____ 53

*Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*,
    2007 U.S. Dist. LEXIS 49031 (D.D.C.2007) _____ 48, 61

*Burnett v. New York Railroad Co.*,
    380 U.S. 424 (1965) _____ 49-51, 61-62

*Cada v. Baxter Healthcare Corp.*,
    920 F.2d 446 (7th Cir. 1990) _____ 55, 59

*Cogburn v. U.S.A.,*
  717 F.Supp.958, 963 (D.Mass.1989)_____ 59

*Coles v. Harvey,*
  2007 WL 63666 (D.D.C.2007)_____ 63

*Collett v. Socialist People's Libyan Arab Jamahiriya,*
  362 F. Supp.2d 230 (D.D.C.2005)_____ 47, 57, 62

*Conley v. Gibson,*
  355 U.S. 41 (1957)_____ 18, 63

*Connos v. Hallmark & Son Coal Company,*
  935 F.2d 336 (D.C.Cir.1991)_____ 58

*Daliberti v. Republic of Iran,*
  97 F. Supp.2d 38 (D.D.C. 2000)_____ 18

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981)_____ 24

*Dammarell v. Iran,*
  281 F.Supp.2d 105 (D.D.C.2003)_____ 26

*Dammarell v. Islamic Rep. of Iran,*
  370 F.Supp.2d 218, 223 (D.D.C.2005)_____ 19

*Doe v. Blue Cross & Blue Shield United of Wisconsin,*
  112 F.3d 869, 877 (7th Cir.1997)_____ 54

*Duncan v. Walker,*
  533 U.S. 167 (2001)_____ 50

*EEOC v. O'Grady,*
  857 F.2d 383 (7th Cir.1988)_____ 61

*Flatow v. Islamic Rep. of Iran,*
  999 F. Supp. 1 (D.D.C. 1998)_____ 17, 38, 51, 55, 57, 62

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
  905 F.2d 438 (D.C.Cir.1990)_____ 19

*Herbert v. Nat'l Acad. of Science,*
  974 F.2d 192 (D.C. Cir. 1992)_____ 18

*Hilao v. Estate of Marcos,*
    103 F.3d 767 (9th Cir.1996)_____ 57

*Hishon v. King & Spaulding,*
    467 U.S. 69 (1984)_____ 63

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003)_____ 19, 64

*Int'l Union, United Auto., Aerospace and Agr. Implement
Workers of America (UAW), AFL-CIO v. Hoosier Cardinal Corp.,*
    383 U.S. 696, 708 (1966)_____ 51

*Irwin v. Dep't of Veterans Affairs,*
    498 U.S. 89 (1990)_____ 59

*Jean v. Dorelien,*
    431 F.3d 776 (11th Cir. 2005)_____ 53, 57

*Jenco v. Islamic Rep. of Iran,*
    154 F.Supp.2d 27 (D.D.C.2001)_____ 18

*Jones v. R.R. Donnelley & Sons Co.,*
    541 U.S. 369 (2004)_____ 51

*Justice v. United States,*
    6 F.3d 1474 (11th Cir. 1993)_____ 60

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
    376 F.3d 1123 (D.C.Cir.2004)_____ 38-39, 47

*Kowal v. MCI Communications Corp.,*
    16 F.3d 1271, (D.C.Cir.1994)_____ 18, 63

*Macharia v. United States,*
    334 F.3d 61 (D.C. Cir. 2003)_____ 19, 64

*Macquarrie v. Great Socialist People's Libyan Arab Jamahiriya,*
    C.A.No 04-176 (EGS)_____ 18, 52, 54, 61

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    547 U.S. 71 (2006)_____ 53

*Nelson v. American National Red Cross,*
    26 F.3d 193 (D.C.Cir.1994)_____ 58

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
    38 F.3d 1380 (3d Cir. 1994)_____59

*Ott v. Midland-Ross Corp.*,
    600 F.2d 24 (6th Cir. 1979)_____59, 61

*Peterson v. Islamic Rep. of Iran*,
    264 F.Supp.2d 46 (D.D.C.2003)_____57, 62

*Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*,
    477 F.3d 1155 (10th Cir. 2007)_____60

*Phillips v. Heine*,
    984 F.2d 489 (D.C.Cir.1993)_____49, 54-55, 58, 61

*Phoenix Consulting, Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C.Cir.2000)_____19-20

*Pohill v. Islamic Rep. of Iran*,
    2001 U.S. Dist. LEXIS 15322 (D.D.C.Aug. 23, 2001)_____62

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C.Cir.2002)_____19

*Rakes v. U.S.*,
    442 F.3d 7 (1st Cir. 2006)_____59

*Reyton v. Rowe*,
    391 U.S 54 (1968)_____57

*Roeder v. Islamic Rep. of Iran*,
    195 F. Supp.2d 140 (D.D.C.2002)_____23-25

*Sandvik v. United States*,
    177 F.3d 1269 (11th Cir.1999)_____50

*Santa Maria v. Pac. Bell*,
    202 F.3d 1170 (9th Cir. 2000)_____55

*Simpson v. Socialist People's Libyan Jamahiriya*,
    362 F.Supp.2d 168 (D.D.C., 2005)_____26

*Socop-Gonzalez v. INS*,
    272 F.3d 1176 (9th Cir.2001)_____55, 59

*Sparrow v. United Air Lines*,
    216 F.2d 1111 (D.C.Cir.2000)_____ 19

*Tristar Corp. v. Freitas*,
    84 F.3d 550 (2d Cir. 1996)_____ 59

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)_____ 50

*United States v. BCCI Holdings (Lux.), S.A.,*
    916 F.Supp.2d 1276 (D.D.C.1996)_____ 62

*United States v. Ibarra*,
    502 U.S. 1 (1991)_____ 54

*Vine v. Rep. of Iraq*,
    459 F.Supp.2d 10 (D.D.C.2006)_____ 48, 56

*Wagner v. Islamic Rep. of Iran*,
    172 F.Supp.2d 128 (D.D.C.2001)_____ 18

*Weinstein v. Islamic Rep. of Iran*,
    184 F. Supp.2d 13 (D.D.C.2002)_____ 18

*Williams v. Sims*,
    390 F.3d 958 (7th Cir. 2004)_____ 54

*Wyatt v. Syrian Arab Rep.*,
    362 F.Supp.2d 103 (D.D.C.2005)_____ 18, 47, 57

## STATUTES

22 U.S.C. § 2371_____ 17

22 U.S.C. § 2656_____ 26

28 U.S.C. § 1305_____ 52

28 U.S.C. § 1601_____ 15

28 U.S.C. § 1605_____ 16-18, 20, 21, 23, 25, 38, 47-48, 50-52, 55-56, 58, 62, 63

50 U.S.C. App. 240_____ 17, 21

## SECONDARY SOURCES

H.R. Rep. 103-702                                                                52

H.R. Rep. No. 104–383 (1995)                                                     39

Pub. L. No. 104-208, Div. A., Tit. I, § 101(c) [Tit. V, § 589(a)],
110 Stat. 3009-172  (1997)                                                       17

S. Rep. 96-831                                                                   29

S. Rep. 102-249                                                                  52

BRIAN L. DAVIS, QADDAFI, TERRORISM, AND THE ORIGINS OF THE U.S. ATTACK
ON LIBYA, (Praeger Publishers, 1990)                                             46

RIAD N. EL-RAYYES AND DUNIA NAHAS, GUERRILLAS FOR PALESTINE: A STUDY
OF THE PALESTINIAN COMMANDO ORGANIZATIONS,
(An-Nahar Press Services, S.A.R.L., 1974)                                        40

STEVE POSNER, ISRAEL UNDERCOVER: SECRET WARFARE AND HIDDEN DIPLOMACY
IN THE MIDDLE EAST (Syracuse University Press, 1987)                             41

## PATTERNS OF GLOBAL TERRORISM

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER,
PATTERNS OF INTERNATIONAL TERRORISM: 1980, (June 1981)                       34, 45

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER,
PATTERNS OF INTERNATIONAL TERRORISM: 1981, (July 1982)                       34, 46

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER,
PATTERNS OF GLOBAL TERRORISM: 1983, (September, 1984)                            32

MIPT Terrorism Information Center, *Patterns of Global Terrorism,* (2000-2007),
available at http://www.terrorisminfo.mipt.org/Patterns-of-Global-Terrorism.asp    26

## GOVERNMENT RECORDS

Central Intelligence Agency*, Research Study on International and
Transnational Terrorism: Diagnosis and Prognosis*, (April 1976)                  35

CENTRAL INTELLIGENCE AGENCY, SIGNIFICANT FEDAYEEN AND
FEDAYEEN-RELATED INTERNATIONAL TERRORIST INCIDENTS 1 JANUARY TO

31 MARCH 1975, (May 31, 2000) Supplement No. 4_____ 33

Central Intelligence Agency, *Terrorism and the Fedayeen,*
(September 1972), at CIA-RDP79-01194A000200120001-1_____ 33

NATIONAL SECURITY COUNCIL, U.S. POLICY TOWARD LIBYA,
NATIONAL SECURITY STUDY MEMORANDUM, (June 5, 1973)_____ 44

Office of the Legal Advisor, United States Department of State, *Cumulative
Digest of the United States Practice in International Law*, (1981-1988),
Book III, 3023_____ 24

PUBLIC PAPERS OF THE PRESIDENT OF THE UNITED STATES, JIMMY CARTER,
EXPORT CONTROLS FOR FOREIGN POLICY PURPOSES,
(June 23 – December 31, 1979), BOOK II, at 2290-2294. _____ 22

*Settlement of the Hostage Crisis*, (Jan. 18, 1981), U.S.-Iran, 20 I.L.M. 223_____ 24

U.S. DEPARTMENT OF DEFENSE, DEFENSE INTELLIGENCE AGENCY INTELLIGENCE
APPRAISAL, LIBYA: TERRORIST APPARATUS (October 15, 1981)_____ 45

U.S. Department of State, *Airgram From U.S. Embassy in Tripoli, Libya,
to U.S. Department of State, Subject: LARG Reservations About Terrorism*,
(November 28, 1972)_____ 41

U.S. Department of State, *Confidential Telegram from U.S. Secretary to
Numerous U.S. Embassies*, (December 31, 1981), at 042486_____ 36

U.S. Department of State, *Confidential Telegram from U.S. Secretary to
Numerous U.S. Embassies*, (March, 1973), at 047847_____ 37

U.S. Department of State, *Confidential Telegram from U.S. Secretary of State
to Ambassador*, at 164986_____ 37

## Congressional Hearings

*Federal Capabilities in Crisis Management and Terrorism: Hearings Before
the Subcommittee on Civil and Constitutional Rights of the House Committee
on the Judiciary*, 97th Cong., (1978)_____ 36

*International Terrorism, Hearing before the Senate Subcommittee on
Foreign Assistance of the Committee on Foreign Relations*, 95th Cong., (1977)_____ 28

*International Terrorism: Legislative Initiatives, Hearings and Markup before
the Committee on International Relations and its Subcommittee on*

*International Security and Scientific Affairs*, 95th Cong., (1978) _____ 43

*Patterns of Global Terrorism and Threats to the United States, Hearing
before the Special Oversight Panel on Terrorism of the Committee on
Armed Services House of Representatives*, 107th Cong., (May 22, 2001) _____ 27, 40

Plaintiffs, by and through counsel, Joshua M. Ambush, of the Law Offices of Joshua M. Ambush, LLC, respectfully submit this Memorandum of Points and Authorities in Support of Plaintiffs' Motion in Opposition to Libyan Defendant's Motion to Dismiss the Complaint.

## I.  INTRODUCTION

Defendant Libya filed a Motion to Dismiss the Complaint, which lists two purportedly dispositive reasons to dismiss the complaint:  (1) Libya is allegedly immune from suit under the Federal Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601, *et seq.*; and (2) the Plaintiffs claims in the Complaint, all of which allegedly arose in 1972, are time barred.  Plaintiff disagrees, as Plaintiff has shown sufficient, conclusive facts for this court to establish jurisdiction over Libyan Defendants, and because equitable tolling principles apply to toll the statute of limitations on Plaintiff's claims, which are timely as a result.

## II.  STATEMENT OF FACTS

### a.  BACKGROUND

On May 30, 1972, Plaintiffs participated in a pilgrimage tour to Israel.  Plaintiff's flight stopped in Rome, Italy to board 12 people, including the three Japanese Red Army ("JRA") terrorists involved in the attack at Lod Airport.  These JRA terrorists were aided by Syrian and Libyan agents and employees, who used their diplomatic pouch privileges to smuggle guns and grenades onto the Plaintiff's flight for the JRA to use in carrying out the attack.

The JRA terrorists, who had arrived on the same flight as the Plaintiffs, waited for their luggage to arrive with the Plaintiffs in the baggage claim area.  When their luggage arrived, the JRA terrorists removed guns and grenades from their luggage, and used these weapons to open fire upon the passengers grouped around the baggage claim area, including the Plaintiffs.  As a result, 24 people died, and 78 were wounded in the devastating terrorist attack at Lod Airport.

### b. **DEFENDANT'S SPONSORSHIP AND MATERIAL SUPPORT OF TERRORISM**

Defendant Libya regularly provided material support and resources to terrorist groups. For example, Libya provided camps for terrorist training, weapons and logistic materials, fraudulent identification documents, and helped terrorist groups obtain legal passage and infiltration into Israel. Libya also funded these activities through various unlawful enterprises, seized American-held oil fields in Libya, and falsified national identification documents, which enabled terrorist groups to travel freely into Arab states and other foreign countries, including Israel.

Defendant Libya also dealt and sold illegal controlled substances, engaged in acts of murder, kidnapping, arson, robbery and extortion, and provided refuge, headquarters, and assistance to numerous terrorist groups. This aid enabled terrorist groups to develop networks in Syria and Lebanon, from which to launch terrorist attacks against Israel.

By and through this aid, heads of the major terrorist organizations met at a refugee camp in Lebanon, and jointly agreed to engage in terrorist attacks. At this same meeting, Defendant Palestinian Liberation Organization ("PLO"), Defendant Popular Front for the Liberation of Palestine ("PFLP"), and Defendant JRA, in partnership with Syria and Libya, jointly formulated plans for the Lod Airport attack, and ultimately carried out the attack.

## III. **STATUTORY FRAMEWORK**

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439 (1989). In particular, section 1605 of the FSIA provides that:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case -- (1) in which the foreign state has waived its immunity either explicitly or

16

by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver; (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605.

The FSIA enumerates a number of specific exceptions to sovereign immunity, including cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph." 28 U.S.C. § 1605(a)(7).

After passage of § 16605 (a)(7), the court held, in *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998), that the waiver of sovereign immunity did not itself create a cause of action. Subsequently, Congress passed the "Flatow Amendment" (28 U.S.C.A. § 1605 (a)(7) Note), to create a federal statutory cause of action for such cases. *See also, Omnibus Consolidated Appropriations Act*, 1997, Pub. L. No. 104-208, Div. A., Tit. I, § 101(c) [Tit. V, § 589(a)], 110 Stat. 3009-172 (28 U.S.C. 1605).

The FSIA prohibits courts from exercising jurisdiction as an exception to sovereign immunity "if the foreign state was not designated as a state-sponsor of terrorism under section (j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, **unless later so**

**designated as a result of such act**." 28 U.S.C. § 1605(a)(7) (*Emphasis added.*)  If the foreign

sovereign is not immune, the federal district courts have exclusive jurisdiction over the action. 28

U.S.C. 1330, 1604; *Daliberti v. Republic of Iran*, 97 F. Supp.2d 38, 42 (D.D.C. 2000).  In

numerous suits preceding this action, private claimants have successfully invoked this statutory

exception to establish a basis by which federal district courts may exercise jurisdiction over

claims similar to those brought by Plaintiffs.  *See, e.g,. Wyatt v. Syrian Arab Republic,* 362

F.Supp.2d 103, 111, n.1 (D.D.C.2005); *Weinstein v. Islamic Rep. of Iran*, 184 F. Supp.2d 13, 20

(D.D.C.2002); *Wagner v. Islamic Rep. of Iran*, 172 F.Supp.2d 128, 133-134 (D.D.C.2001); *Jenco*

*v. Islamic Rep. of Iran*, 154 F.Supp.2d 27, 32-33 (D.D.C.2001).

      As indicated in Plaintiff's Opposition Motion in *Macquarrie v. Great Socialist People's*

*Libyan Arab Jamahiriya,* C.A.No 04-176 (EGS), it remains "settled law [that] the court may in

appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed.

R. Civ. P. 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Science*, 974 F.2d

192, 197 (D.C. Cir. 1992).  A motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim

which would entitle them to relief." *Kowal v. MCI Commun*. Corp., 16 F.3d 1271, 1276 (D.C.

Cir. 1994); *Beverly Enters., Inc. v. Herman*, 50 F. Supp. 2d 7, 11 (D.D.C. 1999).

      A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the

adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim.  "[A]

complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  (*Emphasis added*.)  The court must treat the

complaint's factual allegations -- including mixed questions of law and fact -- as true and draw

all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).

 Thus, if the Defendant challenges the legal sufficiency of the Plaintiff's jurisdictional allegations, the court should accept the Plaintiff's factual allegations as true and determine whether such facts bring the case within any of the exceptions to foreign-state immunity invoked by the Plaintiff. *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C.Cir.1990). The Plaintiff need not set out all of the precise facts on which he bases his claim to survive a motion to dismiss. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C.Cir.2002).

 Once a foreign sovereign Defendant asserts immunity, the Plaintiff bears the burden of producing evidence to show that there is no immunity and that the court has jurisdiction over the Plaintiff's claims. *Id.* at 42. A court may dismiss a complaint ***only*** if it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Id.* (*Emphasis added.*) Once the Plaintiff has satisfied his burden, the Defendant bears the burden of proving that the Plaintiff's allegations do not bring the case within one of the statutory exceptions to immunity. *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C.Cir.2000).

 FSIA cases need only satisfy the liberal notice-pleading standards of Fed.R.Civ.P. 8, and Plaintiffs need only provide Defendants with "fair notice of each claim and its basis." *Sparrow v. United Air Lines*, 216 F.2d 1111, 1118 (D.C.Cir.2000); *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, 2006 WL 3208662, at *3-5 (D.D.C.2006); *Dammarell v. Islamic Rep. of Iran*, 370 F.Supp.2d 218, 223 (D.D.C.2005). Thus, the court has "considerable latitude in devising the

procedures it will follow to ferret out the facts pertinent to jurisdiction." However, the court

must give the Plaintiff "ample opportunity to secure and present evidence relevant to the

existence of jurisdiction." *Phoenix Consulting,* 216 F.3d at 40.

## IV.  PLAINTIFF'S ARGUMENTS

### a.  PLAINTIFF HAS SUBJECT MATTER JURISDICTION OVER DEFENDANTS BECAUSE LIBYA WAS ADDED TO THE STATE-SPONSOR OF TERRORISM LIST FOR BROAD SUPPORT OF INTERNATIONAL TERRORISM

Defendant is wrong to assert that the FSIA requires Plaintiffs to show that Libya's

alleged involvement in the Lod Airport massacre was ***the*** reason that Libya was put on the State

Sponsors of Terrorism List (Defendant's Motion to Dismiss, ¶¶7-8).

Defendants are misconstruing the plain and simple meaning of the statutory provision

that the foreign state must have been designated a state-sponsor of terrorism at the time the act

occurred, **unless later so designated as a result of such act.**  *See*, U.S.C. § 1605 (a)(7)(A) and

(B). (*Emphasis added*.)

Defendants argue that the state-sponsored terrorism exception only applies if the foreign

state was designated a state-sponsor of terrorism at the time of the [enactment of the Export

Administration] Act [of 1979 or as a result of *such [specific]* act [of terrorism].  In 1972, at the

time this cause of action arose, Libya was not impliedly designated a state-sponsor of terrorism.

Therefore, Defendants argue that the "court lacks subject matter jurisdiction over the Plaintiff's

case… and the sovereign has immunity from trial." (Defendant's Motion to Dismiss, ¶ 5).

Defendant's interpretation of the term "as a result of such act," *Id.*, creates the false

impression that Plaintiff's claims are barred absent an express written statement to the effect that

Libya was designated a state-sponsor of terrorism for directly perpetrating the Lod Airport

massacre.

Plaintiffs urge the court to reject the notion that state sponsors of terrorism were designated on the basis of reference to a specific "list" that included some, but excluded other terror attacks, and a foreign state's sovereign immunity, or loss thereof, was dependant upon whether the terror attack in question was or was not "on the list".

The Export Administration Act of 1979, which created sanctions for state sponsors of terrorism, also established, for the first time, a list of countries that repeatedly sponsored terrorism. Thus, it was impossible for Libya to be designated a "state-sponsor of terrorism" at the time of the Lod terror attack.

Nevertheless, the Act makes clear that Plaintiffs can still demonstrate subject matter jurisdiction by showing that Libya was later so designated as a result of such act. *See,* 28 U.S.C. § 1605(a)(7)(A) and (B).

Defendants further assert that, absent absolute proof that Libya was expressly placed on the terrorism list as a direct result of the Lod Airport attack, Plaintiffs' claim of subject matter jurisdiction must fail.

Defendants' arguments are wholly without merit. There has long been an Export Administration Act, but only since 1979 has the Act incorporated new language to create a sanction for countries harboring and supporting terrorism.

The Export Administration Act of 1979, 50 U.S.C. App. 2405(j), states:

> A validated license shall be required for the export of goods or technology to a country if the Secretary of State has made the following determinations: (A) The government of such country has repeatedly provided support for acts of international terrorism. (B) The export of such goods or technology could make a significant contribution to the military potential of such country, including its military logistics capability, or could enhance the ability of such country to support acts of international terrorism.

*Id.* at 2405(j)(1)(A)-(B).  Thus, the legislative history confirms that the criteria for adding a country to the state-sponsor of terrorism list is that the country must demonstrate a <u>pattern of support</u> for international terrorism.

The Export Administration Act, as originally adopted, mandated that the president establish the list of terrorist sponsoring countries.  In 1979, pursuant to the requirements of the Export Administration Act, President Carter designated Libya as a state-sponsor of terrorism for "**repeatedly provid[ing] support for acts of international terrorism**." PUBLIC PAPERS OF THE PRESIDENT OF THE UNITED STATES, JIMMY CARTER, EXPORT CONTROLS FOR FOREIGN POLICY PURPOSES, BOOK II (June 23 – December 31, 1979), at 2290-2294. (*Emphasis added*.)

Thus, the criteria for designating a country as a state-sponsor of terrorism was that the country engage in a *pattern* of sponsoring terrorism.  A country that sponsored merely one act of terrorism, no matter how catastrophic, would not qualify for designation as a state-sponsor of terrorism.  The Act established that the decisive factor to designation was the *repeated* sponsorship of terrorism, and not any one individual act by itself.

 Plaintiffs can demonstrate that Libya engaged in a broad policy of support of international terrorism, occurring long before the incident at Lod Airport, and continuing through the date Libya was added to the state-sponsored terrorism list.

This historical data was compiled from 1968 through 1979, when the state-sponsored terrorism list was established, and relied upon to assess and determine the factual basis for which Libya was added to the state-sponsored terrorism list.

The evidence conclusively shows that Libya and Syria provided "material support or resources" to the PLO, PFLP, and their co-conspirators, the JRA, and these terrorist groups were the perpetrators of the heinous acts of terrorism at Lod Airport.  Libya and Syria were later

designated to the list under the FSIA's provision of "unless later so designated as a result of such act." *Id.*  Thus, this court should find that it has jurisdiction over the subject matter of this suit and the named defendants.

### i. DEFENDANT'S RELIANCE ON *ROEDER* IS MISPLACED, AS ROEDER IS NOT AKIN TO THE CASE AT BAR, AND HELPS PLAINTIFFS' CASE

Defendants further argued that Plaintiffs could not establish that the state-sponsored exception to sovereign immunity applied to Libya, relying on *Roeder v. Islamic Rep. of Iran,* 195 F. Supp.2d 140, 159-160 (D.D.C.2002), for the principle that the court did not have jurisdiction since Libya was not on the state-sponsored list of terrorism at the time of the attack. (Defendant's Motion to Dismiss, ¶ 7).  Defendant's scant basis for this argument is merely that; "at the time of the incident, May 30, 1972, Libya was not on the State Sponsor of Terrorism list;" that "Plaintiffs have not alleged that the attack at the Lod Airport; and that Libya's alleged involvement in that attack, was ***the*** reason that Libya was put on the state-sponsor of terrorism List seven years later."  According to Defendants, the fact that "Libya provided 'material support and resources to international terrorist organizations'… [is] not sufficient to satisfy Section 1605(a)(7). (Defendant's Motion to Dismiss, ¶¶ 7-8).

*Roeder* is clearly distinguishable from the case *sub judice*.  The district court held in *Roeder* that it did not have jurisdiction based on legislative history showing that Iran was designated as a state-sponsor of terrorism a result of its actions occurring *subsequent* to the Iranian terrorist incident in that case, i.e., the Iranian Hostage Crisis of 1979, based on the Algiers Accords which were enacted after the terrorist act in *Roeder*, but prior to the Plaintiff's suit.

The *Algiers Accords* were a treaty signed in Algeria on January 20, 1981, which waived all U.S. claims over the incident. The *Algiers Accords* stated that "the United States will promptly withdraw all claims now pending against Iran … and will thereafter bar and preclude the prosecution against Iran of any pending or future claim of the United States or a United States national arising out of events occurring before the date of this declaration" and "[t]he United States will also bar and preclude the prosecution against Iran in the courts of the United States of any pending or future claim asserted by persons other than the United States nationals arising out of the events specified in the preceding sentence." *See, Dames & Moore v. Regan*, 453 U.S. 654 (1981); *See also*, *Settlement of the Hostage Crisis*, Jan. 18, 1981, U.S.-Iran, 20 I.L.M. 223. Hence, when Iran was added to the state-sponsored terror list, the incidents surrounding the Iranian Hostage Crisis were expressly exempted.

The *Roeder* court found that Iran was added to the terrorism list based upon a "careful review of the facts and statements by the Government of Iran over the last two years." *Roeder* 195 F. Supp.2d at 140. Thus, Iran's addition to the terrorism list was based solely on specific incidents that occurred within an exceptionally narrow two year time-frame.

The *Roeder* court held that the *Roeder* Plaintiffs claims were barred because "Iran was designated [to the state-sponsored terrorism list] as a result of its actions occurring *subsequent* to the Algiers Accords." (*quoting,* Office of the Legal Advisor, United States Department of State, *Cumulative Digest of the United States Practice in International Law*, 1981-1988, Book III, 3023).

In other words, the *Roeder* Plaintiffs' claims, which arose during the Iranian Hostage Crisis, were barred due to the *Algiers Accords,* which granted Iran sovereign immunity from any suit arising out of the Iranian Hostage Crisis. Had the Plaintiff's claims arose from an Iranian

terrorist act that occurred subsequent to the *Algiers Accords*, i.e., in 1982 or 1983 or later, the Plaintiff's suit would not have been dismissed.

The blatant and explicit use of the term "subsequent," indicated to the court that Congress' intended to specifically exclude the Iranian hostage crisis, and to provide Iran with sovereign immunity from suit, for the time period covered by the *Algiers Accords*. *Roeder* 195 F. Supp.2d at 140. Thus, the *Roeder* claims failed to meet either of the two criteria established in the statute. Iran was not **designated a state-sponsor of terrorism at the time** of the Iranian hostage crisis, and Iran was not **later so designated as a result** of the Iranian hostage crisis. 28 U.S.C. § 1605(a)(7)(A)and(B).

In stark contrast to the situation regarding Iran, no such limitations were indicated when Libya was designated one of the original state sponsors of terrorism. In point of fact, Libya was not designated a state-sponsor of terrorism for its actions subsequent to the Lod Airport Massacre.

The statutory language plainly and clearly indicates Congressional intent that any material sponsorship of terrorism by Libya, which may have proximately caused terrorist acts such as the Lod Airport massacre, which were later grounds for Libya to be placed on the state-sponsored terrorism list, is sufficient to grant this court subject matter jurisdiction.

Contrary to Defendant's assertion, the FSIA's language, "as a result of such act," 28 U.S.C. § 1605(a)(7), does not impose a requirement that Plaintiffs demonstrate that the Lod Airport Massacre was **the [sole]** reason or **[specific]** reason Libya was designated a state-sponsor of terrorism. (*See*, Defendant's Motion to Dismiss, ¶¶ 7-8).

As will be detailed *infra*, Libya *was* placed on the list *as a result* of its provision of material support and resources to the terrorists and terrorist groups that perpetrated the Lod

Airport Massacre over a long period of time *prior* to, and certainly including, May 30, 1972, the time that the Lod Airport Massacre occurred.

**b. LIBYA'S DESIGNATION TO THE STATE-SPONSOR OF TERRORISM LIST AROSE FROM THE U.S. GOVERNMENT'S EFFORTS TO TRACK AND DOCUMENT ITS MATERIAL SUPPORT OF TERRORISM OVER MANY YEARS.**

Patterns of Global Terrorism is a Congressionally-mandated report from the U.S. Department of State intended to provide a full and complete record of the countries and groups which are involved in international terrorism. MIPT Terrorism Information Center, *Patterns of Global Terrorism,* (2000-2007), available at http://www.terrorisminfo.mipt.org/Patterns-of-Global-Terrorism.asp; *See also*, 22 U.S.C. § 2656(f).

In 1976, the CIA began recording its efforts to track and document the actions of countries providing aid and support to terrorist groups and organizations.   The CIA documented these efforts in its study, titled the "International and Transnational Terrorism: Diagnosis and Prognosis." *Id.*  After this study, from 1977 through 1980, the CIA began producing its annual report, known as "International Terrorism," which became the "Patterns of International Terrorism" from 1981 through 1984. *Id.*  Patterns of International Terrorism reports were the precursor to the Patterns of Global Terrorism reports, issued in 1984 until 2004. *Id.*  As of 2004, the Patterns of Global Terrorism report is now known as the "Country Reports on Terrorism." *Id.*

Courts have expressly recognized that Patterns of Global Terrorism "is an annual report highlighting worldwide patterns of terrorism, and **reflects the formal and official position of the U.S. government with respect to responsibility for various terrorist acts**." *Simpson v. Socialist People's Libyan Jamahiriya*, 362 F.Supp.2d 168 (D.D.C., 2005) (*quoting, Dammarell v. Iran*, 281 F.Supp.2d 105, 111 n. 6 (D.D.C.2003)).

The addition of Libya and Syria were based on historical accounts collected since 1968, when the United States first began compiling records of international terrorist attacks. Moreover, the U.S. government repeatedly, and conclusively, established that Libya was a country that actively sponsored international terrorism.

> Who are the nations that sponsor international terrorism? Some states might resort to terrorism as a form of asymmetrical warfare against the United States in a future crisis or conflict, or they might use terrorism as part of a protracted campaign to attempt to force the United States to abandon its global role and its regional interests and the regional interests of its allies. Patterns of Global Terrorism 2000 identifies seven governments that sponsor terrorism, namely Iran, Iraq, **Libya,** Korea, North Korea, and Sudan. **The report also identifies Pakistan and Libya as governments of concern.**

*Patterns of Global Terrorism and Threats to the United States, Hearing before the Special Oversight Panel on Terrorism of the Committee on Armed Services House of Representatives*, 107th Cong. 2 (May 22, 2001). (*Emphasis added.*)

These letters and excerpts were incorporated into the Congressional record. They were utilized in presenting the Patterns of Global Terrorism. Thus, according to *Simpson,* supra, they are authoritative legislative history and reflect the "formal and official position of the U.S. government." *Simpson,* 362 F.Supp.2d at 168.

In 1977 and 1978, the outspoken United States Senator, Jacob Javits, a member of the United States Senate Subcommittee on Foreign Assistance of the Committee on Foreign Relations, exchanged correspondence with the U.S. Secretary of State, Cyrus Vance, to clarify how the U.S. government justified its placement of Libya on the state-sponsored terrorism list.

> Four countries … to one degree or another … engaged in such activities [including Libya]. **The information that has been made available to me makes it clear that among these Libya is by far the worst offender**, and yet, other than the Administration's public acknowledgment that this is the case, I have seen nothing

further to indicate that any further actions have been taken or are in
contemplation against such wanton transgressions of the bounds of
civilized conduct.

*International Terrorism, Hearing before the Senate Subcommittee on Foreign Assistance of the*

*Committee on Foreign Relations*, 95th Cong. at 2 (September 14, 1977) (statement of Senator

Jacob K. Javits, United States Senate Subcommittee on Foreign Assistance of the Committee on

Foreign Relations) (*Emphasis added.*)

Moreover, "[a]nother promising area for exploration is the possible establishment of

security standards at airports as they relate to persons other than just passengers.  **The Lod (Tel**

**Aviv)**, Athens, Rome, and Instanbul airport massacres of recent years demonstrate the weakness

of national law and the need for new international standards." *Id.* at 19. (Statement of Richard B.

Lillich, Professor, University of Virginia Law School)   Thus, the terrorist attack was carried out

by the PLO, PFLP and the JRA.  These organizations were aided by Libya.  Hence, Libya was

added to the state-sponsor of terrorism list.  Consequently, the U.S. government determined that,

due to the Lod Airport massacre, airport security would require enhancement, in order to avoid

future terrorist attacks.

Consequently, based on the substantial legislative history entered before the

subcommittee, it was determined that:

> [b]etween January 1968 and December 1976 **there were**
> **approximately 1,150 separate international terrorist incidents**
> … The table referred to is entitled "International Terrorist
> Incidents Directed Against U.S. Citizens or Property" and is taken
> from the CIA publication "International Terrorism in 1976: RP 77-
> 10034U, July 1977.  The statistics are only approximate.

*Id.* at 31, 37.  (statement of John E. Karkashian, Acting Director, Office for Combating

Terrorism, Department of State)  Hence, the relationship between the number of international

terrorist acts actually carried out, and those surveyed by the U.S. government in 1972 were

significant, and was certainly not limited to a few mere examples. The U.S. government

weighted *all* of the direct involvement in terrorist attacks and the material support provided by

Libya, including the Lod Airport massacre, when it determined whether to add Libya to the state-

sponsor of terrorism list.

### i. LIBYA WAS ADDED TO THE STATE-SPONSOR OF TERRORISM LIST FOR REPEATED SUPPORT OF TERRORIST ACTS.

The U.S. government spent four years assessing the steady increase in terrorist activity

throughout the 1970's. This was done to "assess the effectiveness, preparedness and response

capabilities of the U.S. government." *An Act to Combat International Terrorism: Report of the*

*Committee on Governmental Affairs*, S. Rep. No. 96-831, at 16 (1980). (*Emphasis added.*)  The

report that was disseminated by the Senate Governmental Affairs Committee included evidence

to identify those countries which supported international terrorism. *Id.* at 12.

 The Senate's report identified an exchange of correspondence in 1979 between the

Department of State and Senator Jacob Javits. This correspondence indicated that the Carter

administration had identified five governments, including Libya, and justified why these

governments should have sanctions applied accordingly.  "By identifying governments which

support [terrorism], the U.S. government registered this country's strong belief that such acts are

immoral and in violation of the traditional norms of international law." *Id.* at 12-13.

On September 23, 1979, Cyrus Vance, Secretary of State, sent a letter to Senator Javits,

indicating that the U.S. government would recommend "denial of export licenses to countries

**demonstrating a pattern of support for terrorist acts [such as Libya]** for those items which

would make a significant contribution to the military potential of these states or which would

otherwise enhance their ability to support terrorists." *Id.* at 13. (*Emphasis added.*)  Senator Javits

responded, stating that he "regarded this as a most significant statement of Administration policy, and had been satisfied that this policy was being pursued both in letter and spirit." *Id.* at 14. However, Senator Javits referenced an export license that was unlawfully being provided by the Department of Commerce, to the Government of Iraq, a member of the state-sponsored terrorism list, and requested that this export license be revoked under § 6(j) of the Export Administration Act of 1979.

Brian Atwood, the Assistant Secretary for Congressional Relations, with the State Department, provided a report for Senator Javits on the export. Mr. Atwood also included a report on the renewed consideration of the items that would contribute significantly to the military potential of countries "which the Secretary has determined (pursuant to section 6(j) of the Act) to have **provided repeated support for acts of international terrorism**." *Id.* at 15. (*Emphasis added*.)

Accordingly, the U.S. government's basis for adding Libyan Defendants to the state-sponsor of terrorism list, under §6(j) of the Export Administration Act of 1979, is as follows:

> **The Libyan Government, since at least 1972, has actively assisted a number of terrorist groups and individuals by providing various types of assistance including military training on Libyan soil**. These have primarily been members of several "rejectionist" groups of the Palestinian movement … **Libya has received and given refuge to international terrorists involved in a long history of terrorist attacks, *including* [but not limited to]:** The perpetrators of the October 1972 massacre at the Munich Olympics; The hijackers of the Lufthansa aircraft in October 1972; The hijackers of the Japanese Air Line Boeing blowing up in July 1973; The terrorists who attacked the TWA plane at Athens airport in August 1973; the [t]errorists who attempted to shoot down the El-Al plane outside of Rome in September 1973; The terrorists who commandered a train in Czechoslovakia bound for Austria in September 1973; The hijackers of the BOAC plane over Dubai of November 1974; The kidnappers of certain OPEC oil ministers in December 1975.

*Id.* at 16. (*Emphasis added.*)  The term "including" indicates a general emphasis toward a number of examples, but does not limit the emphasis made to those examples.  The "list" of terrorist attacks, as described in the legislative history above, are merely examples.  These few examples do not constitute the entire, comprehensive, and definitive number of terrorist attacks supported by Libya, which were considered when the U.S. government determined whether to add Libya to the list of countries that repeatedly sponsored terrorism.

In fact, there is no such required "list" of attacks or material support which must be met before a country is added to the state-sponsor of terrorism list.  The criteria listed in the Export Administration Act of 1979 are broad, and as laid out in the legislative history, include all support of or involvement in terrorist attacks, (for Libya) since 1969, when Qaddaffi came to power.

Moreover, the Senate Committee went on to state that, "**the committee does not wish to limit the criteria against which to judge nations for inclusion on the list.**" *Id.* at 37. (*Emphasis added.*)  Thus, according to the detailed legislative history, the State Department indicated that while countries may be added to a "list" of state sponsors of terrorism under the requirements of the Export Administration Act of 1979, the basis for this determination is by no means exclusive, or exhaustive, nor does it limit the criteria or events which enable a sovereign nation to be added to the state-sponsor of terrorism list.

The basis for this inclusion acts to serve as a "deterrent to nations which might consider state support of international terrorism." *Id*.  Thus, Libya was added to the state-sponsorship of terrorism list based on the *entirety* of its actions in the 1970's, including its material support and sponsorship for the groups which perpetrated the Lod Airport massacre, such as the PLO, PFLP, and the JRA.

### ii.  THE U.S. GOVERNMENT BEGAN TO TRACK LIBYAN AID AND SUPPORT TO TERRORIST GROUPS AS FAR BACK AS 1969.

CIA documents indicate that the CIA has been tracking Libya's involvement in international terrorist incidents, at least as far back as 1969, when Qaddaffi came to power.

CIA documents indicate that the CIA has been tracking Libya's involvement in international terrorist incidents, at least as far back as 1969, when Qaddaffi came to power. "Libyan leader Mu'ammar Quadhaffi has used terrorism as an instrument of state policy whenever expedient since he came to power in 1969. [Libya has received] pressure from Western Europe and the 1982 U.S. embargo on trade with Libya in oil and high-technology items." CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER, PATTERNS OF GLOBAL TERRORISM: 1983, (September, 1984), at *12.

Furthermore, the CIA has tracked the involvement between Libya, fedayeen organizations such as the PFLP and the PLO, and the JRA, in planning the Lod Airport massacre.

> **Fatah poses as a basically "conservative" guerrilla organization devoid of political bias but in fact supports extreme guerrilla tactics through its front, the Black September Group** … The Popular Front for the Liberation of Palestine (PFLP) believed to have the widest range of international links, is competing with other fedayeen groups and expanding its revolutionary activities at the international level … **The kamikaze attack on Israel's [Lod] Airport last May by PFLP-trained members of the Japanese Red Army Faction, highlights the existing and growing international connections among revolutionary terrorist organizations. Even before the [Lod] Airport massacre, the Japanese Red Army Faction had been dealing with the fedayeen for at least two years** … Links between the Red Army Faction and Popular Front for the Liberation of Palestine (PFLP) became evident in late 1970 with the arrest in Japan of PFLP members publicizing terror via a film on Palestinian guerrilla operations. **During their stay in Japan PFLP members also made arrangements to train Red Army Faction members at PFLP bases** … **Fatah uses such terror**

> **tactics as hijacking and sabotage through its terrorist arm, the "Black September Group" as an additional source of income.** The "Black September Group" enables Fatah to credibly disclaim its alliance with assassinations, hijacking and other forms of terrorism … **[A] Palestinian Liberation Organization office is often merely a cover for a Fatah office.** Nevertheless, despite this ostensibly "moderate image," the Black September" terrorist organization remains directly associated with and under the control of Fatah.

Central Intelligence Agency, *Terrorism and the Fedayeen* (September 1972), at CIA-RDP79-01194A000200120001-1, at *1-3, 5-6. Thus, the U.S. government knew as a matter of fact that the PLO, PFLP, Black September Organization ("BSO"), and the JRA jointly perpetrated the Lod Airport massacre. These attacks were known by the U.S. Government when the U.S. assessed Libya and Syria's addition to the state-sponsored terrorism list.

> This chronology lists significant fedayeen and fedayeen-related international terrorist incidents and supplements the chronologies covering the period January 1970 through December 1974. This listing does not include routine fedayeen actions inside Israel.
> …
> *8 May 1972*, <u>BSO Hijacks Sabena Plane</u>, Five BSO terrorist hijacked a Sabena plane
> …
> *30 May 1972*, <u>Lod Airport Massacre</u>, Japanese terrorist from the Red Army Faction, collaborating with the PFLP, attacked passengers at Lod Airport, killing 28 and wounding 78. The lone Japanese survivor of the massacre was sentenced to life imprisonment.
> …
> *5 September 1972*, <u>Munich Olympics Massacre</u>, BSO terrorists killed 11 members of the Israeli Olympic team at Munich …

CENTRAL INTELLIGENCE AGENCY, SIGNIFICANT FEDAYEEN AND FEDAYEEN-RELATED INTERNATIONAL TERRORIST INCIDENTS 1 JANUARY TO 31 MARCH 1975, (May 31, 2000) Supplement No. 4 at CIA-RDP86T00608R00200080002-1. Using this chronology, the CIA was able to break down the sheer number of terrorist attacks by date, and determine which attacks

were relevant.  The CIA distinguished, *inter alia,* Lod and Munich as major terrorist attacks,

which led to the eventual addition of Libya and Syria to the state-sponsored terrorism list.

> **Our data base was begun in 1968** … one-fourth of all attacks between 1968 and 1980 resulted in death or personal injury.  Of the 5,955 international terrorist incidents recorded between 1968 and 1979, 673 incidents (11 percent) involved deaths and 867 (15 percent) involved injuries … Between 1968 and 1979, most of the attacks directed against Americans occurred in Latin America and the Middle East (table 2 and figure 4).  Our files contain records of almost a hundred terrorist attacks conducted directly by national governments. They occurred every year since 1972 … These state-sponsored attacks were more lethal than other terrorist incidents, with over 42 percent of them resulting in casualties. At least 33 victims were injured and another 40 killed in these 100 events. Most of them occurred in the Middle east, were carried out by Middle East nations, and were directed against citizens of other Middle East countries.

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER, PATTERNS OF

INTERNATIONAL TERRORISM: 1980, (June 1981), at *1. (*Emphasis added.*)  The CIA's database

was constructed to review terrorist attacks and those countries which supported terrorism, which

would eventually lead to those countries being added to the state-sponsor of terrorism list.

> **Over the period 1968-81**, attacks on Americans that produced casualties occurred in 69 countries … **More than 670 groups have claimed credit for at least one international attack since we began keeping statistics in 1968** … The annual number of groups that claim credit for attacks has increased markedly since we began keeping statistics. For example, 49 groups claimed credit for attacks in 1970 … **Other Palestinian groups – particularly the Popular Front for the Liberation of Palestine (PFLP), the PFLP-General Command, and Black June- have conducted terrorist incidents during the past 14 years.** Together, the Palestinian groups perpetrated more international attacks than any other movement. Our records show 9 percent of all terrorist attacks, almost 700 attacks, have been carried out by Palestinians.

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER, PATTERNS OF

INTERNATIONAL TERRORISM: 1981, (July 1982), at *12-14. (*Emphasis added.*) Consequently,

> In some of these states, most of the support rendered to foreign revolutionary or guerrilla formations has been directed toward influencing the course of developments in one or two neighboring states or territories. And for many, perhaps most, the actual promotion of terrorist violence has been no more than a largely unintended byproduct of their activities. Nevertheless, in one way or another, all of them have directly contributed to the recent upsurge of transnational terrorism. Two or three bear special mention. Take Libya, for example. The oil-rich Qaddafi regime has for some years been the world's most unabashed governmental proponent of revolutionary violence … it would appear that Colonel Qaddafi has also been one of the world's least inhibited practioners [sp] of international terrorism … Thus, the recipients of [Libya's] favors (in the form of various combinations of financial, logistical, and technical support) have been numerous and varied. In addition to some of the more militant Palestinian splinter groups, they have included the Irish Republican Army and a number of less widely known guerrilla movements … **[t]his list is not exhaustive**. Moreover, it bodes well to grow since … there have as yet been no convincing indications that Colonel Qaddafi has undergone a change of heart.

Central Intelligence Agency, *Research Study on International and Transnational Terrorism: Diagnosis and Prognosis*, (April 1976), at 20. (*Emphasis added*.)  In compiling its research, the CIA amassed a significant, non-exhaustive list of terrorist groups that were sponsored by Libya, including the PLO, the PFLP, and the JRA.

### iii.   THE U.S. GOVERNMENT DESIGNATED LIBYA ON THE LIST OF STATE SPONSORS OF TERRORISM FOR REPEATED ACTS OF TERRORISM THAT INCLUDED THE LOD AIRPORT MASSACRE OF 1972

The CIA was not alone in collecting information on terror incidents, terror groups and state sponsors of terrorism.  The F.B.I. has jurisdiction to investigate the murder of Americans abroad and accordingly it investigated the Lod Airport massacre[1]. When Congress considered which countries to impose sanctions on for sponsoring terrorism it relied on testimony of F.B.I. expert witnesses.

---

[1] Plaintiffs have obtained death reports for the American victims of the Lod Airport massacre, as prepared by the F.B.I., and will provide them to the court for *in camera* review upon request.

> MR. MIGNOSA. When we talk about what has happened, it has
> happened to either an individual or a group, and these are people
> we have focused upon**. For example, beginning in 1972, when
> we got deeply involved in this situation of terrorism, we had
> the Lod Airport situation**…**and we began as an organization to
> focus on terrorism.**

*Federal Capabilities in Crisis Management and Terrorism: Hearings Before the Subcommittee*

*on Civil and Constitutional Rights of the House Committee on the Judiciary*, 97th Cong. 19-20

(1978) (statement of Sebastian Mignosa, Section Chief of the F.B.I.'s Domestic

Security/Terrorism Section) (*Emphasis added.*)

### iv.  <u>LIBYAN AID FOR TERRORIST ACTIVITY WAS NOT LIMITED TO THE PLO OR THE PFLP, BUT ALSO SUPPORTED THE BSO.</u>

The State Department conclusively established that a link existed between the PLO and

Fatah, and the BSO.  Thus, countries which supplied material support and resources to

organizations such as the PLO, but denied providing such support to Fatah and the BSO, were

indeed actively providing support to all of these related organizations.  **In view of Fatah's**

**proven link with BSO there can be no denying that funds they provide or permit to go to**

**Fatah are being used to finance BSO operations**. U.S. Department of State, *Confidential*

*Telegram from U.S. Secretary to Numerous U.S. Embassies*, (December 31, 1981), at 042486.

(*Emphasis added.*) Moreover,

> [The q]uestion of [a] link between [BSO] and Fatah have been
> subject of much public discussion … **USG has information that
> Fatah is in fact parent body of BSO**. Following is intelligence
> brief prepared by Department and CIA … The BSO is a cover term
> for Fatah's terrorist operations executed by Fatah's intelligence
> organization, Jihas Al-Rasd. The collapse of Fatah's guerrilla
> efforts led Fatah to clandestine terrorism against Israel and
> countries friendly to it. Fatah funds, facilities, and personnel are
> used in these operations … **Fatah Deputy Chief Salah Khalaf,
> Chief of "BSO", gets an independent subsidy from the Libyan
> Government**. For all intents and purposes no significant
> distinction now can be made between the BSO and Fatah.  Four of

36

> Fatah's 10-man general command, including Khalaf , the planner and director of the Munich and Khartoum operations, are identified as "BSO" leaders … Nonetheless, the Fatah leadership including Arafat now seem clearly committed to terrorism.

U.S. Department of State, *Confidential Telegram from U.S. Secretary to Numerous U.S. Embassies*, (March, 1973), at 047847. (*Emphasis added*.)

Ultimately, Libyan funds which enabled the PLO and PFLP to engage in terrorist activities eventually made its way through Fatah to the BSO, despite Libyan claims that Libya did not provide aid and resources to the BSO.  Moreover,

> [The p]osition taken by some Arab governments that they have no connection with terrorist acts is simply not credible to international opinion, inasmuch as terrorists carry Arab passports, operate from Arab countries, broadcast and print their views from Arab capitals, etc. … BSO has claimed credit not only for Munich massacre but also for murder of Jordanian Prime Minister Wasfi Tell in Cairo in November 1971, attempted murder of Jordanian Ambassador to U.K. Zaid Rifai in December 1971, Hijacking of Sabena Jetliner to Tel Aviv in May 1972, and blocking up of oil storage tanks in Trieste in August 1972. **Our information indicates that BSO has clandestine links with Fatah**. Yasir Arafat, head of [PLO] (the overall umbrella organization) and Fatah (main component of PLO) was quoted after Munich massacre as emphasizing unity of all fedayeen action, thus lending credence to indications of linkage of BSO to Fatah. It is thus not credible to make distinctions, as terrorist organizations and certain Arab governments sometimes try to do, between "respectable" fedayeen organizations and those engaging in indiscriminate terrorism.

U.S. Department of State, *Confidential Telegram from U.S. Secretary of State to Ambassador, Page 05*, at 164986. (*Emphasis added*.)

Thus, the U.S. Government observed that material support and resources provided by Libyan and Syrian Defendants were channeled to numerous terrorist organizations through the support of the PLO.  This support enabled numerous terrorist agencies to carry out terrorist attacks against American citizens.

**c. GENERAL CONCLUSORY ALLEGATIONS WHICH ESTABLISH LIBYA'S MATERIAL SUPPORT TO TERRORIST SUFFICIENTLY ESTABLISH THAT LIBYA PROXIMATELY CAUSED THE TERRORIST INCIDENT AT LOD AIRPORT.**

Contrary to Libyan Defendant's arguments, general allegations of Defendant's general sponsorship are sufficient for Plaintiff to properly assert this court's jurisdiction. *See, e.g., Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C.Cir.2004) ("the statute does not require a direct link between such material support and the acts in question."); *Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) ("a Plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises in order to satisfy 28 U.S.C. §1605(a)(7)'s statutory requirements for subject matter jurisdiction." Instead, "sponsorship of" or even "the routine provision of financial assistance to a terrorist group in support of terrorist activities constitutes 'providing material support or resources' for a terrorist act within the meaning of 28 U.S.C. §1605(a)(7).")

*Flatow* examined the plain language of § 1605(a)(7), which incorporated by reference, 18 U.S.C. § 2339A, which defines the federal offense of "providing material support to terrorists" as follows:

> In this section, the term "material support or resources" means currency or monetary instruments or financial services, lodging, training, expert advice or assistance, safe-houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

*Flatow,* 999 F. Supp. at 18 (quoting 18 U.S.C. § 2339A). As the House Report on the terrorism exception stated:

> [S]tate sponsors of terrorism include Libya, Iraq, Iran, Syria, North Korea, Cuba, and Sudan. These outlaw states consider terrorism a legitimate instrument of achieving their foreign policy goals. *They have become better at hiding their material support for their surrogates*, which includes the provision of safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like. *For this reason, the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts is warranted.*

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C.Cir.2004)

(quoting H.R. Rep. No. 104–383, at 62 (1995)) (*Emphasis added.*) At the time, many nations

were actively providing support and resources to terrorist organizations while, at the same time,

publicly decrying them.

### i.  LIBYA ACTIVELY AND OPENLY PROVIDED MATERIAL SUPPORT AND RESOURCES TO TERRORIST GROUPS

The Libyan government, in particular, through the encouragement of Qadhaffi, has been

continuously and actively involved in aiding and abetting terrorist organizations, including the

PLO, PFLP, and the JRA, the perpetrators of the Lod Airport massacre.

> [As early as 1969,] Libya began to give military and material backing to the resistance and undertook to organize money-raising campaigns. **The commandos received huge quantities of light weapons plus the greater part of a fund set up by the Libyans to aid liberation movements throughout the world. With this kind of support, Libya became the commandos' major center for foreign operations**: when they hijacked an airliner belonging to the Royal Jordanian Airlines and diverted it to Benghazi in September 1971, no measures whatsoever were taken against the guerrillas … **Libyan intervention in the affairs of the resistance grew more direct and far-reaching, distinguished by Kaddhafi's unique outspokenness.** Having urged the Arab state closest to Israel to give the commandos freedom of action, the Libyan leader announced in April 1972 that the guerrillas effectiveness was being destroyed by restrictions imposed in Syria and Egypt.  He later put out a call for Libyan volunteers to join the resistance in accordance with this theory of giving the battle with Israel pan-Arab dimensions. **About 600 such recruits were sent to enter the ranks of Fateh in Syria and Lebanon during the**

**early summer of 1972**, and a considerable number were killed either in raids across the border or by Israeli reprisals**… Kaddhafi has been closely associated by many observers with the Black September Organization, and many believe that he was the only Arab leader to have prior knowledge of the Munich operation in September, 1972**. **Libya certainly remains a haven for the commandos**, some of whom hijacked a West German airliner to Benghazi in October 1972 and negotiated the release of the guerrillas held after the Olympic incident in exchange for the airplane's passengers. Again, there were no Libyan objections. According to some reports, Libya was also directly behind the Black September kidnappings in Khartoum in March, 1973 when three diplomats were shot dead. The Sudanese government accused the Libyans of complicity and this was not denied.

RIAD N. EL-RAYYES AND DUNIA NAHAS, GUERRILLAS FOR PALESTINE: A STUDY OF THE PALESTINIAN COMMANDO ORGANIZATIONS (An-Nahar Press Services, S.A.R.L., 1974), pp. 136-137. (*Emphasis added.*)

Libya has been directly involved in terrorist activities, and has provided material support and resources to terrorist groups such as the PLO, PFLP, and the JRA, to aid them in carrying out the Lod Airport massacre.

**During the 1970s and 1980s, the primary threat to U.S. lives and interests came from countries [such as Libya and Syria], for example, that were directly involved in terrorism or supported terrorist groups. Using substantial state resources, these countries were able to sponsor terrorism on a large scale, and with devastating impact,** whether by supporting Palestinian leftist groups in their efforts to terrorize Israel or by directly attacking Americans and other Western targets. **Terrorist groups became increasingly sophisticated, not only in their ability to conduct attacks but also in their ability to manage complex financial and logistical networks**, spreading their influence from the Middle East, Europe, South Asia and beyond.

*Patterns of Global Terrorism and Threats to the United States, Hearing before the Special Oversight Panel on Terrorism of the Committee on Armed Services House of Representatives,*

107th Cong. at 4, 37 (May 22, 2001) (statement of Mark Wong, Director for Regional Affairs,

and Deputy Coordinator for Counterterrorism, U.S. Department of State) (*Emphasis added.*)

Quadaffi has made numerous representations to the Lod Airport Massacre in his

speeches.

> Indeed, [fedayeen] action must be of the type of the operation carried out by the Japanese [fedayeen] … we demand that the [fedayeen] action be able to carry out operations similar to the operation carried out by the Japanese. Why should a Palestinian not carry out such an operation?

STEVE POSNER, ISRAEL UNDERCOVER: SECRET WARFARE AND HIDDEN DIPLOMACY IN THE

MIDDLE EAST (Syracuse University Press, 1987), pp. 82-83.  Furthermore,

> [Qadhaffi] went out of his way to praise the Japanese perpetrators of the Lod Airport Massacre for having displayed the 'true fedayeen spirit.' He also claimed that the [Libyan Arab Republic Government] is backing morally and financially 'all the Fedayeen.' … [Qadhaffi] ipso facto abets Fedayeen terrorist activities with Libyan funds and defends their operations anywhere.

U.S. Department of State, *Airgram From U.S. Embassy in Tripoli, Libya, to U.S. Department of State, Subject: LARG Reservations About Terrorism*, (November 28, 1972), at A-176, *4.

Thus, evidence of Libyan Defendants' material support of terrorism since 1969, is

overwhelming.  Libyan Defendants have provided material support and resources to terrorist

groups such as the PLO, PFLP, and the JRA, the perpetrators of the Lod Airport massacre.

Congress, in assessing whether to place Libya on the State-sponsored terrorism list, considered

Libya's *entire* history of sponsoring terrorism, at least since Quadhaffi came to power in 1969.

> MR. WOLF. My amendment singles out **the one state [(Libya)] which is an acknowledged supporter of terrorism** …
> MR. BINGHAM. This would be a total embargo?
> MR. WOLF. Yes; a total embargo.
> MR. FRASER. Arms exports?
> MR. BINGHAM. All exports.
> MR. WOLF. Under the Export Administration Act. …

MR. WOLF. I might for the purposes of presenting this say that Libya's involvement has **included [but is not limited to]** the October 1972 massacre at the Munich Olympics, the hijackers of a Lifthansa aircraft in October 1972, the hijackers of the Japanese Air Line Boeing blown up in 1973, the terrorists who attacked the TWA plane at Athens airport in August 1973, the terrorists who attempted to shoot down the El-Al plane outside of Rome , these were all accepted activities the Libyans have acknowledged responsibility for, the terrorists who commandeered a train from Czechoslovakia bound for Austria in September 1973, the hijackers of the BOAC plane, November 1974, the kidnappers of the OPEC oil ministers in December 1975, the guerrillas of the Philippines and Thailand, and the revolutionaries in Chad and Ethiopia that have been acknowledged by Mr. Khadaffi as being supported by him, the Black September organization that is being supported by the Libyan government, the Eritean Liberation Front with financial support in their struggle. In terms of support that countries can give to terrorists, perhaps the most abrasive and frustrating to other countries is providing refuge and asylum. Examples of Libyans providing sanctuary to terror groups include in August 1974 members of the Japanese Red Army were given asylum in Libya after holding 51 persons hostage at the U.S. Embassy in Malaysia. Carlos [the Jackal], the notorious terrorist, has been given Libyan refuge after the raid on the Vienna meeting of OPEC … **Khadaffi has allocated $100 million to Black September and $40 million to the El Fatah Group** …

MR. BUCHANAN. In essence, isn't the gentleman making a finding against Libya?

MR. WOLF. I don't think I am making that finding. I think the world has already made that finding.

MR. BUCHANAN. I am saying that we the Congress are making a finding –

MR. FRASER. Would this cut off all trade?

MR. WOLF. It would cut off all sales to Libya.

MR. BUCHANAN. All exports …

MR. DERWINSKI. Can any of our Foggy Bottom people tell us the answer to Don's question? Does this mean sales or trade?

MR. BINGHAM. My understanding is it would prohibit all exports.

MR. BUCHANAN. It says "all exports."

MR. DERWINSKI. All exports?

MR. BUCHANAN. Period.

MR. DERWINSKI. Period. In other words, agriculture exports?

MR. BINGHAM. Any of them.

Chairman ZABLOCKI. Any. It would add to our imbalance of payments.

MR. WOLF. And it would add to our balance against terrorism …

MR. WOLF. The situation has existed for a long time now and nothing seems to help … I think if we have as an objective of setting an example on the subject of terrorism, this is perhaps the least we can possibly do to evidence to the world that we really mean business when we talk against terrorism. It is not as if the Libyans had committed one act. I should like to have the ear of the gentleman from Illinois. The litany of terrorist activities that have involved hundreds of people actually who have been killed as a result of the support of the Libyans is reported … **the important element here is that we have a long history of support for terrorist activities including, [but not limited to]** terrorist activities that occurred in the North of Ireland that have been supported by Mr. Khadaffi.

MR. DERWINSKI. I think that everyone agrees that Khadaffi is the most, probably ranks with Amin as the most irresponsible head of state now in authority …

MR. WOLF. **There is no other nation in the world that has in the form of giving sanctuary, giving support, to terrorist what Libya has done**, not even Amin.

*International Terrorism: Legislative Initiatives, Hearings and Markup before the Committee on International Relations and its Subcommittee on International Security and Scientific Affairs*, 95th Cong. (September-October 1978), at 124-126. (*Emphasis added.*)

Congress, in hearings on the amendments to the Export Administration Act, which would enable the U.S. government to provide sanctions for countries providing material aid, support and resources, determined that Libya has aided numerous terrorist groups in committing a veritable number of terrorist attacks. More specifically,

Libyan support for the fedayeen movement … now appears to have shifted to include limited support for terrorist acts outside the Middle East or against targets not directly related to the Arab-Israeli conflict. Libya has directly supported… the Popular Front for the Liberation of Palestine … **Libya has over the past four years [since 1968] contributed significantly to Palestinian terroristic activity in the form of arms, funding and training**. While precise figures are not available, Libyan efforts in all three areas are substantial. [M]ore recently **Libya has become a major source of weapons for the Palestinian liberation movement**. Libya decided in 1971 that, instead of providing the fedayeen with large amounts of money to purchase arms, the Libyan Government

would buy and distribute the arms and ammunition necessary for the fedayeen to wage war on Israel. **Since 1971, Libya has generally supported groups by providing arms and material directly … a small part of the funds provided by Libya to Palestinian groups has probably been used by them for various terrorist activities**. At the end of 1970 the Libyan Government raised personal income taxes and additional funds acquired were funneled into a government-controlled fedayeen support fund, the Jihad fund. In 1971 **Libya reportedly budgeted between $30,000,000 and $40,000,000 for fedayeen support, probably in addition to the Jihad fund of about $30,000,000** … Quadhaffi, however, has frequently stated that Libya will spare no expense in backing the Palestinian movement, and … resources earmarked for the fedayeen are readily available to them.

NATIONAL SECURITY COUNCIL, U.S. POLICY TOWARD LIBYA, NATIONAL SECURITY STUDY

MEMORANDUM 185, (June 5, 1973), at Appendix B, *B-2 (*Emphasis added.*)

As demonstrated herein, Congress did not create a comprehensive list of terror incidents and identify that list as the basis for sanctioning Libya to the exclusion of any event not mentioned on the list. On the contrary, any "listing" of terror attacks was expressly representative and not exhaustive.

Congress considered the entirety of Libya's actions, through material support and sponsorship of terrorist groups that resulted in thousands of terror attacks over a period spanning 1968-1979, including the JRA terrorist attack on Lod Airport. On *that* basis, Libya earned its designation as a state-sponsor of terrorism.

Libya's involvement in dissident and terrorist activities has increased progressively since Chief of State Col Muammar Quadhaffi came to power in 1969 … Since the Libyan Revolution on 1 September 1969, the country has developed a sophisticated terrorist training apparatus … **In 1972, the Libyans opened three of their military installations to train Palestinians** … This effort has served as an outlet for his frustrations at being rejected by the Arab World as its paramount leader and has gradually evolved into a significant tool of Libyan foreign policy. While Quadhaffi has been consistent in his condemnation of "terrorism" over the last several years, he has been equally emphatic in defending Libya's

right to use "revolutionary violence." … **Libya has created an impressive dissident and terrorist apparatus and appears intent on expanding its unconventional capabilities. This includes not only support and training of dissidents and terrorists, but also the option for direct intervention** through the deployment of the "Islamic Legion."

U.S. DEPARTMENT OF DEFENSE, DEFENSE INTELLIGENCE AGENCY INTELLIGENCE APPRAISAL, LIBYA: TERRORIST APPARATUS (October 15, 1981), at 1, 2, 6-7.  (*Emphasis added.*)  Libya and Syria have consistently enabled terrorist groups to train on their native soil.  This training has led to skilled terrorists, who are trained in the arts of terrorism.

> *Libya.* **The government of Colonel Quadhaffi is the most prominent state sponsor of and participant in international terrorism.**  Despite Quadhaffi's repeated public pronouncements that he does not support terrorist groups, **there has been a clear and consistent pattern of Libyan aid to almost every major international terrorist group**, from the Provisional Irish Republican Army (PIRA) to the Popular Front for the Liberation of Palestine (PFLP) … **Libya's support for terrorism includes financing for terrorist operations, weapons procurement and supply, the use of training camps and Libyan advisers for guerrilla training, and the use of Libyan diplomatic facilities abroad as support bases for terrorist operations** … Quadhaffi's major goals involve the Middle East and Africa, particularly the destruction of Israel, the advancement of the Palestinian cause, and the overthrow of conservative and moderate Arab states. Most of his efforts, therefore, are directed towards aiding Middle Eastern terrorism … *Syria.* As a major supporter of the Palestinian Liberation Organization (PLO), Syria has played an increasingly important role in Palestinian activities.  It has backed radical elements within the PLO, including the PFLP, the PFLP-General Command, and the Democratic Front for the Liberation of Palestine.

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER, PATTERNS OF INTERNATIONAL TERRORISM: 1980, (June 1981), at *8-10. (*Emphasis added.*)  Furthermore,

> *Libya*. Support of terrorist groups has been an element of Libya's foreign policy under Quadhaffi since the mid-1970's. **Quadhaffi has been linked by overwhelming evidence to terrorist attacks and assassinations in Western Europe, the United States, and the**

> Middle East, and is known to support terrorist groups and liberation movements worldwide.

CENTRAL INTELLIGENCE AGENCY, NATIONAL FOREIGN ASSESSMENT CENTER, PATTERNS OF INTERNATIONAL TERRORISM: 1981, (July 1982), at *21. (*Emphasis added*.)

Thus, it is unequivocal that Libya was involved in terrorist attacks, including the Lod Airport massacre, and these actions, as a whole, are what led to Libya's addition to the state-sponsored terrorism list.

However, much of Libyan and Syrian involvement in terrorism was not entirely public. Some of it was covert, but still intended to achieve the same end result, to provide material support and resources to terrorist groups.

> Libya under Qaddafi became a vital part of the international terrorism network that developed in the 1960s and 1970s and flourishes today**. The international terrorism network was not a centrally controlled or directed conspiracy, but rather** what leading terrorism expert Brian Jenkins has described as, **"a semi-permanent infrastructure of terrorism … the resilient web of political fronts, personal relationships, clandestine contacts, foreign connections, alliances with other groups, support structures, resources, and suppliers of materials and services that sustain the terrorist underground."** PLO terrorist groups, particularly PFLP, did especially diligent work in the formation of this informal network, and indispensable was the role played by state supporters of terrorism: [Libya and Syria]"

BRIAN L. DAVIS, QADDAFI, TERRORISM, AND THE ORIGINS OF THE U.S. ATTACK ON LIBYA 13-14, (Praeger Publishers, 1990). (*Emphasis added*.)

Consequently, Plaintiffs have conclusively shown that Defendants, through their various actions in support of international terrorist activities, provided "material support" of terrorism and provided material support and resources directly to the terrorist groups involved in the Lod Airport attack.

### ii. LIBYA CANNOT CLAIM SOVEREIGN IMMUNITY, SINCE IT HAS PROVIDED MATERIAL SUPPORT TO TERRORIST GROUPS AND PROXIMATELY CAUSED TERRORIST ATTACKS

In *Collett v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp.2d 230 (D.D.C.2005), Plaintiffs sued, *inter alia*, Defendant Libya, alleging that the Defendant provided support to the Abu Nidal Organization, an international terrorist organization. This terrorist group kidnapped, tortured, and killed Alec Collett, a journalist, in retaliation for the bombing by the United States of Libyan targets. Plaintiffs successfully argued that Plaintiffs had jurisdiction over Defendants, and that Defendant Libya provided material support and resources to the Abu Nidal Organization.

In *Collett*, the Court based part of its decision on *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C.Cir.2004), a closely related case which involved similar claims against Libya. In *Kilburn,* the Court held that "imposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be directly traceable to a particular terrorist act would likely render §1605(a)(7)'s material support provision ineffectual. Money, after all, is fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records." *Id.*

Furthermore, "a nation loses immunity even if the support it provides does not directly fund the particular terrorist act that injured or killed the victim. The only requirement is that the provision of support **proximately** causes the terrorist act." *Wyatt v. Syrian Arab Rep.*, 362 F.Supp.2d 103, 111, n.1 (D.D.C.2005); *Collett*, 362 F.Supp.2d at 236 (*Emphasis added.*) Consequently, the *Collett* court rejected the Libyan Defendant's argument that material support provided by a nation to a terrorist organization must directly fund the specific acts that caused the alleged injury.

Libya and Syria may not have *directly* caused the terrorist attacks, but rather, provided "material support of terrorism," through training, financing, and other methods of supporting terrorism.  Thus, Libya and Syria cannot claim sovereign immunity, as they proximately caused the terrorist attacks, including the Lod Airport massacre, which were directly perpetrated by the groups that Libya and Syria supported, including the PLO, PFLP, and the JRA.

      **d.**   **PLAINTIFF'S CLAIMS ARE NOT BARRED BY STATUTE OF LIMITATIONS PRINCIPLES DUE TO THE EQUITABLE TOLLING OF DEFENDANT'S SOVEREIGN IMMUNITY UNDER § 1605(f).**

Libyan Defendants argue that all of the claims raised by the Plaintiff are time barred under <u>Fed.R.Civ.P.</u> 12(b)(6).  According to Defendants, the Plaintiffs have not established that the doctrine of equitable tolling applies to the facts of this case, nor can Plaintiffs allege facts that would warrant a delay of nearly ten years in filing suit after any impediment to filing suit was removed.  Defendant's argument disagrees with the majority of the decisions in this Circuit and should be denied.

Defendant's argument relies heavily on *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya,* 2007 U.S. Dist. LEXIS 49031 (D.D.C.2007) (Kessler, J.), for the principle that "Congress did not create an automatic extension of the statute of limitations by the length of the tolling period." *Id.* at *9-10.  Defendants have failed to mention that the court's decision in *Buonocore*, which is counter to the weight of cases in this Circuit, is currently on appeal before the D.C. Circuit Court of Appeals.  The *Buonocore* opinion itself is based upon *Vine v. Rep. of Iraq,* 459 F.Supp.2d 10 (D.D.C.2006), which is also on appeal before the D.C. Circuit Court of Appeals. As such, the outcome of this case and the ruling on these motions may ultimately be governed by the outcome of the appeals.  Accordingly, the negative decision in *Buonocore* is not dispositive of this case.

Defendants also rely on *Phillips v. Heine,* 984 F.2d 489 (D.C.Cir.1993), a case which analyzed equitable tolling under the Death on the High Seas Act ("DOHSA"). The DOHSA, which *does not* contain an explicit tolling provision, is a statute with a different structure and legislative intent under which this case was not brought. This particular case was brought under the state-sponsored exception to the FSIA, not the DOHSA. Thus, this court must review the legislative intent of the FSIA, and not that of the DOHSA.

### i. ANY CALCULATION OF THE STATUTE OF LIMITATIONS MUST INCLUDE EQUITABLE TOLLING PRINCIPLES.

In *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006), a case cited by Libya, the court stated that the statute, which the case is brought under, defines the statute of limitation analysis.

> We look to the relevant statute for guidance in determining whether equitable tolling is appropriate in a given situation. "The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one 'of legislative intent whether the right shall be enforceable … after the prescribed time."

*Id.* at 1261 (holding that "[i]n order to determine congressional intent [on the question of equitable tolling], we must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act.") (quoting *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 426 (1965)).

Accordingly, the FSIA establishes a 10-year statute of limitations for state-sponsored terrorism exception claims, and contains equitable tolling principles as well. The FSIA states:

> No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

28 U.S.C. §1605(f).  Subsection 1605(f) contains an explicit statutory provision which demands that the calculation of the statute of limitations include all principles of equitable tolling. "[I]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citing *Duncan v. Walker*, 533 U.S. 167 (2001)).

However, according to Defendants, "Congress could have easily written that the action must be commenced not later than '10 years after the cause of action arose or 10 years after the enactment of this statute, whichever is later." (Defendant's Motion to Dismiss ¶ 18).  To read § 1605(f), as Libyan Defendants would have it, would mean that equitable tolling principles would only be applied in "extraordinary circumstances." *Id.* (citing *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir.1999)).

Defendants' logic is counter to the Supreme Court's decision in *Burnett v. New York Railroad Co.*, 380 U.S. 424 (1965), wherein the Court held that an express statute of limitations provision should apply a uniform federal equitable tolling doctrine in order to advance the important interests of national uniformity and certainty. *Id.* at 435.  In *Burnett,* the Plaintiff argued that state laws, enacted to preserve causes of action that would otherwise be time-barred after a plaintiff has brought an action in a court with improper venue, Id. at 431-32, were applicable to the federal limitations provision in a related federal statute. *Id.* at 432-33.

However, the Court rejected the Plaintiff's argument, concluding that "[t]o allow the limitation provision to incorporate state saving statutes would produce nonuniform periods of limitation in the several States. The scope of such statutes and the length of additional time they allow vary considerably from State to State." *Id.* at 433.  The Court continued:

> This Court has also specifically held that "[t]he period of time within which an action may be commenced is a material element in [a] uniformity of operation" which Congress would not wish "to be destroyed by the varying provisions of the State statutes of limitation." *Engle v. Davenport*, 271 U.S. 33, 39. The incorporation of various state saving statutes would defeat the aim of a federal limitation provision designed to produce national uniformity.

*Id.* (alterations in original).

Consequently, the Court rejected the argument that the federal statute of limitations should be tolled for a "reasonable time" after the state action is dismissed because that "would create uncertainty as to exactly when the limitations period again begins to run." *Id.* at 435. Thus, the Court applied "familiar principles" of equitable tolling and held that a statute of limitations shall be tolled during the pendency of the state court action (such that the tolling period is tacked on to the limitations period *in full*). *Id*; *See also*, *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of America (UAW), AFL-CIO v. Hoosier Cardinal Corp.*, 383 U.S. 696, 708 (1966) (the "primary underpinning of *Burnett*" was that "a tolling principle was necessary to implement the national policy of a uniform time bar clearly expressed by Congress when it enacted the … limitations provision").

According to the Court, "the absence of a uniform federal limitations period complicated the development of federal law on the question when, or under what circumstances, a statute of limitations could be tolled." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 379 (2004). Thus, by establishing subject matter jurisdiction in the federal courts (28 U.S.C. § 1605(a)(7)), enacting a new federal cause of action against agents in their personal capacity, (28 U.S.C. § 1605 note), i.e., the Flatow Amendment, and providing a federal statute of limitations (28 U.S.C. § 1605(f)), Congress plainly intended that the federal courts "create coherent national standards to support this initiative of national significance." *Flatow v. Islamic Republic of Iran*, 999 F.

Supp. 1, 15 (D.D.C. 1998). Thus, "[i]n the interest of promoting uniformity of determinations with respect to the liability of foreign states," *Id.*, the Court should apply federal common law principles of equitable tolling.

### ii. THE FSIA IS MODELED AFTER THE TVPA, WHICH REQUIRES THAT EQUITABLE TOLLING PRINCIPLES COUNT AGAINST THE LIMITATIONS PERIOD.

According to the Plaintiffs in *Macquarrie v. Great Socialist People's Libyan Arab Jamahiriya,* C.A.No 04-176 (EGS), similar to the amendments to the 1996 FSIA, the 1991 Torture Victim Protection Act ("TVPA") provides a ten-year statute of limitations. *Compare,* FSIA, 28 U.S.C. § 1605(f) ("No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose.") with TVPA, 28 U.S.C. § 1305 note ("No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose.").  This is no mere coincidence.

The legislative history of the FSIA Amendments expressly confirms that Congress unquestionably intended the federal courts to interpret the FSIA Amendments as they had interpreted the provisions of the TVPA.  *See*, H.R. Rep. 103-702, at *4, *6 (the new exception to the FSIA "is modeled after the Torture Victim Protection Act"; "The bill includes a 10-year statute of limitations, as in the TVPA, to ensure that the Federal courts will not hear stale claims").

The legislative history of the TVPA expressly demonstrates Congress's intent that the ten year statute of limitations would not begin to run until a defendant's immunity had been waived: "*Excluded also from calculation* of the statute of limitations would be the period when a defendant has immunity from suit." S. Rep. 102-249, at *10-11 (emphasis supplied). This explicit guidance makes plain that the TVPA statutory period does not run – *i.e.*, the clock is

stopped – during the period that a defendant is immune from suit.  Courts interpreting the TVPA statute of limitations have followed this approach.

For example, in *Arce v. Garcia*, 434 F.3d 1254, 1256 (11th Cir. 2006), the Eleventh Circuit considered the timeliness of TVPA claims filed in May 1999, which concerned injuries that  occurred between 1979 and 1983.  The Court first concluded that equitable tolling was appropriate until August 1989, at which time the Defendants were no longer in power, and evidence of human rights abuses were finally being uncovered. *Id.* at 1263-64.  Having tolled the statutory period until August 1989, the Court of Appeals held that the *Arce* Plaintiffs' claims, filed in May 1999, were within the ten-year statutory of limitations for TVPA claims and, therefore, were considered to be timely. *Id.* at 1264; *See also, Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) (tolling TVPA claims until 1994 and holding that action was timely filed in October 2003).

Following these cases, and in light of the legislative history of the TVPA – that the period during which a defendant has immunity shall be "[e]xcluded also from calculation of the statute of limitations" – and the legislative history of the FSIA amendments – which expressly confirm Congress's legislative intent that the FSIA is "modeled after the Torture Victim Protection Act" – this Court should conclude that Congress intended the ten-year statutory period for claims under the FSIA's terrorism exception to begin to run only upon the waiver of sovereign immunity. *See also, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) (("when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its … judicial interpretations as well'"); *citing, Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)).

### iii.  THE FULL 10 YEAR LIMITATIONS PERIOD MUST BE ARRESTED FOR EQUITABLE TOLLING PRINCIPLES.

"Principles of equitable tolling usually dictate that when a time bar has been suspended and then begins to run again upon a later event, the time remaining on the clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped." *United States v. Ibarra*, 502 U.S. 1, 4, n.2 (1991).  The general rule is that "a statute of limitations may be tolled – that is, *arrested* – on the basis of one or the other of two common law doctrines: equitable estoppel and equitable tolling." *Williams v. Sims*, 390 F.3d 958, 959 (7th Cir. 2004)(Posner, J.) (*emphasis added*); *See also*, *Allen v. Chicago Transit Authority*, 317 F.3d 696, 698 (7th Cir. 2003) (Posner, J.) ("[e]quitable tolling delays the running of the statute of limitations"); *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 877 (7th Cir.1997)(Posner, J.) (the "rule in [the Seventh] circuit" is to "subtract[]" the tolling period from the calculation of the statutory limitations period).[2]

Thus, the approach to tolling taken in *Phillips* trumps what is Congress's plainly intended policy objective in setting forth a statutory limitations period in the first place: to permit plaintiffs to take a specified amount of time (even if they do not "need[] it," Phillips, 984 F.2d at 492) to investigate their claims and consider their options before deciding whether to file suit. (*See,* Plaintiff's Opposition Motion, *Macquarrie v. Great Socialist People's Libyan Arab Jamahiriya,* C.A.No 04-176 (EGS) ¶ 16-17.)  There is a crucial difference between a court

---

[2] Judge Posner's decisions for the 7th Circuit, in *Williams*, *Allen* and *Doe*, indicate that under equitable tolling principles, the tolling period is not counted toward the limitations period. Notably, all of these decision came after *Cada v. Baxter Healthcare Corp*., 920 F.2d 446, 453 (7th Cir. 1990) (Posner, J.), the decision relied upon in *Phillips v. Heine*, 984 F.2d 489 (D.C. Cir.1993), which was held controlling in *Vine* and *Buonocore,* and is heavily relied upon by Defendants in the case herein.  However, to the extent Phillips is based on the analysis adopted in *Cada*, *Cada* has been superseded by Judge Posner's decisions, and is no longer good law in the Seventh Circuit.

deciding *of its own volition* to use its inherent equitable power to toll a limitation period – a quintessentially discretionary act – versus a court following an *express statutory directive* to "apply" "principles of equitable tolling." 28 U.S.C. § 1605(f).

Because Congress granted litigants ten years to file a claim under the Flatow Amendment, codified the principles of equitable tolling in such claims, and instructed the federal courts to "apply" the period of a sovereign's immunity when calculating the limitations period, a court may not rewrite the statute of limitations by substituting its own subjective view of how much time a plaintiff reasonably needed to file suit. *Id.; Phillips*, 984 F.2d at 492.

This same analysis was recently applied by the Ninth Circuit, sitting *en banc*, which held that its own prior decision – which had adopted the *Phillips* approach to tolling – must be overturned. *See, Socop-Gonzalez v. INS*, 272 F.3d 1176, 1195-96 (9th Cir.2001) (*en banc*). The *en banc* court expressly overruled *Santa Maria v. Pac. Bell*, 202 F.3d 1170 (9th Cir. 2000), because it resulted in litigants facing differing periods in which to file their federal claims based solely on the determination of one judge versus another.

In overruling *Santa Maria*, the Ninth Circuit *en banc* court also noted that the Seventh Circuit case on which *Phillips* relied, *Cada v. Baxter Healthcare Corp*., 920 F.2d 446, 453 (7th Cir. 1990) (Posner, J.), should also be rejected. That the Ninth Circuit *en banc* court has expressly rejected *Cada*, further undermines the holding in *Phillips*. *See also, Adair v. Johnson*, 216 F.R.D. 183, 187 n.7 (D.D.C. 2003) ("[e]quitable tolling is a doctrine whereby a court, in the interests of justice, can suspend the normal running of the statute of limitations*"); Baker v. Henderson*, 150 F. Supp. 2d 17, 21 (D.D.C. 2001) (noting that under principles of equitable tolling, "the limitations period resumes running once" the tolling event has ended).

**e. EXTENDING THE LIMITATIONS PERIOD FOR PLAINTIFFS, FOR ONLY A "REASONABLE TIME" UNDER *VINE*, IS UNREASONABLE.**

Defendants also rely on *Vine v. Rep. of Iraq*, 459 F.Supp.2d 10 (D.D.C.2006), for the principle that "the Plaintiff is given extra time only if he needs it," *Id.* at 22, and that equitable tolling only extends the limitations period for a "reasonable period of time." (Defendant's Motion to Dismiss ¶ 22). However, Congress **explicitly** included the principle of equitable tolling to be applied to calculation of the statutory period. To exclude this principle otherwise would render the equitable tolling language in § 1605(f) "superfluous, void, or insignificant," against direct Congressional intent. *Andrews,* 534 U.S. at 31.

Furthermore, *Vine* can clearly be distinguished from the case *sub judice*. In *Vine,* the court determined that Plaintiffs could have brought suit during the statutory period, since the Defendant's immunity was abrogated only six years after the passage of § 1605(a)(7). As more than four years remained in the limitations period at the time the Defendant's immunity was abrogated, the court held that "the 'presumption' that Plaintiffs could have brought suit 'within the statutory period' applies." *Vine,* 459 F.Supp.2d at 29-30. Consequently, the court found a strong presumption against the use of equitable tolling.

Here, the Plaintiffs could not have filed suit within the limitations period. The Defendant's immunity was not abrogated during the limitations period. It was not until over ten years after the attack and the expiration therefore, of the ten-year statutory period created by § 1605(f), that Defendant's immunity was abrogated. The Plaintiffs in *Vine* were unable to bring their case before the initial 10-year period expired, because of the Defendant's immunity. Thus, the Defendant's reliance on *Vine* is inapplicable and misguided. Moreover, *Vine* is on appeal to the D.C. Circuit Court of Appeals. *Vine* was argued on October 12, 2007, and is expected to be overturned.

56

Furthermore, the vast majority of cases in this Circuit also disagree with Defendant's logic. *See, Collett*, 362 F. Supp.2d at 242 ("Accordingly, the statute of limitations for the Plaintiff's claims must be tolled to begin when the Defendants were stripped of their immunity with the 1996 enactment of 28 U.S.C. § 1605(a)(7)."); *Wyatt v. Syrian Arab Rep.*, 362 F.Supp.2d 103, 111 n.1 (D.D.C.2005) ("Under the terms of § 1605(f), all claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was waived."); *Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) ("As a matter of law, the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. §1605(a)(7)…will be April 24, 2006."); *Peterson v. Islamic Rep. of Iran*, 264 F.Supp.2d 46, 60 (D.D.C.2003)(holding that "28 U.S.C. provides for a statute of limitations of '10 years after the date on which the cause of action arose,' and provides for equitable tolling during the 'period during which the foreign state was immune from suit." (quoting 28 U.S.C. § 1605(f))

The state-sponsorship of terrorism provision of the FSIA was intended to have broad remedial purposes, which must be broadly construed, consistent with their plain meaning. *Reyton v. Rowe,* 391 U.S 54 (1968).  Previously, Courts have excluded the immunity period from the statute of limitations calculation, and this honorable Court should do the same. *Arce,* 434 F.3d at 1264; *Jean v. Dorelien,* 431 F. 3d 776, 780 (11th Cir.2005)(approving the *Collett* court's interpretation of § 1605(f) that found "the statute of limitations for the Plaintiff's claims must be tolled to begin when the Defendants were stripped of their immunity.") *Hilao v. Estate of Marcos,* 103 F.3d 767, 773 (9th Cir.1996).

### i. PLAINTIFF FILED THEIR CLAIMS WITHIN A "REASONABLE PERIOD" AFTER EQUITABLE TOLLING EXPIRED AND THE STATUTE OF LIMITATIONS BEGAN

In Defendant's Motion to Dismiss, Defendants alleged that "tolling does not bring about an automatic extension of the statute of limitations by the length of the tolling period. It gives the Plaintiff extra time only if he needs it." (Defendants' Motion to Dismiss ¶ 20) (quoting *Phillips,* 984 F.2d at 492).  However, as stated previously, Defendants reliance on *Phillips* is misplaced, since the FSIA and DOHSA are two entirely different legislative frameworks.

In *Phillips,* the D.C. Circuit limited the statute of limitations period to less than 10 months, based solely on the fact that there was no justification for Plaintiff to wait a full nine and one-half months before filing suit.  *Phillips* dealt solely with a death in a plane crash, and "nothing had prevented Plaintiff from gathering information in the preceding years." *Id.* at 492. In the case herein, Plaintiffs are dealing with classified information on terrorism, which can remain classified for as many as thirty years, or longer, after a terrorist attack has occurred.

To determine whether a statute of limitations has run, the Court must first examine when the cause of action asserted by the Plaintiffs arose.  Because 28 U.S.C. § 1605(f) is a federal statute of limitations, the Court must apply federal rules on when causes of action accrue. *Connos v. Hallmark & Son Coal Company,* 935 F.2d 336, 341 (D.C.Cir.1991).  Under the federal law, a discovery rule applies to determine when cauases of action accrue and the statute of limitations begins to run. *Id.* at 342.

Often described as a "discovery of injury" rule, the discovery rule actually operates to trigger the running of a limitations period when a party knows it has been injured, and has reason to believe that a defendant has committed some wrongdoing that creates a right against the Defendant. *Nelson v. American National Red Cross,* 26 F.3d 193, 196-97 (D.C.Cir.1994).  Thus, even if one is unsure of which of a number of remedies might be available against a Defendant, discovery of an injury and an identification of those responsible normally starts a limitations

period running. *See Atchison, Topeka & Santa Fe Ry. Co., v. I.C.C.,* 851 F.2d 1432

(D.C.Cir.1988).

The discovery rule serves to prevent the time provided for in a statute of limitations from

beginning to run until a party has the facts necessary to understand that he or she has been

injured and a Defendant's liability for the harm. *See Cada v. Baxter Healthcare Corp.,* 920 F.2d

446, 450 (7th Cir.1990). In other words, when a person has the relevant facts and can discover

that they have a cause of action against a Defendant by asking someone who could analyze the

issue (for example, a lawyer), the statute of limitations begins to run. *See Cogburn v. U.S.A.*, 717

F.Supp.958, 963 (D.Mass.1989).

Numerous circuits have adopted this approach to equitable tolling. *Cf.*, *Irwin v. Dep't of

Veterans Affairs,* 498 U.S. 89, 92 (1990) (phrasing the Court's inquiry in terms consistent with

this understanding, noting that it granted certiorari "to determine when the 30-day period under §

2000e-16(c) *begins to run*")(*emphasis added*); *American Pipe & Construction, Co. v. Utah*, 414

U.S. 538, 561 (1974) (in case brought under federal antitrust statutes, "the commencement of [a]

class action ... *suspended* the running of the limitations period")(*emphasis added*); *Rakes v. U.S*.,

442 F.3d 7, 24 (1st Cir. 2006) (equitable tolling "halts the running of the clock"); *Tristar Corp.

v. Freitas*, 84 F.3d 550, 553 (2d Cir. 1996) (equitable tolling of a statute means "that the running

of the statute is suspended"); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387

(3d Cir. 1994) ("[e]quitable tolling functions to stop the statute of limitations from running"); *Ott

v. Midland-Ross Corp.*, 600 F.2d 24, 32-33 (6th Cir. 1979) (plaintiff was "entitled to the full

amount of time allowed by Congress for the commencement of his action, undiminished by any

[tolling] period of time"); *Socop-Gonzalez v. I.N.S.,* 272 F.3d 1176, 1195 (9th Cir. 2001) (*en

banc*) (the "conventional rule" is "that when a statute of limitations is tolled, the days during a

tolled period simply are not counted against the limitations period*"); Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007) ("[e]quitable tolling suspends the running of a statute"); *Justice v. United States*, 6 F.3d 1474, 1478 (11th Cir. 1993)("when time bar is suspended because of equitable tolling and begins to run upon happening of subsequent events, the time remaining is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped").

### ii.  A SOVEREIGN'S IMMUNITY DOES NOT COUNT AGAINST THE FSIA LIMITATIONS PERIOD WHICH GAVE PLAINTIFFS 10 YEARS, OR UNTIL APRIL 2006, TO FILE THEIR CLAIMS.

Under these settled federal common law principles of equitable tolling, the period of time of a sovereign's immunity is *not counted* against the ten-year limitations period.  Accordingly, the statue of limitations for Plaintiffs' claims did not begin to run until at least April 24, 1996, when Congress enacted the 1996 amendments to the FSIA and waived Libyan Defendant's immunity.  Thereafter, Plaintiffs had a full ten years – or until April 24, 2006 – to file their claims.

Furthermore, even if, prior to 1996, Plaintiffs had known that Libya and Syria were the sponsors of the PLO, PFLP and the JRA, Plaintiffs would have also known that they had no cause of action against Libya and Syria, as both were immune.  Thus, even under any "reasonable" interpretation of the discovery rule, the Plaintiffs could not have "discovered" a cause of action against Libya and Syria prior to 1996 because none existed. *Baker v. Great Socialist People's Libyan Arab Jamahiriya*, 2006 WL 3208662, at *3-5 (D.D.C.2006). Moreover, as the cause of action under the Flatow Amendment was not created until 1996, it would have been impossible for Plaintiffs to discover such a cause of action before it was created – or put another way, the action cannot logically accrue before it exists. *Id.*

The *Buonocore* court, in granting the Defendants' Motion to Dismiss, which is currently on appeal, failed to consider what is a "reasonable" period of time in determining the limitations period. *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya,* 2007 U.S. Dist. LEXIS 49031 (D.D.C.2007).  Furthermore, by holding that a court may extend the time for filing "by a 'reasonable period' after the tolling circumstance is mended," *Phillips*, 984 F.2d at 492, Plaintiffs are left at the mercy of a judicial determination of what is "reasonable."

As the Plaintiffs convincingly argued in *Macquarrie v. Great Socialist People's Libyan Arab Jamahiriya,* C.A.No 04-176 (EGS), the Supreme Court in *Burnett* explicitly rejected the "reasonable" standard because it "would create uncertainty as to exactly when the limitation period again begins to run." *Burnett*, 380 U.S. at 435; *See also*, *Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d at 876 (determining what is "reasonable" for equitable tolling "injects unnecessary uncertainty into the judicial inquiry"); *Ott*, 600 F.2d at 33 ("reference to the applicable limitations period established by the Congress provides a reliable and consistent statutory determination of reasonableness").

Thus, Plaintiffs were unable to file suit within the statute of limitations period, as sufficient documentation with which to link Libyan and Syrian Defendants to the attack at Lod Airport did not arise within the first few years of the terrorist attack.  Classified information was not readily available to the public, and Plaintiffs were unable to immediately obtain access to this privileged information without a Freedom of Information Request.  Plaintiffs' justification for waiting a reasonable time before filing suit arose solely out of the fact that classified documents only begun surfacing closer to the expiration of the limitations period.  *EEOC v. O'Grady,* 857 F.2d 383, 393 (7th Cir.1988) ("Although statutes of limitations protect Defendants from the

burden of defending stale claims, this interest may be outweighed 'where the interests of justice require vindication of the Plaintiff's rights'" (quoting *Burnett*, 380 U.S. at 426).

The tolling period is based upon an examination of the facts of the individual case. *See United States v. BCCI Holdings (Lux.), S.A.,* 916 F.Supp.2d 1276, 1284 (D.D.C.1996); *See also, Pohill v. Islamic Rep. of Iran*, 2001 U.S. Dist. LEXIS 15322 at *13, n.3 (D.D.C.Aug. 23, 2001)(Case filed 13 years after incident and four years after enactment of 28 U.S.C. §1605(a)(7) and § 1605(f) was timely "because the ten-year statute of limitations was tolled for the period during which Iran was immune from suit.").  Many documents in this particular case still remain classified, and the full extent of Libyan and Syrian Defendants involvement in Lod remains to be seen.  Indeed, Plaintiffs were only able to secure the majority of the classified documents, as referenced in this Motion, in 2002 or later, as they were classified and unavailable to the public. Thus, with the current resources available, only now are Plaintiffs sufficiently able to demonstrate the findings they have made in this Motion.

Congress intended to entirely exclude the period of time prior to 1996 from the calculation of when the statute of limitations begins to run, and thus, the earliest the FSIA statute of limitations could have run is April 2006. *See, e.g., Collett,* 362 F.Supp.2d at 242; *Wyatt*, 398 F.Supp.2d at 145; *Peterson,* 264 F.Supp.2d at 60; *Flatow v. Islamic Rep. of Iran,* 999 F.Supp. at 23.  These now-declassified documents have enabled Plaintiffs to bring this lawsuit, *at a reasonable time*, within the 10-year statute of limitations period, as provided in *Flatow*, and 28 U.S.C. §1605(f).

The declassified documents now available to the Plaintiffs have established that Libyan and Syrian Defendants provided material support to the terrorist groups involved in the terrorist attack on Lod Airport, such as the PLO, PFLP, and the JRA.  The Plaintiffs filed their Complaint

after a reasonable time within the 10-year statute of limitations period.  Consequently, this Court

should deny the Defendant's Motion to Dismiss.

## V.  LIBYAN DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED

On May 30, 1972, when Defendants engaged in acts of terrorism against citizens of the

United States, as described in the complaint, Defendants enjoyed sovereign immunity in U.S.

Courts for such acts.  Accordingly, the statute of limitations was tolled under Subsection 1605(f),

until April 24, 2006, when the Defendants were stripped of their sovereign immunity.

Subsequent to this date, i.e. from the passing by Congress of § 1605(f), Plaintiffs had ten years to

file this lawsuit, rather than ten years from the date of the attack.

The years when Defendants were immune from suit are excluded from the statute of

limitations calculation.  The equitable tolling principle in § 1605(f) must be read to toll the

statute of limitations for Libyan Defendants, for acts occurring in 1972, when Libya enjoyed

sovereign immunity from suits in U.S. Courts, until the passage of  § 1605(f) in 1996.

Consequently, the instant action was timely filed inside of ten years from April 24, 1996; within

the statute of limitations on April 21, 2006, and is not time barred.

"A complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that plaintiffs can prove no set of facts to support their claim that would entitle them to

relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Hishon v. King & Spaulding*, 467 U.S. 69,

73 (1984).  Further, "the complaint is construed liberally in the plaintiff's favor, and [the court]

will grant plaintiffs the benefit of all inferences that can be derived from the facts alleged."

*Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).  Accordingly, "[t]he

court must treat the plaintiffs' factual allegations –  including mixed questions of law and fact –

as true and draw all reasonable inferences in the plaintiffs' favor." *Coles v. Harvey*, 2007 WL

63666 (D.D.C.2007) (citing *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C.Cir.2003);

*Holy Land Found. For Relief and Dev. Ashcroft*, 333 F.3d 156, 165 (D.C.Cir.2003).

WHEREFORE, Plaintiffs respectfully request that Libyan Defendant's Motion to

Dismiss be denied.

Respectfully submitted,

*/s/ Joshua M. Ambush*

_____

Joshua M. Ambush (Md. Bar # 27025)
Law Offices of Joshua M. Ambush, LLC
Hilton Plaza
1726 Reisterstown Road
Suite 206
Baltimore, Maryland 21208
410-484-2070
410-484-9330 (facsimile)
joshua@ambushlaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSE MANUEL VEGA FRANQUI, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-00734-RBW |
| | ) | |
| SYRIAN ARAB REPUBLIC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JOSHUA M. AMBUSH

I, Joshua M. Ambush, hereby affirm, under penalty of perjury, that to the best of my knowledge and understanding, the statements contained in the Plaintiffs' Motion in Opposition to Defendant's Motion to Dismiss, and accompanying Memorandum of Points and Authorities, are true and accurate, and that the documents attached as exhibits thereto, are the best copies available of official government records.

Respectfully submitted,

*/s/ Joshua M. Ambush*
_____
Joshua M. Ambush (Md. Bar # 27025)
Law Offices of Joshua M. Ambush, LLC
Hilton Plaza
1726 Reisterstown Road
Suite 206
Baltimore, Maryland 21208
410-484-2070
410-484-9330 (facsimile)
joshua@ambushlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Affidavit of Joshua M. Ambush was delivered *via* electronic filing and/or first class mail postage prepaid, to Thomas J. Whalen, Esquire, Mark A. Johnston, Esquire, Eckert Seamans Cherin & Mellott, LLC, 1747 Pennsylvania Avenue, N.W., Twelfth Floor, Washington, D.C. 20006; Wendy West Feinstein, Eckert Seamans Cherin & Mellott, LLC, U.S. Steel Tower, 44th Floor, 600 Grant Street, Pittsburgh, PA 15219, this 17th day of December, 2007.

*/s/ Joshua M. Ambush*
_____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSE MANUEL VEGA FRANQUI, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-00734-RBW |
| | ) | |
| SYRIAN ARAB REPUBLIC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

UPON CONSIDERATION of the foregoing Plaintiffs' Motion in Opposition to

Defendant's Motion to Dismiss and Accompanying Memorandum of Points and Authorities, it is

this _____ day of _____, 2007, by the U.S. District Court for the District of Columbia,

ORDERED, that the Defendant's Motion to Dismiss is DENIED.

_____
Judge Reggie B. Walton
U.S. District Court for the District of Columbia

67