Tripoli A-176
Page 2

LIMITED OFFICIAL USE

laborers.

Al-Fajr reproduced part of an article published recently by the Washington Star and headlined, "Secret Memo of the State Department Restricts Arab Visits to the United States." The Star reported that secret USG decisions "against the Arabs" were implemented beginning October 19. Al-Fajr also referred to the resolve of Secretary of State Rogers to "protect every Zionist in the United States, liquidate all elements supporting the Arab Cause, confiscate all Arab publications concerning the Arab Cause and silence every voice supporting that Cause, particularly among Arab students in American Universities." The US aims at making Arabs in America feel that everyone moving and speaking in favor of that Cause is subject to surveillance by American Intelligence, and at subduing and humiliating the national feelings of Arab students while bolstering Zionists' feelings of pride that they enjoy American support of their State, the paper said.

Moreover, al-Fajr charged, at the University of North Carolina "Arab students -- including eight Libyans -- were subject to ridiculous questions such as, 'Why does Libya help the Commando Organizations? What do you know about these Organizations? Do you know any Palestinian student here? Do you promise not to talk about the Palestinian Problem? Do you have any circulars or pictures or statements regarding the Palestinian Cause?'"

### LAR Position?

Al-Fajr in commenting on the above, asserted that the United States and Britain were "motivated by Zionist Intelligence to take advantage of what they call 'Terrorism', in order to justify the committing of more acts of aggression. "It is strange that they forgot that the Zionists were the first people to use terrorism through their terrorist bands of Irgun, Stern, and Hagana." The paper asked, "What benefits accrue to the Arabs as a result of these acts of terrorism? Are the Arabs getting any benefits?" "Of course not. In fact, the Arabs are the only ones harmed by these terrorist operations."

"In fact" al-Fajr concludes, the Arab States, particularly the LAR, bear with deep conviction their responsibility

LIMITED OFFICIAL USE

Tripoli A-176
Page 4

LIMITED OFFICIAL USE

in his October 7 speech at Tripoli, went out of his way to praise the Japanese perpetrators of the Lod Airport massacre for having displayed the "true Fedayeen spirit"; he also claimed that the LARG is backing morally and financially "all the Fedayeen" (Tripoli 1615).

As is his wont, Qadhafi would like to have his cake and eat it too; he ipso facto abets Fedayeen terrorist activities with Libyan funds and defends their operations anywhere, even though he would prefer that a unified commando movement, in tandem with a progressive Arab bloc, confine its operations to occupied Palestine, including Israel. Unfortunately there is no indication in the al-Fajr article that Qadhafi is considering the use of his moral and financial influence to limit Fedayeen operations.

JOSIF

CLASSIFIED BY CHARLES E. MARTHINSEN
AUTOMATICALLY DECLASSIFIED ON
19 NOVEMBER 1973

LIMITED OFFICIAL USE

DECLASSIFIED
Authority E.O. ____
By ___ Date ___

# Department of State
## TELEGRAM

SECRET   653

PAGE 01   STATE   042486

73462
ORIGIN SS-25

INFO  OCT-01  ADP-00  /026 R

DRAFTED BY AF:DDNEWSOM/NEA:ARN:DAKORN:JFC
22670   3-7-73
APPROVED BY P - AMB. PORTER
S/CCT - AMB MEYER
NEA - MR. ATHERTON
AF/N - MR. BLAKE
S/S - MR. MILLER

                              125526

R 080053Z MAR 73
FM SECSTATE WASHDC
TO USINT ALGIERS
AMEMBASSY BEIRUT
USINT CAIRO
AMEMBASSY JIDDA
AMEMBASSY KUWAIT
AMEMBASSY ABU DHABI
AMEMBASSY MANAMA
AMEMBASSY RABAT
AMEMBASSY TRIPOLI
AMEMBASSY TUNIS
AMEMBASSY SANAA
INFO AMEMBASSY AMMAN
AMEMBASSY KHARTOUM
USMISSION USUN NEW YORK
AMCONSUL JERUSALEM
AMEMBASSY LONDON
AMEMBASSY NOUAKCHOTT
AMEMBASSY PARIS
AMEMBASSY BRUSSELS
AMEMBASSY ROME
AMEMBASSY BONN
AMEMBASSY MOSCOW

S E C R E T STATE 042486

EXDIS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETARY

SECRET



## Department of State TELEGRAM

SECRET

PAGE 02   STATE   042486

E.O. 11652: ADS, DECLAS. DEC. 31, 1981
TAGS: PINS, XF
SUBJ: ARAB GOVERNMENTS SUPPORT FOR BLACK SEPTEMBER ORGANIZATION

1. KHARTOUM TRAGEDY HAS UNDERLINED AGAIN THE SERIOUS IMPLICASIONS FOR INTERNATIONAL ORDER OF BLACK SEPTEMBER ORGANIZATION. DEPARTMENT DESIRES YOU EMPHASIZE TO HOST GOVERNMENT AT HIGHEST LEVEL POSSIBLE, SERIOUS VIEW U.S. GOVERNMENT WILL TAKE OF SUPPORT FOR OR TOLERATION OF BLACK SEPTEMBER ORGANIZATION BY ARAB GOVERNMENTS.

2. ALL APPROACHES SHOULD STRESS THAT ACTIVITIES OF THIS ORGANIZATION CREATE COMMON PROBLEM OF WORLDWIDE SIGNIFICANCE ALREADY DETRIMENTAL TO ARAB CAUSE AND LIKELY TO BE MORE SO IF THERE ARE SUBSEQUENT INCIDENTS. ARAB LEADERS SHOULD WELL UNDERSTAND RISK TO THEMSELVES IF TERRORIST ACTIVITIES OF THIS ORGANIZATION CANNOT BE FRUSTRATED.

3. THE U.S. UNDERSTANDS FORCE OF PALESTINE CAUSE IN ARAB WORLD AND HAS ITSELF MADE CLEAR ITS SYMPATHY FOR PALESTINIANS. WE BELIEVE RECENT EVENTS HOWEVER HAVE CLEARLY DEMONSTRATED THAT RATIONALIZING EXISTENCE OF TERRORIST ORGANIZATIONS BY LINKING THEM WITH PALESTINE CAUSE SERVES ONLY TO GIVE THEM WIDER SCOPE TO DETRIMENT OF ALL AND OF ARAB CAUSE. IN VIEW OF SHOCK WITH WHICH KHARTOUM MURDERS WERE RECEIVED BY AMERICAN PUBLIC AND OUR OWN STRONG OPPOSITION TO TERRORISM, ATTITUDE OF U.S. TOWARD ARAB GOVERNMENTS WILL INCREASINGLY BE STRONGLY AFFECTED BY DEGREE TO WHICH THEY PROVIDE FUNDS AND OTHER SUPPORT TO OR HARBOR MEMBERS BSO OR GROUPS WITH SIMILAR OUTLOOK.

4. SHOULD BE OBVIOUS TO ALL THAT CONTINUATION OF BSO ACTIVITIES WILL MAKE USG'S TASK IN SEEKING A PEACEFUL SETTLEMENT FOR ARAB-ISRAELI CONFLICT MUCH MORE COMPLEX, DIFFICULT AND LENGTHY. WE ARE SURE ARAB GOVERNMENTS WOULD NOT WANT TO SEE THIS HAPPEN.

5. FOR BEIRUT: STATE 41440 COVERS ESSENTIAL ELEMENTS OF APPROACH YOU SHOULD MAKE. YOU MAY IN ADDITION DRAW ON ANY OF FOREGOING POINTS YOU FEEL USEFUL.

RODUCED ITHOUT THE AUTHORIZATION C THE EXECUTIVE SECRET

SECRET

Department of State

TELEGRAM

SECRET

PAGE 03   STATE   042456

6. FOR JIDDA, KUWAIT, MANAMA AND ABU DHABI. YOU SHOULD STRESS ESPECIALLY THAT IN VIEW OF FATAH'S PROVEN LINK WITH BSO THERE CAN BE NO DENYING THAT FUNDS THEY PROVIDE OR PERMIT TO GO TO FATAH ARE BEING USED TO FINANCE BSO OPERATIONS.

7. FOR AMMAN AND KHARTOUM: SUGGEST FOREGOING BE CONVEYED AS INFORMATION TO THESE GOVERNMENTS ALREADY OPPOSED TO BSO AS APPROACH WE ARE MAKING TO OTHERS. ROGERS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETAR

SECRET

DECLASSIFIED
Authority E.O. 12958
By MW Date 5/19/02

## Department of State
### TELEGRAM

'73 MAR 13 PM 8:21    '73 MAR 15 PM 8:21

SECRET   985

PAGE 01  STATE 047847

46
ORIGIN SS-25

INFO OCT-01 ADP-00 /026 R

DRAFTED BY NEA/ARN:DAKORN/INR/RNA/CJONES:JFC
APPROVED BY NEA - JOSEPH SISCO
NEA - MR. ATHERTON
S/CCT - AMB. MEYER
AF/N - MR. BLAKE
EUR/RPM - MR. MCGUIRE
S/S - MR. MILLER
EA/J - MR. CAMPBELL

------------------  063836

R 151655Z MAR 73
FM SECSTATE WASHDC
TO ALL NATO CAPITALS
AMEMBASSY DUBLIN
AMEMBASSY STOCKHOLM
AMEMBASSY MADRID
USINT CAIRO
USINT ALGIERS
AMEMBASSY BEIRUT
AMEMBASSY JIDDA
AMEMBASSY KUWAIT
AMEMBASSY ABU DHABI
AMEMBASSY MANAMA
AMEMBASSY RABAT
AMEMBASSY TUNIS
AMEMBASSY TRIPOLI
AMEMBASSY SANAA
AMEMBASSY NOUAKCHOTT
AMEMBASSY TOKYO
AMEMBASSY NEW DELHI
AMEMBASSY KABUL
AMEMBASSY TEHRAN
AMEMBASSY ISLAMABAD
INFO AMEMBASSY AMMAN
AMEMBASSY KHARTOUM
USMISSION USUN NEW YORK
AMCONSUL JERUSALEM
AMEMBASSY MOSCOW

EXDIS EXDIS EXDIS EXDIS EXDIS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETARY

SECRET

Department of State

TELEGRAM

SECRET

PAGE 02  STATE  047847

S E C R E T  STATE  047847

EXDIS

E.O. 11652: XGDS-1; DECLAS: DEC. 31, 1981
TAGS: PINS, XF, XG, US
SUBJ: ARAB GOVERNMENT SUPPORT FOR BLACK SEPTEMBER ORGANIZATION
REF: STATE 42486; 44511; 46941

1. QUESTION OF LINK BETWEEN BLACK SEPTEMBER ORGANIZATION (BSO) AND FATAH HAS BEEN SUBJECT OF MUCH PUBLIC DISCUSSION SINCE MURDER OF U.S. DIPLOMATS IN KHARTOUM. FATAH LEADER ARAFAT HAS DISAVOWED CONNECTION WITH BSO, AND MANY IN ARAB WORLD AND ELSEWHERE HAVE POINTED TO ARAFAT'S DISAVOWAL AS JUSTIFICATION FOR CONTINUING FINANCIAL AND OTHER SUPPORT FOR FATAH.

2. AS STATED IN REFTELS, USG HAS INFORMATION THAT FATAH IS IN FACT PARENT BODY OF BSO. FOLLOWING IS INTELLIGENCE BRIEF PREPARED BY DEPARTMENT AND CIA. THOUGH BRIEF ORIGINALLY WAS SLUGGED NO FOREIGN DISSEMINATION, AGENCY HAS AGREED TO ITS BEING USED WITH SELECTED FOREIGN GOVERNMENT OFFICIALS IN OUR EFFORTS TO PERSUADE THEM CEASE SUPPORT FOR OR TOLERATION OF BSO AND OTHER TERRORIST GROUPS. THIS BRIEF SHOULD NOT BE ATTRIBUTED TO CIA IN ANY WAY, AND OWING TO EXTREME SENSITIVITY OF INFORMATION IT SHOULD BE CONVEYED ORALLY ONLY:

BEGIN TEXT: THE BLACK SEPTEMBER ORGANIZATION (BSO) IS A COVER TERM FOR FATAH'S TERRORIST OPERATIONS EXECUTED BY FATAH'S INTELLIGENCE ORGANIZATION, JIHAZ AL-RASD. THE COLLAPSE OF FATAH'S GUERRILLA EFFORTS LED FATAH TO CLANDESTINE TERRORISM AGAINST ISRAEL AND COUNTRIES FRIENDLY TO IT. FATAH FUNDS, FACILITIES, AND PERSONNEL ARE USED IN THESE OPERATIONS. THERE IS EVIDENCE THAT THE "BSO" OPERATION IN KHARTOUM WAS CARRIED OUT WITH SUBSTANTIAL HELP FROM FATAH'S KHARTOUM OFFICE AND APPLAUDED BY FATAH RADIO STATIONS IN CAIRO AND BEIRUT. IN ADDITION, FATAH DEPUTY CHIEF SALAH KHALAF, CHIEF OF "BSO", GETS AN INDEPENDENT

TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETAR[Y]

SECRET

Department of State

TELEGRAM

SECRET

PAGE 03   STATE   047847

SUBSIDY FROM THE LIBYAN GOVERNMENT.

FOR ALL INTENTS AND PURPOSES NO SIGNIFICANT DISTINCTION NOW CAN BE MADE BETWEEN THE BSO AND FATAH. FOUR OF FATAH'S 10-MAN GENERAL COMMAND, INCLUDING KHALAF, THE PLANNER AND DIRECTOR OF THE MUNICH AND KHARTOUM OPERATIONS, ARE IDENTIFIED AS "BSO" LEADERS. FATAH LEADER YASIR ARAFAT HAS NOW BEEN DESCRIBED IN RECENT INTELLIGENCE AS HAVING
GIVEN APPROVAL TO THE KHARTOUM OPERATION PRIOR TO ITS INCEPTION.

ARAFAT CONTINUES TO DISAVOW PUBLICLY ANY CONNECTION BETWEEN FATAH AND TERRORIST OPERATIONS. SIMILARLY, FATAH MAINTAINS ITS PRETENSE OF MODERATION VIS-A-VIS THE ARAB GOVERNMENTS, A POSE WHICH MOST OF THESE GOVERNMENTS FIND CONVENIENT FOR THEIR PUBLIC POSITION TOWARD THE PALESTINIAN CAUSE. IT SEEMS CERTAIN ALSO THAT SOME ELEMENTS WITHIN FATAH ARE OPPOSED TO TERRORISM, AND THE CHAOTIC STATE OF THE WHOLE FEDAYEEN MOVEMENT ASSURES FACTIONALISM, POWER STRUGGLES, AND UNCLEAR LINES OF COMMAND. NONETHELESS, THE FATAH LEADERSHIP INCLUDING ARAFAT NOW SEEM CLEARLY COMMITTED TO TERRORISM. END TEXT

3. BELIEVE INFORMATION RE BSO-FATAH LINK SHOULD BE MADE AVAILABLE TO SELECTED OFFICIALS ALL EUROPEAN AND ARAB CAPITALS WHICH WERE ACTION ADDRESSEES REFTELS, BUT LEAVE TO DISCRETION ALGIERS AND TRIPOLI WHETHER THIS ADVISABLE IN CASE OF ALGERIA AND LIBYA.

4. FOR TOKYO, NEW DELHI, KABUL, TEHRAN, ISLAMABAD: DEPARTMENT REPEATING STATE 46941 TO YOU FOR INFO. BELIEVE IT WOULD BE USEFUL FOR YOU TO FILL IN APPROPRIATE HOST GOVERNMENT OFFICIALS ON LINK BETWEEN BSO AND FATAH AS PER ABOVE. ROGERS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRE[TARY]

PUBLIC PAPERS OF THE PRESIDENTS
OF THE UNITED STATES

# Jimmy Carter

## 1979

(IN TWO BOOKS)

BOOK II—JUNE 23 TO DECEMBER 31, 1979



UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON : 1980

the physical, biological, mathematical, or engineering sciences." To date, 133 Medals have been awarded, beginning in 1962. Each President beginning with Kennedy has awarded Medals. President Carter presented the most recent awards on November 22, 1977.

The presentation of the award to the 1979 recipients will occur in the near future.

## Decontrol of Marginal Oil Wells

*Executive Order 12187. December 29, 1979*

BASE PRODUCTION CONTROL LEVEL FOR MARGINAL PROPERTIES

By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended (15 U.S.C. 751 et seq.), and notwithstanding the delegations to the Secretary of Energy in Executive Order No. 11790, as amended by Executive Order No. 12038, and in order to delay the decontrol of marginal oil wells, it is hereby ordered as follows:

1-101. For purposes of the pricing regulations adopted pursuant to the Emergency Petroleum Allocation Act of 1973, with respect to months commencing after December 31, 1979, the base production control level for marginal properties shall equal 20 percent of the total number of barrels of old crude oil produced and sold from the property concerned during calendar year 1978, divided by 365, multiplied by the number of days during the month in 1978 which corresponds to the month concerned.

1-102. For purposes of this Order, the term "marginal properties" has the same meaning as that term under the crude oil pricing regulations adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended.

1-103. The Secretary of Energy may, pursuant to Executive Order No. 11790, as amended by Executive Order No. 12038, adopt such regulations as he deems necessary or appropriate to conform the crude oil pricing regulations to this Order.

JIMMY CARTER

The White House,
   December 29, 1979.

[Filed with the Office of the Federal Register, 12:43 p.m., December 31, 1979]

NOTE: The text of the Executive order was released on December 31.

## Export Controls for Foreign Policy Purposes

*Letter to the Speaker of the House and the President of the Senate. December 29, 1979*

Dear Mr. Speaker: (Dear Mr. President:)

In accordance with the authority contained in section 6 of the Export Administration Act of 1979 (Public Law 96-72 of September 29, 1979; hereinafter "the Act"), I hereby extend export controls maintained for foreign policy purposes as specified in Enclosure 1. In accordance with section 6(e) of the Act I hereby notify Congress of this extension.

I am also submitting, as Enclosure 2, my conclusions with respect to: the criteria set forth in section 6(b) of the Act; the nature and result of alternative means attempted to achieve the purposes of these controls or the reasons for extending them without attempting any such alternative means; and the ways in which such controls will further significantly the foreign policy of the United States or will further its declared international obligations.

Pursuant to section 6(k) of the Act, the countries and the goods and technologies

2290

listed in Enclosure 1 will be clearly identified in Export Administration Regulations published in the FEDERAL REGISTER as being subject to export controls for foreign policy purposes.

With reference to section 4(c) of the Act, adequate evidence has been presented demonstrating that, notwithstanding foreign availability, the absence of these controls would prove detrimental to the foreign policy of the United States.

Revisions of the regulations are being issued with an effective date of January 1, 1980, to comply with section 6(a)(2). They will be reissued in final form later in 1980, in order to take into consideration public comments received pursuant to section 13(b) of the Act.

Sincerely,

JIMMY CARTER

[Enclosure 1]

EXPORT CONTROLS FOR FOREIGN POLICY PURPOSES EXTENDED FOR THE PERIOD JANUARY 1 THROUGH DECEMBER 31, 1980

I. All countries except members of the North Atlantic Treaty Organization, Japan, Australia, and New Zealand:

A. A validated license is required for the export of crime control and detection instruments, equipment, and related technical data.

B. Applications for validated export licenses will generally be considered favorably on a case-by-case basis unless there is evidence that the government of the importing country may have violated internationally recognized human rights and that the judicious use of export controls would be helpful in deterring the development of a consistent pattern of such violations or in distancing the United States from such violations.

II. South Africa and Namibia only:

A. A validated license is required for the export of:
1. All U.S.-origin commodities and technical data for military and police entities;
2. Aircraft and helicopters and items controlled pursuant to the South African arms embargo for all consignees; and
3. Computers for government consignees exceeding performance levels permitted for shipment at national discretion under multilaterally agreed security export controls.

B. Applications for validated export licenses will:
1. Be denied for military or policy entities except, on a case-by-case basis, for medicines, medical supplies, and medical equipment not primarily destined to military or police entities or for their use; and
2. Generally be considered favorably on a case-by-case basis for:
   a. Aircraft and helicopters for which adequate written assurances have been obtained against military, paramilitary, or police use; and
   b. Computers which would not be used to support the South African policy of apartheid.

III. Libya, Iraq, People's Democratic Republic of Yemen, and Syria only:

A. A validated license is required for the export of aircraft valued at $3 million or more and helicopters over 10,000 pounds empty weight.

B. Applications for validated export licenses will generally be considered favorably on a case-by-case basis for such aircraft and helicopters for civil use if issuance of the licenses would be consistent with the policies set forth in subsections 3(4), 3(8), and 3(10) of the Act and subject to the requirement in sub-

2291

section 6(i) of the Act to notify Congressional committees.

IV. Libya only:

A. A validated license is required for off-highway wheel tractors of carriage capacity of 10 tons or more.

B. Applications for validated export licenses will generally be considered favorably on a case-by-case basis for such tractors in reasonable quantities if for civil use, such as transportation of oil field equipment.

V. North Korea, Vietnam, Kampuchea, and Cuba only:

A. A validated license is required for all commodities and technical data except:

1. Technical data generally available to the public and educational materials;
2. Personal baggage, crew baggage, vessels and aircraft on temporary sojourn, ship stores, and plane stores;
3. Foreign-origin items in transit through the United States;
4. Shipments for U.S. Government personnel and agencies; and
5. Gift parcels not exceeding $200 of commodities such as food, clothing (non-military), and medicines.

B. Applications for validated licenses will generally be denied. Exports on a non-commercial basis to meet emergency needs will be considered on a case-by-case basis.

VI. USSR only:

A validated license is required for the export of petroleum equipment.

VII. All countries:

A. A validated license is required for the export of the following commodities and related technical data:

1. Commodities which could be of significance for nuclear explosive purposes; and
2. Any commodities which the exporter knows or has reason to know will be used directly or indirectly for:
   a. Designing, developing, or fabricating nuclear weapons or nuclear explosive devices;
   b. Devising, carrying out, or evaluating nuclear weapons tests or nuclear explosions;
   c. Designing, constructing, fabricating, or operating the following facilities or components for such facilities:
      i. Facilities for the chemical processing of irradiated special nuclear or source material;
      ii. Facilities for the production of heavy water;
      iii. Facilities for the separation of isotopes of source and special nuclear material; or
      iv. Facilities for the fabrication of nuclear reactor fuel containing plutonium.

B. In reviewing applications for validated licenses pursuant to sub-paragraph VII A above, the following considerations are among those which will be taken into account:

1. The stated end-use of the component;
2. The sensitivity of the particular component and its availability elsewhere;
3. The types of assurances or guarantees given in the particular case; and
4. The non-proliferation credentials of the recipient country.

[Enclosure 2]

CONCLUSIONS WITH RESPECT TO CRITERIA, ALTERNATIVE MEANS, AND FURTHERANCE OF FOREIGN POLICY OR INTERNATIONAL OBLIGATIONS

I. *Crime Control and Detection Instruments and Equipment*

These controls continue in effect pursuant to section 6(j) of the Act.

No country has been formally determined to have a government engaging in a consistent pattern of gross violations of internationally recognized human rights. Therefore, except for the embargoes on North Korea, Vietnam, Kampuchea, Cuba, and the South African police and military, the validated license requirement for these items does not constitute a presumption that an application for such a license would be denied. However, where a consistent pattern of such violations appears to be developing, either positive or negative use of export controls might help to deter such development.

II. *South Africa and Namibia*

Prohibition of the export of virtually all items to military and police entities and controls on the export of aircraft and helicopters to all consignees and on the export of specified computers to government consignees are intended to distance the United States from the practice of apartheid, strengthen the effect of the United Nations arms embargo, and support racial justice throughout Africa.

There has been no movement toward fundamental social and political change in South Africa. Not extending controls would adversely affect the credibility of our South African policy in the minds of both the South African Government and black African nations.

The United States has attempted to influence the South African Government through public expressions of dissatisfaction with its social and political systems and reduction of diplomatic and other relationships. These other means have been insufficient to serve as an adequate alternative to export controls.

Regarding enforcement, it is recognized that it is extremely difficult, if not impossible, to prevent the South African military and police from acquiring U.S. goods indirectly. On the other hand, we believe that U.S. firms have been conscientious in complying with the controls. Foreign firms with no U.S. ties are probably less zealous in adhering to U.S. regulations, especially for items exported to them under general license and for U.S. components or technology incorporated in foreign manufactured products.

Most types of equipment and technology affected by the controls are available from foreign sources. However, Australia recently restricted sales of aircraft to South Africa.

The effects of the controls on U.S. exports can be only roughly estimated. Factors other than export controls affect the overall export picture.

In general terms, the U.S. share of the South African market dropped from 13 percent in 1977 to 11 percent in 1978. If the 13 percent share had been maintained, U.S. exports would have been $400 million higher in 1978. In 1977 the United States had the largest market share; in 1978 the United Kingdom and Germany had larger shares. Significant decreases in U.S. market shares occurred from 1977 to 1978 in pharmaceuticals, tires, chemicals, trucks, locomotives, motor vehicle components, and computers. For the first five months of 1979 the U.S. share of the market had recovered to 12.8 percent. There have been substantial U.S. sales since May.

Although it is difficult to determine whether losses are the result of the embargo or of other factors, examples reported by individual U.S. firms include the following:

—loss to a Japanese firm of a $45 million order for a commodity for which previous orders alternated between U.S. and German suppliers;

—inability of a U.S. company to provide technical data to its South African

subsidiary, which resulted in the loss of $1 million in annual royalty payments and ultimately led to divestiture of the subsidiary;

—loss to a British firm which stresses U.S. export controls in its marketing efforts of three contracts for about $10 million and of estimated follow-on sales of about $26 million;

—placement with a non-U.S. firm of a $50 million order by a South African company which had previously purchased exclusively from U.S. companies;

—sourcing by a U.S. project manager of $500 million worth of contracts in 1979 without U.S. participation;

—damage to reputation as a reliable supplier because of inability to supply parts and servicing for previously sold equipment;

—loss of exports because of the difficulty of determining whether an insignificant portion might reach the military or police; and

—additional administrative expenditures in order to comply with U.S. regulations while attempting to meet existing contractual and servicing agreements.

### III. *Terrorism*

The listing of Libya, Iraq, People's Democratic Republic of Yemen, and Syria in the heading of part III of Enclosure 1 of this notification constitutes the determination, pursuant to subsection 6(i)(1) of the Act, as to which countries have repeatedly provided support for acts of international terrorism.

Exports to these countries of crime control and detection instruments and equipment (which include vehicles designed to military specifications), aircraft valued at $3 million or more, and helicopters over 10,000 pounds empty weight are controlled pursuant to section 6(i) of the Act.

Syria and Iraq have not made major purchases of U.S. aircraft since 1976. The People's Democratic Republic of Yemen trades largely with the USSR and exports of aircraft to that nation have been minimal. Libya, however, has the potential to continue to be a significant market for U.S. aircraft and helicopter manufacturers.

Controls on the export to these countries of U.S.-origin aircraft valued at $3 million or more and helicopters over 10,000 pounds can be effectively enforced.

Large transport aircraft are available from French, German, and British companies as well as from the Soviet Union. Helicopters are produced by the same countries, as well as by Israel and Japan.

Examples of consequences attributed to these controls by individual U.S. firms include the following:

—U.S. helicopter manufacturers report that they have not pursued inquiries from or marketing efforts in these four countries because of the uncertainties caused by the U.S. controls; and

—a major U.S. aircraft manufacturer may lose a $186 million sale of aircraft to Libya because of application of this control.

### IV. *Libya*

Controls on the export to Libya of large tractors further the foreign policy objective of regional stability and are consistent with our policy on military sales to that country. Libyan troops have been directly involved in three countries in the past year (Chad, Uganda, and the Central African Republic) and are on a high state of alert along the border with Egypt, where a brief border war broke out in 1977.

Large tractors could be used to transport tanks and other outsized military vehicles, thereby enhancing the mobility of Libya's sizable armored force.

This type of vehicle is available from foreign suppliers in adequate quantities to serve the Libyan market. However, U.S. controls prevent an American contribution to Libyan military activity.

Controls of sales of off-highway tractors of carriage capacity of 10 tons or more can be effectively enforced.

Discontinuation of the controls would be seen by other friendly countries as a United States contribution to strengthening Libyan capability to mount hostile actions along its borders.

The controls supplement other means designed to influence Libyan behavior, including numerous demarches on issues such as Libyan activity in Uganda. There are very few alternative means available to the United States. For example, Libya has no need for U.S. economic or military assistance.

In 1977 the U.S. exported to Libya 330 vehicles of this type with a value of $7.1 million; these figures dropped in 1978 to 14 vehicles at $0.3 million. A sale of about $60 million was lost to a foreign firm in 1978. Industry representatives estimate a potential Libyan market of about $50 million. There is also some indirect adverse effect on exports to other markets.

### V. *Embargoes of Communist Countries*

The embargoes on exports to North Korea, Vietnam, Kampuchea, and Cuba are administered not only under the Export Administration Act but also under the Trading With the Enemy Act. The latter authority continues by virtue of sections 101(b) and (c) and 207 of Public Law 95-223, and has been extended twice pursuant to national interest determinations, the most recent being from September 14, 1979, to September 14, 1980.

These embargoes were originally imposed for security reasons. During the Korean conflict we imposed an embargo against North Korea. During the Vietnam war we embargoed trade with communist controlled portions of that country and, when the communists took over complete control in 1975, this embargo was extended to all of Vietnam and to Kampuchea. The embargo against Cuba came at a time when Cuban actions presented a serious threat in the Western hemisphere.

The circumstances which prompted imposition of these embargoes have changed over the years. However, it would be irresponsible to discard them on that basis alone. Ending a virtually total embargo is a dramatic action with significant policy ramifications.

North Korea is still technically in a state of war with the United States, the Republic of Korea, and the United Nations. It is expanding its offensive military and subversive potential and suppressing human rights. It recently rejected U.S. overtures for tripartite discussions on ways to ease tensions on the Korean peninsula.

In the case of Vietnam, we announced our willingness some time ago to end the embargo at such time as normal diplomatic relations are established and Ambassadors are in place. Subsequent Vietnamese invasion and occupation of Kampuchea have blocked progress.

Controls on exports to Kampuchea should be similar to those affecting Vietnam, particularly in light of the present occupation. The United States is making a major exception to the embargo of Kampuchea in the form of humanitarian aid to the people.

Full normalization of trade and diplomatic relations with Cuba hinges upon Cuban willingness to address, among other issues, restraint in other countries and compensation for American citizens whose property was expropriated by the Cuban Government.

The controls on North Korea, Vietnam, Kampuchea and Cuba are understood and generally supported by the public, so there is little difficulty in enforcing them.

Other countries are not formally cooperating with the United States in these embargoes. However, third country exports to North Korea are minimal because that country is in default on its international trade payments, there is very little trade of any kind with Kampuchea, and Vietnam and Cuba now largely orient their former trade with the United States toward the USSR.

All of the OECD countries combined exported only $435 million to Vietnam in 1977. Even without the embargo, the Vietnamese would probably have turned elsewhere whenever possible, buying from the United States only when it was in their particular interest to do so. The most notable loss has been the replacement of U.S. firms by European firms in oil and gas exploration activities in and offshore Vietnam.

In 1959, U.S. firms supplied 64 percent of Cuba's total imports. If the embargo were lifted, the USSR would probably continue to be Cuba's major trade partner, but U.S. exporters, with the advantage of proximity, could be expected to replace some Japanese, Canadian, and European firms currently exporting to Cuba.

In aggregate value, U.S. exports to Cuba would likely not exceed $300 million annually over the medium term and would probably reach no more than $100–150 million in the first year if trade were resumed.

Because Cuba does not represent a substantial incremental market for any specific U.S. industries, the embargo has not retarded the ability of any U.S. economic sectors to compete in world trade. Exporting to Cuba would not, therefore, substantially raise production levels or efficiency in any industries.

VI. *Petroleum Equipment to the USSR*

The control on the export of petroleum equipment to the USSR provides a flexible foreign policy tool. When necessary and appropriate it can be used to sensitize the Soviets regarding actions which are damaging to United States foreign policy interests.

The United States supports the improvement of bilateral economic relations with the Soviet Union as an element in our effort to improve overall relations. At the same time it is recognized that improvement in one sector of the bilateral relationship cannot be long sustained if it is not accompanied by improvements in other areas. Discontinuation of this control would represent a change in policy not warranted by existing circumstances in our relationship with the USSR.

Among the various means of furthering U.S. objectives vis-a-vis the Soviet Union, this control continues to be useful.

While the United States Government can effectively control exports of U.S.-produced petroleum equipment, for most items adequate quantities of similar equipment are available from foreign sources. There is only limited foreign availability of some deep submersible pumps and seismic equipment.

The effect of the controls on U.S. exports can be only roughly estimated since other factors affect the data. Although no license applications have been denied since the control was imposed in August 1978, some exports have been lost.

U.S. exports of petroleum equipment to the USSR average about two percent of total U.S. petroleum equipment exports. The U.S. share of the Soviet market had been generally increasing until the third

quarter of 1978. In 1974, U.S. suppliers received 13.6 percent of all Soviet oil and natural gas machinery orders placed with Western manufacturers. The 26.9 percent U.S. share of the 1977 Soviet market for petroleum equipment increased markedly to 55.5 percent in the first quarter of 1978 and to 51.1 percent for the third quarter. It dropped to 8.0 percent for the last quarter, bringing the figure for all of 1978 down to 44.6 percent. The U.S. shares for the first three quarters of 1979 were 23.5, 20.0, and 9.7 percent.

Although it is difficult to determine whether losses are the result of the controls or of other factors, reports by U.S. firms include the following:

—loss to foreign competition of contracts for gas lift equipment valued at about $70 million (plus larger anticipated follow-on sales) because of delays and uncertainty in the U.S. licensing process;

—expenditures in the range of hundreds of thousands of dollars attributable to late delivery penalties and other costs related to the licensing process;

—use of the U.S. license requirement by foreign companies as leverage to obtain sales, since U.S. companies must schedule delivery to allow time for a license review and U.S. firms are never certain that the license will be granted.

VII. *Nuclear Non-Proliferation Controls*

Section 17(d) of the Act and section 309(c) of the Nuclear Non-Proliferation Act of 1978 (Public Law 95-242 of March 10, 1978), are interpreted as intending that:

  a) nuclear non-proliferation controls do not expire on December 31, 1979, and a determination to extend them is thus not required; and

  b) the criteria and other factors set forth in sections 6(b) and (e) of the Act are not applicable to these controls.

The Congress is therefore notified that these controls continue in force.

Nuclear non-proliferation controls further significantly the foreign policy of the United States and its declared international obligations.

NOTE: This is the text of identical letters addressed to Thomas P. O'Neill, Jr., Speaker of the House of Representatives, and Walter F. Mondale, President of the Senate.

# Economic Compact Between New York and New Jersey

*Statement on Signing H.R. 4943 Into Law. December 31, 1979*

H.R. 4943 grants approval to the interstate compact between New York and New Jersey, providing for increased economic and industrial development in the New York City and northern New Jersey metropolitan region. While this bill is only a small part of the Port Authority's bold program, I take great personal pleasure in signing it.

Congressman Peter Rodino and the other Members of Congress from these two great States deserve considerable credit for expediting the passage of this legislation. I also extend my congratulations to Governors Carey and Byrne, Mayor Koch, and Alan Sagner and Peter Goldmark of the Port Authority of New York and New Jersey.

As I have emphasized throughout the past 3 years, the most effective remedy for the problems of our older urban centers—and of the Northeast in general—is to restore the private economic base of our inner cities. The steps taken in this direction by the Port Authority serve as a fine

# Intelligence Appraisal

# LIBYA:
# TERRORIST APPARATUS(U)

PREPARED BY



This is a Department of Defense Publication
Produced by the Defense Intelligence Agency

## LIBYA: TERRORIST APPARATUS (U)

### Summary

Libya's involvement in dissident and terrorist activities has increased progressively since Chief of State Col Muammar Qadhafi came to power in 1969. This effort has served as an outlet for his frustrations at being rejected by the Arab World as its paramount leader, and such activities have gradually evolved into a significant foreign policy tool. Over the past several years, the Libyan leader has been consistent in his condemnation of "terrorism," and he has been equally emphatic in defending Libya's right to use "revolutionary violence." While the statements may appear to be an exercise in semantics, from the Libyan perspective, they serve as a moral justification for the country's actions under circumstances where no other options appear viable.

Since the Libyan Revolution on 1 September 1969, the country has developed a sophisticated terrorist training apparatus.

Over the years, a fairly effective unconventional warfare command and control structure has also evolved.

Qadhafi's terrorist apparatus is considerably less a threat to Israel and the US than it is to Arab states that seek a peaceful resolution of Arab-Israeli differences. If the volatile Arab-Israeli situation is calmed, Qadhafi's potential for exploiting Arab-Islamic nationalist frustrations would be greatly reduced. Even with a settlement, however, Qadhafi would continue to present a threat to Western interests because of his belief that the West, the US in particular, seeks to reimpose a colonial status on the region. He also rejects Western materialism, which he believes is corrosive to fundamental Islamic values.

### Discussion

#### Background

On 1 September 1969, Muammar Qadhafi, a 27-year-old signal corps captain, led a bloodless coup that overthrew the monarchy and established the Libyan Republic. The proclamation of the new Republic, issued the same day, clearly reflected a Libyan-Arab-Islamic nationalist ideology. To accomplish his lofty objectives, Qadhafi had to obtain support in a country characterized by regional, tribal, racial, and ethnic differences and that had historically been apathetic toward government in general. The unifying element in his appeal was Islam, a theme that had been espoused by the deposed Sanusis, but which called for a new religious and political activism.

Libya's revolution was born in the ideas of Egyptian leader Jamal Abd al Nasser and the nationalist sentiments his speeches and ideas stirred in young Qadhafi, then a secondary student in Sebha, Libya. By 1959 Qadhafi had organized his first "study" cell at Sebha. The clandestine net continued to grow as Qadhafi set up cells in the secondary school at Misurata, which he attended following

expulsion from Sebha in 1961 for political activities. The clandestine organization, which became known as the Free Officer's Movement, grew during Qadhafi's year at the University of Libya and subsequently at the Libyan Military Academy.

After the revolution, the new government moved rapidly to consolidate its power. As trusted Free Officer members took over sensitive military and political positions, potential opposition leaders were jailed or driven into exile. Despite the internal focus, however, Qadhafi continued to support dissident Muslim Chadian tribesmen who had been backed by the deposed monarchy. He also initiated a new income tax of up to 3 percent, which was used to assist the Palestinians.

Dissident and Terrorist Training

Because of Qadhafi's tribal links to Sebha, the southern extremity of his tribe and a traditional meeting point of Arabs, Tuareg (Berber), and Toubou tribes, he had developed an intense interest in Libya's Muslim neighbors. This was also in keeping with Libya's Sanusis tradition, since its missionaries had spread their puritanical brand of Islam among these peoples. As a result, Qadhafi supported the Muslim Toubou as well as other Muslim tribes against the French-backed Christian-controlled government in Chad after the revolution.

Qadhafi also backed Tuareg tribesmen in Algeria in their effort to remain autonomous in the face of expanding central government controls. Libya's involvement with the Algerian Tuareg tribes probably began as a result of Libyan dissatisfaction with the 1955 Franco-Libyan Treaty, which shifted the Algerian-Libyan border in Algeria's favor. Libya has a Tuareg population of about 7,000 which provides a natural link to Algeria's 30,000 Berber Tuaregs. The Tuaregs also appear to figure prominently in Qadhafi's dream of establishing a Pan-Saharan Islamic States that would span North Africa.

In 1970, Qadhafi set up two general training areas for Toubou and Tuareg activities. The one at Sebha was apparently involved in training and supporting the Tuareg, while the other at Kufra supported the Toubou. All of the training was accomplished under the auspices of the Libyan Army, which provided the training cadre, logistics support and equipment. The training and support, however, was very decentralized and was apparently conducted at a number of satellite locations near Sebha and Kufra.

In 1972, the Libyans opened three of their military installations to train Palestinians. The camp at Tarhunah provided basic military training, while the sites at Tukra and Ras al Hilal were more specialized and conducted frogman, sabotage, and possibly assassination-type courses. By about 1976, training camps had sprung up across Libya, teaching the full spectrum of unconventional military activities to a wide array of Arab and international students.

Initially, Libya's dissident and terrorist training had been a result of its interests in its Muslim neighbors and the Arab-Israeli confrontation. As Qadhafi's various pan-Arab unity efforts failed and his attempts to assume the