

Figure 3. The notice inserted in the Washington Post by Bunge and Born Ltd. as a condition for the release of Jorge and Juan Born

15

Guided by a Lebanese guerrilla-turned-informer named Michel Moukarbel, three French counterintelligence agents in Paris attempted to bring in a suspected terrorist—a man known to them only by his cover name of Carlos—for questioning on the evening of 27 June 1975. Inexplicably, they were unarmed. Carlos was not. He escaped in a blaze of gunfire that left Moukarbel and two of the French security officers dead at the scene. The third French agent was gravely wounded.



A French police photo of Carlos in Paris

Carlos vanished—leaving a thoroughly shaken French security service behind him—only to reappear as the leader of the group of terrorists that successfully took almost all the delegates to an OPEC ministerial-level conference in Vienna hostage on 21 December 1975. He remains something of a man of mystery. But during the months between his hasty exit from Paris and his dramatic return to the limelight, enough evidence documenting—or hinting at—remarkably extensive terrorist activities and connections was uncovered to make him seem like a real life "Jackal." The first piece in the jigsaw puzzle was furnished by a chance break in London that enabled the British to identify Carlos as Illich Ramirez-Sanchez, the 25-year-old son of a wealthy and staunchly Communist Venezuelan lawyer who had dispatched his family to London in 1966.

Carlos' early political career was highlighted by a brief stint at the Patrice Lumumba University in Moscow—from whence he was reportedly expelled for dissolute living and improper attitudes in early 1970. Little is known of Carlos' movements in the wake of his unscheduled departure from the USSR. In any event, more than a year was to pass before he returned to London, and he apparently spent at least part of this period in the Middle East. At some point in the early 1970s, he became a member of the extensive terrorist network operated by the Popular Front for the Liberation of Palestine (PFLP)—a fact openly acknowledged by a PFLP spokesman in July 1975 with the boastful addition that Carlos and Moukarbel had been planning a series of dramatic new actions when the French authorities finally closed in on them.

Painstaking investigation of Carlos' known associates subsequently revealed that, in addition to Moukarbel (described by the PFLP as its "Paris paymaster"), he had been working with a mixed entourage of dedicated revolutionaries that included several Latin Americans. One of the latter has been further identified as a member of the secretariat of the Colombian Communist Party. Carlos had also been provided with shelter and other helpful services by a number of women friends, including at least two European nationals, who probably had little knowledge of what he was really doing.

Charged, in general terms, with striking at "Zionism and imperialism," the Carlos organization had apparently been given latitude to operate over a wide geographic area embracing not only the UK and much of Continental Europe but, according to plans recovered by British authorities, parts of the Middle East as well. Moreover, evidence in the form of records that had been maintained by Moukarbel and the nature of some of the weapons that Carlos had left for safekeeping with friends in England and France established that the group had been cooperating, in keeping with PFLP policy, with a number of other terrorist groups—most notably the Japanese Red Army (JRA) and the German Baader-Meinhof Gang. It now seems certain, for example, that Carlos and Moukarbel were deeply involved in the planning of the JRA seizure of the French Embassy in The Hague in September 1974.



ABOVE: The Soviet-made RPG-7 rocket launcher used by members of Carlos' group in their abortive attack on an El Al plane at Orly airport outside Paris on 13 January 1975

BELOW: A French policeman points to the hole in the fuselage of the Yugoslav airliner that was hit by one of the rocket grenades fired at the El Al plane



Other headline incidents to which Carlos has been linked since his near arrest in France include an assassination attempt against J. Edward Sieff (a prominent English Jew and clothing-store magnate) in December 1973; the bombing of a popular Paris Left Bank hangout, Le Drugstore, in 1974; two attacks against El Al aircraft at Orly Airport in January 1975; and an assassination attempt against a Yugoslav consular official in Lyons in March 1975. Extras or principals from other terrorist organizations were involved in some of these as well. To what extent, if any, that state actors may also have taken a hand is unknown. But Cuban officials had been maintaining contact with members of this group in both England and France, and the [illegible] were sufficiently suspicious of this activity to send three of Havana's diplomats packing in the wake of Carlos' escape.

Since 1974, at least, the group that Carlos had headed in Paris had generally identified itself as the "Mohammed Boudia Commando." When he reappeared in Vienna in December 1975, it was at the head of a seemingly new formation with a different name (the "Arm of the Arab Revolution") and, possibly, a different principal sponsor. (The PFLP has denied responsibility for the OPEC operation; so too has Libya, but the Egyptians, among others, have openly accused Colonel Qaddafi of being behind it.) In any event, the composition of Carlos' Vienna attack force (believed to have consisted, in addition to its Venezuelan leader, of two Germans and three Palestinians) provided solid new evidence of the trend toward closer cooperation among terrorists of different nationalities.

As of this writing, Carlos' whereabouts are again unknown. Nor are the returns on his December venture as yet all in. It remains to be seen, for example, just what new international countermeasures—if any—will result from that action. Nevertheless, the immediate outcome of Carlos' OPEC operation (including safe haven for the terrorists and massive publicity for their objectives)—coupled with his boast that he currently controls some two-score seasoned professionals—suggests that the world will hear from him again before too long.



The hostages taken in Carlos' attack on the OPEC ministerial-level conference in Vienna on 21 December 1975 board the Austrian Airlines DC-9 that flew them and their captors to Algiers (with a side trip to Tripoli)

17

## Why?

The commonalities, differences, or changes in patterns of behavior that have been described thus far are, of course, attributable to the interplay of a host of variables. Only a few of these, i.e., the ones that seem to have had the greatest direct bearing on the timing, scope, and nature of the *internationalization* of terror, are addressed at any length below. No attempt is made to develop some sort of model or overarching theory with respect to this phenomenon. Far more modest, the objective here is simply to ascertain to what extent the current rash of transnational (and, to a lesser degree, international) terrorist activity is attributable to broad regional and global trends and developments as opposed to unique and possibly transitory local problems and circumstances.

A few general observations—some of them, perhaps self-evident—are needed to set the problem in perspective and to lay the groundwork for further analysis. First of all, *transnational terrorism* is by nature more congenial to urban than to rural-based groups and is thus characteristically spawned by societies at a mid to advanced stage of socio-economic development. Resort to *international terrorism*, on the other hand, is just as likely to result from calculations concerning the relative efficacy of alternative methods for bringing national power to bear in a given situation as from an outright dearth of national resources. Hence, such behavior is not the special province of any particular category of state.

Modern-day practitioners of transnational terrorism have benefited from a generally permissive international environment—a point which will be elaborated below. For the most part, therefore, the *constraints* on their behavior have either been a function of local environmental factors affecting their objective capabilities, opportunities, and alternatives or have been self-imposed for tactical or philosophical reasons.

These latter restraints are, of course, uncertain, for personal predilections can be overshadowed by frustration or desperation. Nevertheless, as evidenced by the data presented in Appendices B and C, *cultural heritage* has been a key factor affecting individual terrorist groups' perceptions of the limits beyond which the level or intensity of violence is likely to become counterproductive. Moreover, although generalization is difficult because the ideological mix is different in almost every case, so has what is here termed the group's *credo* or *ethos*. The sharp differences in behavior between the two wings of the IRA and among the various Palestinian terrorist groups are evidence enough of this. But far more research is needed before confident judgments will be possible with respect to just what combinations of beliefs are most likely to foster repeated resort to extreme and indiscriminate forms of violence.

Since the extent and efficacy of internal security controls bear heavily on the frequency, form, and domestic impact of transnational terrorist incidents in any given country, *the proliferation of this form of political violence has both contributed to and fed upon the recent trend toward more widespread resort to various forms of authoritarian rule.* On one hand, open societies and weak or permissive authoritarian regimes are particularly vulnerable to such activity—and to its domestic ramifications. On the other, rigid and forceful authoritarian rule can foster transitional terrorism by forcing dissidents to operate abroad.

Together with earlier references to the basic societal problems that can give rise to various forms of political violence, the foregoing observations focus on the human and local environmental factors affecting the extent, nature, and domestic impact of transnational or international terrorist activity in different parts of the world. The question remains, however, as to just why there has been such a marked and enduring upsurge in transnational terrorism over the past eight years. In part, this phenomenon is attributable to a war-punctuated regional conflict affecting the interests of a large number of nations and attended by particularly deep-seated feelings of bitterness and frustration. But it would not have grown to its present dimensions were it not for the concurrent convergence and acceleration of a number of changes in the global environment that had been taking shape much earlier.

These trends are difficult to disaggregate. Technological advance, growing global interdependence, and the increasing urgency attached to ... draft modernization in many parts of the world are, for example, closely interrelated. But each bears brief comment.

The impact of new technology on terrorist capabilities with respect to weapons, mobility, and tactical communications has already been cited. As evidenced by the development of ever more sophisticated letter bombs, the occasional employment of missiles, and the staging of coordinated actions in widely separated locations, it has been significant. But whatever the nature of a

18

terrorist act or the means of its execution, it must be remembered that the role of the media is critical to the spreading and intensification of its psychological impact. Hence, among all the technological advances in recent years, the development of *satellite communications*, and in particular, their upgrading in 1968 to include a television capability have unquestionably been among the most important in making transnational activity seem attractive to terrorist groups.

The advent of satellite communications has also fed and underscored the thickening network of political, economic, and technological dependencies and obligations now commonly subsumed under the rubric of *interdependence*. Whether or not this term has been abused of late, the growth in both the numbers and importance of international, transnational, and (as a consequence of the centralizing imperatives of local modernization efforts) subnational linkages over the past decade has had at least a two-fold impact on the world-wide potential for terrorism. On the one hand, it has created a host of new, vulnerable, and potentially highly disruptive targets for terrorist attack (e.g., commercial and communications centers, transportation hubs, international power grids and pipelines, super-tankers, and jumbo aircraft). On the other, it has generated a sort of identity crisis that has been reflected in a troublesome countervailing upsurge of nationalism and ethnicity.

For their part, the many other strains and dislocations associated with *the process of modernizing change* have swelled the ranks of the alienated in many parts of the world. They have also added millions of emigre workers to the international pool of political exiles and refugees which terrorists can exploit for cover, recruits, and various forms of operational support.

The upsurge in transnational terrorism has also been aided and abetted by a *"revolutionary"* turn in *the overall political environment* somewhat reminiscent of that experienced about 200 years ago. The postwar order has, in fact, come under challenge from all sides: from the developing nations of the Third World; from "maverick" Communist regimes; from dissatisfied second rank powers; and from a broad array of social forces fired, with differing degrees of responsibility, by a new sense of "social conscience."

By late 1967, the potential for a general escalation of political violence was clear. Viewed in this context, the Palestinians' dramatic entry into the air piracy business in 1968 becomes something of a logical if unexpected extension of a chain of developments that had included the emergence of the unruly New Left, a further proliferation of violence-prone splinter groups, and the first indications of the general post-Guevara shift in emphasis from rural to urban guerrilla warfare in Latin America.*

The characteristics and contours of this "revolutionary atmosphere" have undergone some change in the intervening years. The salience of some of the original contributory issues, e.g., Vietnam, has faded. But, as amply illustrated by the increasingly sympathetic treatment accorded to the Palestine Liberation Organization (PLO) in the United Nations General Assembly (UNGA) and other international forums over the past 18 months, that of the new moral, political, and economic standards championed by the Third World has not.** On the contrary, now backed by the new political clout of the Arab oil states, these values appear to be gaining in force. In short, the established postwar international political system has been cast into something of a state of flux—with all that that implies with respect to its effective order-keeping capabilities.

Terrorists have benefited from this overall state of affairs in many ways. Among other things, it has:

— Accorded an aura of legitimacy to the acts of any terrorist group claiming leftist revolutionary or national liberation movement status;

— Frustrated efforts to develop more effective international countermeasures;

— Facilitated transnational contact and cooperation among terrorist groups;

— Fostered a significant increase in the number of national, transnational, and international organizations providing national liberation movements and other "progressive" dissident

---

*With Guevara's demise and subsequent decline in stature as a revolutionary theorist and tactician, the works of such leading advocates of terrorist violence as Fanon, Satre, and Marighela have assumed increasing importance as a major literary source of inspiration for ultra militants in many parts of the world.

**The PLO is a political umbrella organization embracing several Fedayeen commando groups. It was accorded recognition as the sole legitimate representative of the Palestinian people (at the expense of Jordan) by the 1974 "Islamic nonaligned" and Rabat summit meetings. In November of that same year, it was granted observer status by the UNGA. All told, some 50 states have allowed the PLO to open offices in their capitals. In addition, five UN-affiliated international agencies (ILO, WHO, UPU, ITU, and UNESCO) have granted it observer status.

19

formations with various forms of direct and indirect support.

The attitudes and behavior of supportive states—ranging from those willing to provide little more than kind words and occasional safe haven to those that regularly furnish practicing or potential terrorists with funds, arms, training, documentation, and other operational support—have constituted another key global environmental *factor* affecting the scope and nature of transnational terrorist activity during the period under review. *Variable* might be a better term, however, for the extent of such assistance has fluctuated with changing appreciations of broader interests on the part of the state actors involved. For example, 1975 witnessed a distinct downward trend in such support.

In any event, if one excludes the simply indulgent or indifferent (including those liberal Western European states like France and Switzerland that, because of their strategic location and the extensive protection they accord to democratic rights and freedoms, have become involuntary hosts to all manner of foreign dissident groups) the list of nations in question dwindles to less than a score. Counting a few states that have recently retired—or partially retired—from the business, these "activists" include (but are not limited to) Libya, Cuba, the USSR, China, North Korea, Algeria, the People's Democratic Republic of Yemen, Tanzania, Congo, Zaire, Egypt, Syria, Iraq, and, however reluctant it has been to engage in such activity, Lebanon.

In some of these states, most of the support rendered to foreign revolutionary or guerrilla formations has been directed toward influencing the course of developments in one or two neighboring states or territories. And for many, perhaps most, the actual promotion of terrorist violence has been no more than a largely unintended byproduct of their activities. Nevertheless, in one way or another, all of them have directly contributed to the recent upsurge of transnational terrorism.

Two or three bear special mention. Take Libya, for example. The oil-rich Qaddafi regime has for some years been the world's most unabashed governmental proponent of revolutionary violence. And from the number of times that Libya has been linked to specific terrorist groups and incidents—including Carlos' raid on the OPEC meeting in Vienna—it would appear that Colonel Qaddafi has also been one of the world's least inhibited practioners of international terrorism.

Tripoli's focus has been on nationalist formations, whatever their ideological coloration or religious leanings. Thus, the recipients of its favors (in the form of various combinations of financial, logistical, and technical supports) have been numerous and varied. In addition to some of the more militant Palestinian splinter groups, they have included the Irish Republican Army and a number of less widely known guerrilla movements based in the Philippines, Ethiopia, Somalia, the People's Democratic Republic of Yemen, Chad, Morocco, Tunisia, Thailand, and Panama.

This list is not exhaustive. Moreover, it bodes well to grow since, despite Tripoli's professions of reluctance to grant safe haven to the JRA terrorists who seized the American Consulate General in Kuala Lumpur in August 1975, there have as yet been no convincing indications that Colonel Qaddafi has undergone a change of heart.

Moscow's posture has been more ambiguous. Basically, the Soviets have had serious misgivings about the utility of transnational terrorist activity. They have repeatedly warned that excessive violence can tarnish the reputation of those involved and have stressed their belief that such tactics are not only generally unproductive but can lead to unforeseen and possibly uncontrollable adverse consequences. At the same time, however, the Kremlin's broader interests—including, importantly, those stemming from its continuing adversary relationship with Peking—have denied it the option of a straightforward hands-off policy. Thus, after a period of hesitancy, the Soviets began channelling funds, weapons, and other assistance to fedayeen groups through a number of intermediaries in 1969. All indications are that they continue to do so today.* Similarly, they have continued their long-standing program (the more innocuous aspects of which are publicly associated with Moscow's Patrice Lumumba University) of bringing young revolutionaries from all parts of the Third World to the Soviet Union for training and indoctrination. And like Carlos, some of these individuals have subsequently cropped up on the transnational terrorist scene.

There is also a considerable body of *circumstantial* evidence linking Moscow to various terrorist formations in Western Europe. That some linkages

---

*In their commentary on fedayeen activities, however, the Soviets have consistently been careful to distinguish between "permissible" attacks on "legitimate" targets inside Israel and "regrettable" incidents involving non-combatant third parties.

and may, in fact, be taken for granted, for the broad considerations cited above give the Soviets ample reason for selectively attempting to monitor, penetrate, and gain some influence over such groups. But for obvious reasons, they have had to be very circumspect. They seem, for example, to have relied more heavily there than anywhere else on the cooperation of intermediaries who, if exposed, can be plausibly represented as having acted on their own initiative. In any event, the only hard evidence of Warsaw Pact member assistance to individuals associated with the Baader-Meinhof Gang points to Pankow and Prague. The arms destined for the non-Marxist Provisional Wing of the IRA that were seized at Schiphol Airport in Holland in late 1971 were of Czechoslovak origin and had been handled by a Czechoslovak firm. Even in the original "Carlos Affair," Cuba was the state actor most directly implicated. In short, the true dimensions of Soviet involvement remain extremely difficult to ascertain.

Nonetheless, one thing is clear. However much the Soviets might wish otherwise, their efforts to gain some handle on extremist activity have, together with their pursuit of less congruent objectives, done more to aggravate than to contain the current rash of transnational terrorist activity. The hard fact is that it is difficult to translate assistance into leverage or control when there are other available sources of support. Indeed, as the Soviets should by now have learned, any assistance provided to an extremist group under these circumstances risks simply increasing the recipient's potential for autonomous action.

A third actor deserving of separate comment is Cuba—not so much because of the extent of Havana's past activities in support of revolution and rebellion, but because there is mounting evidence (such as the statement issued at the conclusion of the regional Communist conference which was hosted by the Cubans in June 1975) that Castro's ambiguous policies have finally undergone a fundamental change in this regard. After years of hedging, the Cubans have now publicly espoused Moscow's recommended *via pacifica* strategy with respect to revolutionary struggle in Latin America—a development which bodes ill for those smaller militant formations that still rely heavily on Cuban support. It would appear that they will have to fall in line or face the risk of extinction. But many of Latin America's more active proponents of armed struggle are less vulnerable to Cuban retrenchment. Some are already highly self-sufficient. Of the remainder, those who are unable to tap the enormous war chests that have been accumulated by Argentine terrorist groups are likely to engage in more frequent ransom and resupply operations of their own. Partly because of this, and partly because Castro has made it abundantly clear that he does not intend to effect a parallel cutback in his support of armed revolutionary struggle outside of Latin America, the impact of Cuba's new posture on the overall level of transnational terrorism may be minimal.

The last and most elusive global variable to be addressed here is the *overall economic environment*. It can impact on the problem of terrorism in a number of subtle and, in some cases, countervailing ways. For example, *extra-cyclical world-wide economic strains*—such as those generated by the sudden quadrupling of oil prices—can so overtax the capabilities of local regimes as to invite domestic violence of a sort that could easily spill over national boundaries. Short of this, they can contribute to a general undercurrent of unrest by curtailing the resources that can be devoted to ameliorating societal ills.

Because the social and political effects of *cyclical trends* in the overall economic climate tend to be delayed and uneven, the potential consequences of short-term fluctuations do not lend themselves to generalization. Medium- to long-term trends, however, can affect both the potential and the opportunities for transnational terrorist activity in any given area. In so far as it affects industrialized countries, *rising economic prosperity* can, for example, facilitate the undetected movement of terrorist groups by fostering a heavy flow of tourist and commercial travel. It also attracts the large aggregations of emigre workers that not only make it easier for foreign terrorists to escape notice but provide a ready pool of manpower for their operational teams and support mechanisms. More broadly, a prolonged and general economic upturn can increase local potentials for political violence by causing popular expectations to far outpace governmental capacities to deliver. And in more affluent societies, at least, the attendant emphasis on materialistic values can alienate significant segments of the student and intellectual communities. Indeed, a combination of these last two destabilizing trends contributed, together with the factors cited earlier, to the emergence of a distinctly "revolutionary" political atmosphere in the late 1960s.

Conversely, *a prolonged economic decline* (something which some observers predict the world will experience for the next 20 years or more) has

generally tended to dampen revolutionary ardor. Popular expectations decline, and people everywhere are preoccupied with the exigencies of day-to-day existence. But the world has much changed since its last broad economic slide. Whether the numbing effects of generalized adversity will be felt as strongly in the future is thus open to question. Their potential impact on the level of transnational terrorist activity is even more uncertain. The actors engaged therein are scarcely representative of the general population. They are few in number and elitist by nature. And given the proven strength of their convictions, they are likely to be among the most resistant to the psychological effects of untoward changes in the overall economic environment.

### How Cost Effective?

The answer to this question depends on the vantage point of the observer. The achievement of disproportionately large effects from the employment of minimal resources is, of course, what political terrorism is all about. Its most serious drawback is that its consequences are, as the Soviets maintain, to a considerable degree unpredictable. It can alienate those groups whose sympathy was sought. Rather than disorient the masses, it can rally them to a previously unpopular government. It can galvanize a weak or wavering government into forceful counteraction. In short, tactical successes can, as in Jordan in 1970 and Uruguay in 1970-72, lead to strategic reverses of major proportions.

This risk is, however, easily accepted by those who dispose of no effective alternative methods for achieving their goals. Moreover, despite a number of sobering experiences, the overall balance sheet thus far provides the practitioners of transnational terrorism with grounds for considerable optimism.

Briefly put, the record shows that both transnational and international terrorists have generally been successful in avoiding capture (or, if caught, in escaping punishment) and in meeting at least some of their proximate objectives. For example, in a study of 63 major kidnapping and barricade operations executed between early 1968 and late 1974, the RAND Corporation concluded that such actions were subject to the following probabilities of risk and success:

—87 percent probability of actually seizing hostages;

—79 percent chance that *all* members of the terrorist team would escape punishment or death, whether or not they successfully seized hostages;

—40 percent chance that all or some demands would be met in operations where something more than just safe passage or exit permission was demanded;

—29 percent chance of full compliance with such demands;

—83 percent chance of success where safe passage or exit, for the terrorists themselves or for others, was the sole demand;

—67 percent chance that, if concessions to the principal demands were rejected, all or virtually all members of the terrorist team could still escape alive by going underground, accepting safe passage in lieu of their original demands, or surrendering to a sympathetic government; and

—virtually a 100 percent probability of gaining major publicity whenever that was one of the terrorists' goals.*

Such hostage operations have resulted in the freeing of large numbers of prisoners, the payment of huge ransoms, and in one case where Austria was targetted, the changing of government policy. Until mid-1974, at least, the record for skyjacking was fully comparable. Out of 127 terrorist attempts to seize aircraft between March 1968 and early July 1974, only a dozen were abortive. Of the remainder, less than 10 are known for certain to have ended in the death or imprisonment of the terrorists. In a great majority of cases through 1972, the skyjackers were successful in securing full compliance with their demands. Thereafter, however, they generally received no more than safe haven, and for the past year and a half, skyjacking has been a distinctly losing proposition. Of the 6 attempts made between late July 1974 and the end of 1975, 4 were nipped in the bud and the other 2 brought sentences of death or life in prison to the terrorists involved.

Terrorist acts lacking a bargaining dimension (e.g., bombings and assassinations) have generally entailed a correspondingly lower degree of risk. All told, only about 267 individuals associated with transnational terrorist activity have been caught in the past five years. Of these, 39 were freed without punishment, 58 escaped punishment by getting safe conduct to another country, 16 were released from confinement

---

*As excerpted in *Terroristic Activity—International Terrorism*, Hearings Before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Committee on the Judiciary, United States Senate, Ninety-Fourth Congress, First Session, Part 4, May 14, 1975 (Washington: US Government Printing Office, 1975), p. 240.

22



**One Barricade and Hostage Operation That Went Awry**

On 24 April 1975, a group of West German terrorists identifying themselves as members of the Holger Meinz Commando seized the FRG Embassy in Stockholm in a bloody and abortive attempt to force Bonn to release 26 individuals associated with the Baader-Meinhof organization from jail. When their demands were refused, the terrorists dynamited the top story of the embassy building in an equally unsuccessful effort to cover their escape. The photo shows the embassy burning in the background as Swedish police carry off one of the captured terrorists.

on the demand of fellow terrorists. 50 were released after serving out their prison terms, and 104 were still in jails as of mid-September 1975. The average sentence meted out to those terrorists who have actually stood trial has been 18 months.*

### How Disruptive?

The human and material toll exacted by transnational and international terrorist violence over the past eight years has been relatively low. For example, although the total cost of such activity in terms of ransom payments and property damage has never been tallied, all indications are that it falls far short of the half billion dollars loss suffered to school vandals in the US each year.

Closer track has been kept of the human casualties involved. Latest estimates place these at about 800 killed and 1,700 wounded—including the losses incurred by the terrorists themselves. To put these figures in better perspective, consider the fact that they fall somewhat short of the total casualties attributable to domestic terrorism in Northern Ireland alone during the same period or that Argentine terrorists and "counterterrorists" have managed to kill more than 1,000 of their countrymen since mid-1974. For a starker contrast, take Vietnam. There, in one year (1968), Viet Cong terrorists were credited with assassinating 6,000 people and wounding 15,000 more. Comparisons with "normal" levels of domestic violence in the US may also be useful. There were, for example, about 20,000 homicides—and more than 2,000 bombings—recorded here in 1975.

The juxtaposition of these statistics suggests that the dimensions of the problem posed by transnational and international terrorism are still quite small and that the increase in such activity since 1968, while marked, should have done little to undermine world order. But the disruptive impact of these terrorist incidents and campaigns has been magnified by the publicity they have received and by their interaction with other destabilizing trends and forces. Thus, while the terrorists have made no revolutions and, by

---

*"Terrorism 'Growing and Increasingly Dangerous'," (Interview with Robert A. Fearey, Special Assistant to the Secretary of State and Coordinator for Combatting Terrorism, *U.S. News and World Report*, 29 September 1975, p. 79.

# DATELINE:

## HIGHLIGHTS OF A YEAR-END AND INTERNATIONAL

- **2 DECEMBER:** South Molluccan Terrorists Seize a Dutch Train



South Molluccan terrorists pick up supplies outside the train that they held for 12 days before surrendering to Dutch authorities.

- **4 DECEMBER:** South Molluccan Terrorists Seize the Indonesian Consulate in Amsterdam

A blindfolded and tethered hostage is displayed on a third floor balcony of the Indonesian Consulate on 5 December—a full two weeks before his South Molluccan captors finally laid down their arms and surrendered.



# DECEMBER 1975

## UPSURGE IN MAJOR TRANSNATIONAL TERRORIST INCIDENTS

- **21 DECEMBER:** The Carlos-Led "Arm of the Arab Revolution" Attacks the OPEC Ministers' Meeting in Vienna



Wounded in the assault on OPEC's Vienna headquarters, a terrorist is carried off to the hospital. The following day, he was placed on board the plane that carried the rest of his group and 43 of their hostages to North Africa.

- **21 DECEMBER:** An American Employee of a US Firm is Kidnapped in Ethiopia by Eritrean Terrorists

- **23 DECEMBER:** A US Embassy Official is Gunned Down by Unidentified Terrorists in Athens

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

**22 Days of Terror:** The overlapping periods of direct terrorist violence associated with the five incidents cited here spanned almost the whole month of December.

themselves at least, toppled no governments, they have

— Embarrassed several governments and contributed to the effective collapse of a few (e.g., the initial Bordaberry Administration in Uruguay and the Isabel Peron regime in Argentina);

— Added an abrasive new dimension to both North-South and East-West relations;

— Contributed to the growing international status and fortunes of the PLO;

— Compelled some nations to temporarily abandon their law enforcement function (e.g., to release captured terrorists) out of fear of future retribution;

— Aggravated and accentuated the dilemmas generated within the existing international system by the emergence of a growing company of powerful non-state actors;

— Introduced strains in relations among those Western nations which, because of divergent national interests, feel constrained to adopt differing positions with respect to specific incidents or broader terrorist-related issues;

— Reinforced the currently pervasive sense of global flux and disorder;

— Caused a large number of nations, including the US, to divert substantial resources to defense against terrorist attacks;*

— Adversely affected the quality of life in many open or formerly open societies.

---

*In the US this has been reflected most clearly in the installation of an effective but costly airport security system and, following the Khartoum incident of 1973, in a supplemental $20 million appropriation provided to the Department of State for the sole purpose of improving the security of American diplomatic and consular installations abroad. The construction of a special bomb-proof courthouse in which to try the captured leaders of the Baader-Meinhof Gang was one of the more notable extra expenses that have been incurred by Bonn. By the time these proceedings are over, it is estimated that they will have cost the West German taxpayer more than $6 million. Even the liberal Swedes have become nervous since incurring the wrath of the JRA in March 1975 by arresting two members of that group and deporting them to Japan. In any event, they chose to take no chances when they hosted the Chilean Davis Cup tennis team some six months later. They converted the fashionable coastal resort where the matches were held into a veritable fortress protected by floodlights, fences up to 35 feet high; and a 1,000-man police force equipped with gunboats, helicopters, scores of dogs, and some 50 horses.

In short, while scarcely cataclysmic, the spoiling effects of modern-day transnational and international terrorism have been substantial. Harking back to earlier discussion, this state of affairs is both a measure and, in large part, a consequence of increasing global interdependence. As the dimensions and complexity of the web of interstate and transnational linkages that together comprise the functional core of the "international system" have grown under the impact of technological advance, the reverberations of events—including terrorist attacks—which disturb or threaten its more important intersections have tended to become increasingly widespread and sharply felt. At the same time, the limits within which individual states can attempt to cope with such problems through unilateral action without risk of adversely affecting the interests of others have steadily narrowed. But, as previously observed, rather than encourage increasing interest in supranational solutions, the frustrations born of this *de facto* shrinkage of sovereignty have generated an unhelpful backlash of nationalism. And this, of course, has been one of the key factors that have affected the nature and effectiveness of the international community's response to the terrorist threat.

## What International Constraints?

With the exception of a number of bilateral agreements providing, *inter alia*, for a greater exchange of intelligence and technical assistance or, as in the memorandum of understanding concerning hijackers of aircraft and vessels that was signed by the US and Cuba in 1973, for the prompt extradition of specified categories of terrorists, the international response to terrorism has been relatively weak and ineffective.

The UN's problems in grappling with *transnational* terrorism were cited and illustrated at the outset of this study. *International* terrorism, however, has proved to be a somewhat less contentious issue. Indeed, the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation Among States which the General Assembly adopted without vote on 24 October 1970 asserts at one point that:

Every State has the duty to refrain from organizing, instigating, assisting or participating in acts of civil strife or terrorist acts in another State or acquiescing in organized activities within its territory directed towards the commission

26

of such acts, when the acts referred to in the present paragraph involve a threat or use of force."

But even as an essentially unenforceable admonition, this rule of behavior is weakened and clouded by the greater emphasis that the Declaration accords to the "principal of equal rights and self-determination of peoples." The language employed in this regard implies that it is the overriding duty of all states to assist groups struggling for the realization of these rights in every way possible. For example, the Declaration avers that:

> Every State has the duty to refrain from any forcible action which deprives people referred to above in the elaboration of the present principles of their right to self-determination and freedom and independence. In their actions against, and resistance to, such forcible action in pursuit of the exercise of their right to self-determination, such peoples are entitled to seek and to receive support in accordance with the purposes and principles of the Charter. (Emphasis added)**

There have, in addition, been a total of five international conventions adopted over the past 12 years that have dealt with one or another aspect (in all cases rather narrow) of the terrorism problem. These are as follows:

— The Tokyo Convention (Convention on Offenses and Certain Other Acts Committed on Board Aircraft) Signed in September 1963, it did not come into force until December 1969. It is a very limited accord which does no more than to set a few jurisdictional ground rules and to require the contracting states to (1) make every effort to restore control of the aircraft to its lawful commander and (2) arrange for the prompt onward passage or return of hijacked aircraft together with their passengers, cargo, and crew. As of this writing, 77 countries have ratified it.

— The Hague Convention (Convention for the Suppression of the Unlawful Seizure of Aircraft): Signed in December 1970, it came into force 10 months later. Its principal feature is that it requires (albeit with important discretionary exceptions) contracting parties either to extradite or to prosecute skyjackers. Seventy-four countries have ratified it.

— The Montreal Convention (Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation): Signed in September 1971, it came into force in January 1973. Covering the sabotage or destruction of aircraft or air navigational facilities, it requires the contracting parties to make such offenses subject to severe penalties and establishes the same extradition or prosecution system for offenders as in The Hague Convention. Sixty-three countries have ratified it.

— The Organization of American States Convention (Convention to Prevent and Punish Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion that are of International Significance): Signed in February 1971, it entered into force in October 1973 (the US is a signatory, but not a party). With its emphasis on the prevention and punishment of crimes against persons to whom the state owes a special duty of protection under international law, it was a precursor of the UN convention concerning the protection of diplomats which is cited below. It also employs The Hague Convention extradite-or-prosecute formula. Only four of the thirteen signatory countries have ratified it.

— The United Nations Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons Including Diplomatic Agents: Signed in December 1973, it has yet to come into force. It requires the contracting states to establish certain specified acts against protected persons (or against the official premises, private accommodations, or means of transport of such a person) as crimes under internal law. Once again, The Hague Convention on extradite-or-prosecute formula applies. So far, only nine countries have ratified it.

Although they reflect international concern and at least a slim majority consensus that something must be done, these conventions presently do not, singly or in combination, constitute much of an effective constraint on terrorist activity. In the first place, many states—including a high percentage of those that have been particularly active in supporting revolutionary or national liberation groups—are not yet parties thereto. Secondly, the conventions lack teeth in that all make the extradition or prosecution of terrorists subject to discretionary escape clauses and none provides for the application of punitive sanctions against states that simply refuse to comply at all. Finally, the exclusive focus on skyjacking and the

---

*Yearbook of the United Nations 1970 (New York, United Nations Office of Public Information, 1972), p. 789.

**Ibid., p. 791.

protection of diplomats leaves a good deal of terrorist activity outside the cognizance of international law.

But this, it would seem, is all the traffic will bear. The US has tried repeatedly to correct some of these deficiencies and has run into a stonewall of opposition on each occasion. For example, at the conclave sponsored by the International Civil Aviation Organization (ICAO) that formulated the final draft of The Hague Convention, the US delegation sought unsuccessfully to (1) limit drastically exceptions to extradition of hijackers, (2) establish hijacking as a common crime, and (3) exclude political motivation as a defense against extradition or prosecution of hijackers. Two years later, in September 1972, the US submitted a draft convention to the UNGA that was aimed at limiting the "export" of terrorism. But even though it established a number of restrictive criteria that would have to be met before its enforcement provisions became applicable, it was effectively stifled by opposition centering on the impermissibility of interference with the right of self-determination. The following summer, a proposal sponsored by the US and several other nations for a separate enforcement convention that would have backed the Tokyo, Hague, and Montreal documents with sanctions affecting the rights and services guaranteed under existing international and bilateral air service agreements was soundly defeated at the ICAO's Rome Conference and Assembly.

The obstacles which have blocked more effective international action are formidable. They have, as previously indicated, included the controversy over *justifiable* versus *illegal* political violence and broad resistance to such further infringements of national sovereignty as would be implied in any inflexible curtailment of the right to grant political asylum. Equally important, however, they have also included an understandable reluctance on the part of many nations otherwise ill-disposed toward terrorist activity to commit themselves to any course of action that might either invite direct terrorist retribution or provoke the application of sanctions by states that happen to be sympathetic to the terrorists' cause.

To make these observations is not, however, to imply immutability. It must be remembered, for example, that such progress as has been made in the field of multilateral countermeasures has, in each instance, been occasioned by reaction to some general or specific escalation of terrorist violence. (In this regard, hopes that Carlos' assault on the OPEC ministerial meeting in Vienna will have some sort of salutary catalytic effect may yet be borne out in practice.) There are, moreover, a host of other factors which could alter the attitudes and behavior of any of the state actors concerned. Hence, whether or not all the obstacles to a more effective international response that have been cited thus far will retain their present force in the decade ahead is a valid question—and it is one that is addressed below.

## IV. THE OUTLOOK

### International Terrorism

Although it is possible that a few others may emulate the irresponsible behavior of Libya's Colonel Qaddafi, international terrorism seems unlikely to pose much of a threat to world order or US interests during the next few years. Even in its presently weakened state, the international system subjects states to a host of legal obligations and practical constraints that they can ignore only at considerable risk. The continuing force of these considerations is evidenced by the fact that international terrorism is no more prevalent today than it was in 1968.

Indeed, throughout the entire postwar era, both the weak and the musclebound have tended to view international terrorism as a policy tool to be used sparingly and (except when exercising their "right" of retaliation) discreetly when potentially effective alternative means are lacking. Moreover, while no apologia for such activity is intended, it should be noted that—with the exception of certain actions undertaken in connection with the Middle East conflict—its objectives have generally been defensive (e.g., the neutralization of hostile foreign-based groups or individuals) as opposed to the offensive and deliberately disruptive character of most transnational terrorism.

Nevertheless, the sporadic employment of government-controlled terrorist groups against Israeli targets both within and outside that country's borders raises some troublesome questions about what the 1980s may hold in store. And while their true sponsorship has yet to be firmly established, so do the recent Rejectionist Front-associated operations in Madrid and Vienna that were intended to bring pressure on moderate Arab regimes.

These questions center on the kind of adjustments in international behavior that may flow from ongoing changes in the distribution and component elements of national power and, no less important, from the growing array of economic, political, and technological restraints affecting the ways in which

latent power can be translated into effective leverage. Are Arab actions a precursor of things to come? Is it, in fact, likely that, lacking or despairing of more conventional means for defending or advancing their international interests, an increasing number of states will opt to engage in—or to sponsor—terrorist activity?

In assessing this possibility, some observers have noted that because of the expense, the risks, and the constraints deriving from the patron-client relationships that are now involved, high-intensity conventional warfare—even of the local variety—may be becoming obsolete. On the other hand, although it is "permissible" under current international ground rules, low-level protracted conflict of the Vietnam type is not, as they point out, a very attractive alternative. For these reasons, they suggest that there will be a strong temptation for governments to employ terrorist groups as means of waging "surrogate warfare" against other nations. Brian Jenkins has expressed this notion as follows:

> Terrorists, whatever their origin or cause, have demonstrated the possibilities of a third alternative—that of "surrogate warfare." Terrorism, though now rejected as a legitimate mode of warfare by most conventional military establishments, could become an accepted form of warfare in the future. Terrorists could be employed to provoke international incidents, create alarm in an adversary's country, compel it to divert valuable resources to protect itself, destroy its morale, and carry out specific acts of sabotage. Governments could employ existing terrorist groups to attack their opponents, or they could create their own terrorists. Terrorism requires only a small investment, certainly far less than what it cost to wage conventional war. It can be debilitating to the enemy. Prior to the 1973 Yom Kippur War, a senior Israeli officer estimated that the total cost in men and money to Israel for all defensive and offensive measures against at most a few thousand Arab terrorists was 40 times that of the Six Days War in 1967. A secret backer of the terrorists can also deny sponsoring them. The concepts of subversion, sabotage, of lightning raids carried out by commandos, are not new, but the opportunities are.*

The case presented, however, is far stronger with respect to the probability of increasing resort to some form of surrogate warfare—which, as Brian Jenkins notes, is scarcely a new phenomenon—than for the corollary argument that this development is likely to be characterized by widespread adoption of terrorist tactics.** For one thing, the safety factor of deniability would all but disappear if a state were to engage in such activity on a regular basis. For another, barring total collapse of world order and consequent international anarchy (something that no state actor has reason to promote), international terrorism is highly unlikely to gain acceptance as an admissible form of behavior in the foreseeable future.

All told, in fact, it seems likely that the employment of terrorist groups in a surrogate warfare role will continue to be more the exception than the rule for some time to come. And if this proves to be the case, it follows that while there may be a slight upward trend in the annual total of international terrorist incidents, the scope of the problem in 1985 should not be much more serious than it is today.

### Transnational Terrorism

On balance, the outlook with respect to transnational terrorism is less encouraging. On the positive side, the decline in the number of states willing to provide terrorist safe haven gives promise of being lasting.* It seems most doubtful that the currently shrinking aggregations of emigre workers will soon regain their former size, and this will probably have some small impact on the security and resources of terrorist groups operating in Western Europe. More importantly, political developments of a sort which presently seem to be at least possible could significantly reduce levels of terrorist activity in such current trouble spots as Northern Ireland, Argentina, and the Middle East.

But overall, the potential for domestic, international, and transnational terrorism is—as asserted at the outset of this study—almost certain to remain high. Furthermore, most of the broad environmental factors that have contributed to the feasibility, efficacy, and popularity of transnational terrorism in recent years will continue to operate with at least equal force in the decade ahead. The salience of some, in fact, seems bound to increase.

Barring some cataclysmic event which reduces mankind to a more primitive order of existence, technological advance, modernizing social and economic change, and growing global interdependence are, for example, essentially irreversible phenomena

---

*Brian Jenkins, *International Terrorism: A New Mode of Conflict*, op. cit., p. 21.

**It must be remembered that under the definitions employed in this study, there are many kinds of covert subversive activities—including support of insurgent paramilitary forces and even sponsorship of highly discriminate sabotage operations—that would not of themselves constitute terrorism.

*Although this trend has been evident for some time, it was underscored in August 1975 when the JRA terrorists who had seized the US Consulate in Kuala Lumpur not only had great difficulty in finding a state willing to grant them safe haven, but were even denied permission to transit nationally-controlled airspace by some Third World countries.

with an urgency and momentum which seems more likely to increase than to decline in the coming decade. And while their political consequences can, to a certain degree, be controlled by carefully-tailored policy decisions, they bode well to aggravate the terrorism problem by generating further increases in (1) divisive ethnicity and nationalism, (2) urban unrest, (3) terrorist capabilities, and (4) societal vulnerabilities.

In the political field, the widespread erosion of established institutions of authority that has both invited and facilitated terrorist activity in recent years shows no signs of abatement. For its part, the postwar international order seems likely to remain under challenge—and thus in flux—throughout the decade ahead. But the problem will probably continue to be most evident at the national level where increasing difficulties of governance hold forth the prospect of a further proliferation of ineffective and unstable regimes.

As a byproduct of the above, most non-state actors on the world stage will probably manage to escape significantly firmer national or international control for some time to come. Because of this, and because the values underlying the strong "social conscience" component of today's political environment seem likely to retain their current force, the chances are that national liberation and leftist revolutionary formations will continue to receive both moral and material support from a wide variety of transnational and international organizations as well as a potentially substantial flow of ransom and "insurance" payments from vulnerable multinational corporations.

At the same time, the trend toward greater international contact and cooperation among terrorist groups that has already markedly enhanced the operational capabilities of some of the organizations involved seems likely to gain further momentum. For one thing, lingering inhibitions born of sharply different goals and outlook are bound to decline in the face of continuing and widely-publicized proof of the advantages that can be derived from such a course. For another, the tough but scattered local counter-terrorist campaigns that are sure to dot the political landscape throughout the decade ahead will each provide compelling new incentives for transnational cooperation.

Ominously enough, therefore, the wave of the future seems to be toward the development of a complex support base for transnational terrorist activity that is largely independent of—and quiet resistant to control by—the state-centered international system. This does not mean, however, that the behavior of supportive state actors will become increasingly irrelevant. On the contrary, it suggests that unless the principal patrons of subversion and revolutionary violence cut back on the assistance they are furnishing to practicing or potential terrorists more drastically than currently available evidence as to their intentions gives grounds to expect, the deleterious impact of their behavior may be considerably greater than in the past.

The problem of extensive and sometimes sympathetic publicity is another aggravating environmental factor that promises to persist in many parts of the world. Not only has all the attention that has been focused on terrorism made it increasingly newsworthy, but the coverage and capabilities of the world's satellite communications systems have been steadily upgraded since 1968. Moreover, radio, television, and the press are bound to continue to reach an ever larger audience.

Although most Western media officials, at least, are by now fully aware of the danger of playing into terrorist hands, competitive pressures are strong and the line between responsible and irresponsible reportage or commentary is very fine. In short, self-censorship is unlikely to work very well. On the other hand, the only potentially more effective alternative—firm governmental management of the news—is, in time of peace, virtually out of the question in most Western democracies.

Another aspect of the information explosion that promises to continue to be troublesome is the diffusion of terrorist-adaptable technological know-how and—to a lesser degree—of possibly inspirational speculation about new and potentially ultra-disruptive terrorist tactics. Although the objectives of such literature may be (and most often are) above reproach, it can scarcely help but aggravate the problems posed by the development and wholesale deployment of sophisticated (and in many cases, man-portable) weaponry; the world-wide proliferation of nuclear facilities; and the race, motivated by both political and economic considerations, to sell nuclear technology and modern armaments to developing countries. And these problems are serious enough as it is. Indeed, despite the attention that has been paid to nuclear safeguards and the physical security of sensitive installations and depots, the world seems to be moving toward a state of affairs in which the limits of any "technological escalation" of terrorist violence will depend more on the self-imposed restraints

affecting the behavior of the groups involved than on lack of capability or opportunity.

It is, of course, the upper limits of the potential scale of terrorist violence that are of most concern. Individual terrorist groups already have the capability of manufacturing or otherwise acquiring a variety of weapons or agents of mass destruction. More will be in a position to exercise this option in the future. Just how likely is it that they will do so?

That the threatened employment of such awesome ordnance would have profound political and psychological effects is undeniable. But it must be emphasized that there are major hazards that would be involved for the terrorists as well. The most important of these (and the one probably primarily responsible for the failure of terrorists to make more of an effort to exploit mass destruction technology in the past) is the high risk of adverse public reaction—particularly in the event that the group involved were to end up in a position where it felt compelled to make good its threat.

Although a few terrorist groups have, in fact, resorted to indiscriminate mass murder, such instances have been relatively rare, and in each case thus far the human toll has been negligible in comparison to the casualties that would result from the broadcast of only a few ounces or less of a highly toxic agent or the detonation of even a small nuclear device. Basically, terrorists are in business to influence people, not exterminate them. Moreover, those that aspire to some sort of political legitimacy—and this means most of them—are generally quite sensitive to the need to take some care to avoid alienating local and international opinion.

The fact remains, however, that weapons of mass destruction cannot help but hold considerable temptation for militants whose basic strategy of violence centers on wringing maximum political leverage from publicity and fear. Hence, it seems prudent to assume that sooner or later some group is bound to take the plunge.

Because their very mention strikes terror into the hearts of many, nuclear weapons come first to mind. But the practical problems facing the would-be nuclear blackmailer are numerous and complex. Although nuclear devices are clearly no longer beyond terrorist reach, their acquisition (whether through theft or manufacture) is still—and for a few years yet will probably continue to be—a relatively demanding task. Once in terrorist hands, their emissions present anti-detection shielding problems not only during passive storage but, if deployed against specific targets, during the delivery and bargaining phases of the operation as well. Moreover, there is further room for trouble when it comes to establishing the credibility of the threat since the target authorities must be persuaded not only that the terrorists actually have a nuclear device but that it will probably work. Finally, all but the most fanatical terrorists might be given pause by the fact that if worst comes to worst, the destructive effects of such weapons are not manageable.

Thus, while the prospect of nuclear-armed terrorists can scarcely be dismissed, a more likely scenario—at least in the short term—would seem to be a terrorist seizure of a nuclear weapons storage facility or a nuclear power plant in a straightforward barricade operation. Such a group need not threaten a nuclear holocaust (although that possibility would be in the back of everyone's mind), just the destruction of the bunker or reactor with the attendant danger of radiological pollution. The threat would be inherently credible. The publicity would be enormous. And if their demands were to be denied, the terrorists would be in a position to tailor the amount of damage they actually inflicted to their appreciation of the existing circumstances.

A more pressing threat, however, would seem to lie in the field of chemical, biological, and radiological agents. In contrast to nuclear devices, many of these are presently relatively easy to acquire. Hence the danger that they could turn up in the hands of the sort of ultra-radical or psychopathic fringe group that would have the fewest compunctions about actually using them is very real. Moreover, since small—sometimes minute—quantities are usually all that are needed for potentially devastating effects, such agents also tend to be easy to conceal, easy to transport, and easy to introduce into the target area. Credibility poses few problems, for a small sample of the agent delivered by mail or left at some designated pick-up point should quickly dispel any doubts on this score. Finally, a number of these agents offer the additional advantage of being amenable to relatively selective targeting (e.g., the occupants of a single building or compound).

As implied in earlier discussion, any such dramatic escalation of terrorist violence as that suggested by these brief scenarios on weapons of mass destruction would be likely to touch off a new flurry of efforts to devise international countermeasures. Indeed, another convention or two would probably result. But just how

much practical effect this would have is open to serious question.

Simply put, the net thrust of the forces at work within the international community promises to remain more centrifugal than centripetal throughout the decade ahead. Indeed, all indications are that rising nationalism and ethnicity, the developing nations' fundamental challenge to the existing world order, and the related proliferation of subnational and other non-state actors will continue to render the international system increasingly complex and uncertain. Moreover, the attendant diffusion and erosion of political authority will tend to be self-reinforcing. And under these circumstances, the degree of consensus needed to adopt and enforce meaningful counterterrorist accords will be more elusive than ever.

It follows that the recent stiffening of a number of nations' policies toward terrorists is almost certainly more reflective of relatively narrow and quite disparate tactical calculations—with respect, for example, to such things as improved domestic security arrangements, the current state of play in the Arab-Israeli conflict, or the latitude of action that may now be afforded by Third World divisions and the general unpopularity of certain terrorist groups—than of any broad upsurge of interest in a global approach. Nonetheless, this development is encouraging for it opens up new possibilities for bilateral and limited multilateral counterterrorist undertakings of a sort that have, in combination with unilateral measures, proved relatively effective in the past.

In sum, although it is unlikely to trigger a collapse of world order, transnational terrorism promises to pose a continuing and potentially gravely unsettling problem for the world community until such time, possibly years hence—that the international system gets into new and generally accepted contours. The frequency and intensity of violence will decline in some areas. The cast of characters will be constantly changing. In all likelihood, technological and organizational innovations in the security field will make terrorism a more risky affair. Yet at best the overall number of terrorist groups seems unlikely to decline—and the number of countries in which they are active appears destined to grow. Furthermore, because of their symbolic value, their availability, and the embarrassment they can create, the popularity of *American targets* will probably remain high.

Ironically, there may well be fewer *people engaged* in transnational terrorist activity some five years hence than there are today. But this prospect is not as encouraging as it sounds. For even if changes in the political environment or partial satisfaction of their objectives do encourage some of the larger and more "responsible" formations to eschew transnational violence, their place on the international stage is likely to be quickly filled by more militant splinter groups—not to mention a smattering of total newcomers to the game. And since (as amply demonstrated by the JRA, Carlos and company, and the PFLP) small terrorist groups can, when properly connected, mount all manner of highly disruptive operations, such a development could—through the introduction of additional increments of fanaticism—provoke at least temporary increases in the intensity of terrorist violence.

In any event, it seems likely that the constraints on terrorist behavior will, through international default, continue to depend primarily on (1) the terrorists' subjective orientation and (2) the policies and resources of the individual countries in which they operate. Of necessity, however, the impact of these will be uneven. Remember, too, that the inherent dynamics and logic of a campaign of terrorist violence are such that it has a natural propensity to escalate over time. Moreover, all but the most isolated terrorist groups will be able to draw on a common and cumulative media-fed pool of experience and inspiration. Hence, even if the cited constraints do result in some tapering off in the frequency of transnational terrorist incidents during the next few years, we should expect to witness steadily greater and more widespread sophistication in targetting, execution, and weaponry. And while, as suggested earlier, most groups will probably continue to be deterred by both moral considerations and calculations of the risks involved, the danger that a fanatic few might resort to weapons of mass destruction will increase accordingly.

## V. IMPLICATIONS

Two basic messages emerge from the foregoing discussion. The first is that the phenomenon of widespread internationalized terror is not only likely to persist for at least the next several years, but also to evolve in ways that could pose a more substantial threat to US interests—and, under certain circumstances, to world order—than in the recent

past.* The second is that the factors bearing on this phenomenon and its political ramifications are so numerous and cut across so many jurisdictional and disciplinary lines that the development of more effective national and international countermeasures is likely to be a particularly demanding task.

Whether or not weapons of mass destruction are actually brought into play, the odds are that the impact of transnational and international terror will be more sharply felt in the US in the years just ahead. There is, for example, good reason to believe that at least a few foreign terrorist groups are planning to step up their attacks on American targets abroad in the near future. Moreover, the influx of foreign travellers and dignitaries expected in connnection with such major US-sponsored events as the current Bicentennial celebrations and the 1980 Winter Olympics will inescapably afford a host of opportunities for dramatic terrorist action. Hence, despite the likelihood that the practical considerations that have so far generally deterred foreign-based terrorist groups from extending their areas of operation to US shores will retain their present force, there is a good chance that a few will succumb to the temptation to do so.** Finally, no matter how tough and well-publicized a "no concessions" policy the US Government maintains, it seems likely that Washington will be targeted by terrorist demands somewhat more frequently in the future—partly to probe more fully the limits of US resolve, partly for sheer publicity or other psychological effect, and partly to foster intergovernmental or domestic tensions.

More importantly, perhaps, even if the problem of internationalized terror is not brought "closer to home" in the ways suggested above, it promises to impinge more directly on US interests and options with respect to a broad range of critical issue areas. For example, it is likely to:

—Figure as even more of an irritant in both East-West and North-South relations;

—Sharpen the dilemmas inherent in the politically and economically sensitive questions of arms sales and the transfer of advanced technology;

—Provide potential new grounds for strains in Washington's relations with its principal friends and allies;

—Reinforce some of the obstacles which currently impede efforts to find a mutually-acceptable way to cope with the dependence of Western industrialized countries on foreign energy sources; and

—Impose burdensome new demands on limited human and material resources.

Although, as emphasized in earlier discussion, the dimensions of the threat posed by international and transnational terror should not be overdrawn, the picture outlined above is sobering. Among other things, it suggests that the machinery and guidelines that the US and its allies have so far developed for dealing with the problem bear careful review.

There is no magic formula for endowing any given government's approach to the problem of terrorism with the direction, breadth, and coherence required to marshal the remarkably disparate talents and resources that are needed and to weave its response into the overall fabric of its domestic and foreign concerns. Indeed, any number of alternative courses of action could prove equally effective. Nevertheless, it bears emphasis that together with *timely intelligence* and *sound multi-disciplinary analytical support*, *flexibility* and *extensive coordination* (both inter- and intra-state) would seem to be critical to devising and implementing a counterterrorist strategy that is both internally consistent and minimally disruptive to national values and foreign policy objectives in terms of "hidden" social, economic, and political costs.

Obviously, such a strategy cannot be framed in isolation. Among other things, its architects would need ready access to top policymakers in both the foreign and domestic fields as well as to the advice of a broad range of government and non-government experts or interested parties. Moreover, the necessity to maintain some freedom of maneuver (born of the fact that every new terrorist incident is likely to have its unique aspects) is a particularly delicate

---

*Despite the frequency with which terrorists have attacked American citizens and property overseas, the US has been lucky in many ways. For example, foreign terrorist groups have for the most part eschewed staging operations on American soil—and those transnational terrorist incidents that have been authored here by domestic groups have generally been relatively minor affairs. Furthermore, the US Government has, as previously indicated, rarely been the target of terrorist demands. Hence, except for extensive (and readily accepted) airport security measures, the quality of American life and democratic freedoms has been little affected. And Washington has so far been spared the agony of having the lives of key political leaders or large numbers of innocents, be they Americans or foreigners, hang on its decisions.

**While it bears note, the parallel danger that commonly perceived opportunities for action in connection with such events could result in growing contact and cooperation between US-based and foreign terrorist groups falls outside the purview of this study.

33

problem—and one that can easily contribute to unnecessary misunderstandings. Hence, routine pre-crisis coordination of terrorism-related policies and contingency plans with all the key domestic and foreign actors whose interests and options they could affect becomes all the more important.

## SIGNIFICANT VARIABLES

### Group Characteristics

—Nature of the organization or, if none, of the political, sectoral, or bureaucratic entity controlling the estate

—Country of origin

—Relationship to the government of that country

—Size and organization

—Leadership

—Composition (and occupational and educational qualifications of the members, and their age range)

—Objectives

#### Elementary Typology*

Perpetrators (ethnic, religious, linguistic, or regional)

Nationalists (territorial or sub-cultural)

Ideological

—Anarchist

—Radical Left (revolutionary socialist, Trotskyist, Maoist, Titoists, Castroist, and other oriented wing groups)

—Among Communists

—Extreme Right

—Other

Para-Jewish

—Domestic base (extent of popular sympathy and support, links with legitimate social or political organizations, and links with other domestic dissident groups)

—Foreign links (with other terrorist organizations, with international or bilateral transnational organizations, and with foreign governments)

—Life expectation of formation, period or periods of concealment or unconcealed activity, and, if applicable, date of demise

### Event Characteristics

—Location of incident

—Nature of act

#### Elementary Typology

—Kidnapping

—[illegible]