Authority NND909310
By MW Date 3/1/12

| ORIG'N/ACTION | | |
|---|---|---|
| INR · 6 | | |
| RM/R | REP | AF |
| 1 | | 5 |
| ARA | EUR | FE |
| | 5 | |
| NEA | INR | |

# DEPARTMENT OF STATE
# AIRGRAM

A-176    LIMITED OFFICIAL USE

Pol 23-8 Libya
Pol 13 to Arab

FOR RM USE ONLY

TO    :    Department of State

INFO:    USINT Algiers    Amembassy Amman
         Amembassy Beirut    Amembassy Bonn
         Amembassy Cairo    Amembassy London
         Amembassy Tel Aviv
DEPT PASS: Other Interested Posts
FROM    :    Amembassy, Tripoli    DATE: November 23, 1972

SUBJECT :    LARG Reservations About Terrorism

REF    :    FBIS M141849 Nov. 72 (Press Review)

SUMMARY: The Tripoli daily newspaper, al-Fajr al-Jadid, on
November 14, 1972 featured a news report heavily larded with
editorial content regarding terrorism. The substance of the
reportage is that the LARG, while it must defend and justify
terrorist operations mounted by Palestinians and their
sympathizers, sees little benefit to the Arab Cause accruing
as a result of those operations and would strongly prefer
that Fedayeen operations be confined to Israel and the
surrounding Arab countries. Al-Fajr may be regarded, in
our view, as an authoritative mouthpiece for the Qadhafi
regime. Lamentable, the paper gave no indication that the
LARG is prepared to use its moral and financial influence
with the Fedayeen to reflect its reservations about "unlimited
terrorism."

## Al-Fajr Report

Under the headline, "Secret Decisions of the American
Government against Arabs Residing in the United States,"
Tripoli's daily al-Fajr al-Jadid November 14, 1972
reported that the "huge wave of anti-Arab propaganda now
sweeping Europe and the United States is directed in
general against the Arab States and in particular against
LAR." Al-Fajr said that the release of their "comrade
commandos" from "enemy prisons" by the Lufthansa hijackers
and the fact that all the commandos sought asylum in LAR
sparked this propaganda and the "violent, anti-Arab measures
by governmental and semi-official authorities in Europe
and the United States" directed against Arab students and

FORM
4-62 DS-323

LIMITED OFFICIAL USE

FOR DEPT. USE ONLY
☑ In    ☐ Out

Drafted by:
POL:AHabayeb/CEMarthinsen:emh

Clearances:    Contents and Classification Approved by:
ADCM:CEMarthinsen

Tripoli A-176
Page 2

LIMITED OFFICIAL USE

laborers.

Al-Fajr reproduced part of an article published recently
by the Washington Star and headlined, "Secret Memo of the
State Department Restricts Arab Visits to the United States."
The Star reported that secret USG decisions "against the
Arabs" were implemented beginning October 19. Al-Fajr
also referred to the resolve of Secretary of State Rogers to
"protect every Zionist in the United States, liquidate
all elements supporting the Arab Cause, confiscate all
Arab publications concerning the Arab Cause and silence
every voice supporting that Cause, particularly among Arab
students in American Universities." The US aims at making
Arabs in America feel that everyone moving and speaking
in favor of that Cause is subject to surveillance by
American Intelligence, and at subduing and humiliating the
national feelings of Arab students while bolstering Zionists'
feelings of pride that they enjoy American support of
their State, the paper said.

Moreover, al-Fajr charged, at the University of North
Carolina "Arab students -- including eight Libyans --
were subject to ridiculous questions such as, 'Why does
Libya help the Commando Organizations? What do you know
about these Organizations? Do you know any Palestinian
student here? Do you promise not to talk about the Palestinian
Problem? Do you have any circulars or pictures or state-
ments regarding the Palestinian Cause?'"

LAR Position?

Al-Fajr in commenting on the above, asserted that the
United States and Britain were "motivated by Zionist
Intelligence to take advantage of what they call 'Terrorism',
in order to justify the committing of more acts of aggression.
'It is strange that they forgot that the Zionists were the
first people to use terrorism through their terrorist bands
of Irgun, Stern, and Hagana." The paper asked, "What
benefits accrue to the Arabs as a result of these acts of
terrorism? Are the Arabs getting any benefits?" "Of
course not. In fact, the Arabs are the only ones harmed
by these terrorist operations."

"In fact" al-Fajr concludes, the Arab States, particularly
the LAR, bear with deep conviction their responsibility

LIMITED OFFICIAL USE

Tripoli A-176
Page 4

LIMITED OFFICIAL USE

in his October 7 speech at Tripoli, went out of his way
to praise the Japanese perpetrators of the Lod Airport
massacre for having displayed the "true Fedayeen spirit";
he also claimed that the LARG is backing morally and
financially "all the Fedayeen" (Tripoli 1615).

As is his wont, Qadhafi would like to have his cake and
eat it too; he ipso facto abets Fedayeen terrorist
activities with Libyan funds and defends their operations
anywhere, even though he would prefer that a unified
commando movement, in tandem with a progressive Arab
bloc, confine its operations to occupied Palestine,
including Israel. Unfortunately there is no indication
in the al-Fajr article that Qadhafi is considering the
use of his moral and financial influence to limit
Fedayeen operations.

JOSIF

CLASSIFIED BY CHARLES E. MARTHINSEN
AUTOMATICALLY DECLASSIFIED ON
19 NOVEMBER 1973

LIMITED OFFICIAL USE



 *Department of State* **TELEGRAM**

SECRET    653

PAGE 01   STATE  042486

73462
ORIGIN SS-25

INFO  OCT-01  ADP-00  /026 R

DRAFTED BY AF:DDNEWSOM/NEA:ARN:DAKORN:JFC
22678    3-7-73
APPROVED BY P - AMB. PORTER
S/CCT - AMB MEYER
NEA - MR. ATHERTON
AF/N - MR.BLAKE
S/S-MR. MILLER

------------------------    125526

R 080053Z MAR 73
FM SECSTATE WASHDC
TO USINT ALGIERS
AMEMBASSY BEIRUT
USINT CAIRO
AMEMBASSY JIDDA
AMEMBASSY KUWAIT
AMEMBASSY ABU DHABI
AMEMBASSY MANAMA
AMEMBASSY RABAT
AMEMBASSY TRIPOLI
AMEMBASSY TUNIS
AMEMBASSY SANAA
INFO AMEMBASSY AMMAN
AMEMBASSY KHARTOUM
USMISSION USUN NEW YORK
AMCONSUL JERUSALEM
AMEMBASSY LONDON
AMEMBASSY NOUAKCHOTT
AMEMBASSY PARIS
AMEMBASSY BRUSSELS
AMEMBASSY ROME
AMEMBASSY BONN
AMEMBASSY MOSCOW

S E C R E T STATE 042486

EXDIS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETARY

SECRET



# Department of State

# TELEGRAM

SECRET

PAGE 02   STATE   042486

E.O. 11652: ADS, DECLAS. DEC. 31, 1981
TAGS: PINS, XF
SUBJ:   ARAB GOVERNMENTS SUPPORT FOR BLACK SEPTEMBER ORGANI-
        ZATION

1.   KHARTOUM TRAGEDY HAS UNDERLINED AGAIN THE SERIOUS
IMPLICASIONS FOR INTERNATIONAL ORDER OF BLACK SEPTEMBER
ORGANIZATION.  DEPARTMENT DESIRES YOU EMPHASIZE TO MOST
GOVERNMENT AT HIGHEST LEVEL POSSIBLE, SERIOUS VIEW U.S.
GOVERNMENT WILL TAKE OF SUPPORT FOR OR TOLERATION OF
BLACK SEPTEMBER ORGANIZATION BY ARAB GOVERNMENTS.

2.   ALL APPROACHES SHOULD STRESS THAT ACTIVITIES OF THIS
ORGANIZATION CREATE COMMON PROBLEM OF WORLDWIDE SIGNIFI-
CANCE ALREADY DETRIMENTAL TO ARAB CAUSE AND LIKELY TO BE
MORE SO IF THERE ARE SUBSEQUENT INCIDENTS.  ARAB LEADERS
SHOULD WELL UNDERSTAND RISK TO THEMSELVES IF TERRORIST
ACTIVITIES OF THIS ORGANIZATION CANNOT BE FRUSTRATED.

3.   THE U. S. UNDERSTANDS FORCE OF PALESTINE CAUSE IN ARAB
WORLD AND HAS ITSELF MADE CLEAR ITS SYMPATHY FOR PALES-
TINIANS.  WE BELIEVE RECENT EVENTS HOWEVER HAVE CLEARLY
DEMONSTRATED THAT RATIONALIZING EXISTENCE OF TERRORIST
ORGANIZATIONS BY LINKING THEM WITH PALESTINE CAUSE SERVES
ONLY TO GIVE THEM WIDER SCOPE TO DETRIMENT OF ALL AND OF
ARAB CAUSE.  IN VIEW OF SHOCK WITH WHICH KHARTOUM MURDERS
WERE RECEIVED BY AMERICAN PUBLIC AND OUR OWN STRONG OPPOSI-
TION TO TERRORISM, ATTITUDE OF U.S. TOWARD ARAB GOVERN-
MENTS WILL INCREASINGLY BE STRONGLY AFFECTED BY DEGREE TO
WHICH THEY PROVIDE FUNDS AND OTHER SUPPORT TO OR HARBOR
MEMBERS BSO OR GROUPS WITH SIMILAR OUTLOOK.

4.   SHOULD BE OBVIOUS TO ALL THAT CONTINUATION OF BSO
ACTIVITIES WILL MAKE USG'S TASK IN SEEKING A PEACEFUL
SETTLEMENT FOR ARAB-ISRAELI CONFLICT MUCH MORE COMPLEX,
DIFFICULT AND LENGTHY.  WE ARE SURE ARAB GOVERNMENTS WOULD
NOT WANT TO SEE THIS HAPPEN.

5.   FOR BEIRUT:  STATE 41440 COVERS ESSENTIAL ELEMENTS OF
APPROACH YOU SHOULD MAKE.  YOU MAY IN ADDITION DRAW ON
ANY OF FOREGOING POINTS YOU FEEL USEFUL.

PRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRET

SECRET

**TELEGRAM**

SECRET

PAGE 03   STATE   042486

6.   FOR JIDDA, KUWAIT, MANAMA AND ABU DHABI. YOU SHOULD
STRESS ESPECIALLY THAT IN VIEW OF FATAH'S PROVEN LINK
WITH BSO THERE CAN BE NO DENYING THAT FUNDS THEY PROVIDE
OR PERMIT TO GO TO FATAH ARE BEING USED TO FINANCE BSO
OPERATIONS.

7.   FOR AMMAN AND KHARTOUM:   SUGGEST FOREGOING BE CONVEYED
AS INFORMATION TO THESE GOVERNMENTS ALREADY OPPOSED TO
BSO AS APPROACH WE ARE MAKING TO OTHERS.     ROGERS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETAR

SECRET

EXDIS EXDIS EXDIS EXDIS EXDIS EXDIS



## Department of State
### TELEGRAM

SITUATION ROOM

'73 MAR 13 PM 8:21          '73 MAR 15 PM 8:21

SECRET    985

PAGE 01   STATE 047847

66
ORIGIN SS-25

INFO: OCT-01  ADP-00  /026 R

DRAFTED BY NEA/ARN:DAKORN/INR/RNA/CJONES:JFC
APPROVED BY NEA • JOSEPH SISCO
NEA - MR. ATHERTON
S/CCT - AMB. MEYER
AF/N - MR. BLAKE
EUR/RPM - MR. MCGUIRE
S/S • MR• MILLER
EA/J - MR. CAMPBELL

------------------------          809836

R 151655Z MAR 73
FM SECSTATE WASHDC
TO ALL NATO CAPITALS
AMEMBASSY DUBLIN
AMEMBASSY STOCKHOLM
AMEMBASSY MADRID
USINT CAIRO
USINT ALGIERS
AMEMBASSY BEIRUT
AMEMBASSY JIDDA
AMEMBASSY KUWAIT
AMEMBASSY ABU DHABI
AMEMBASSY MANAMA
AMEMBASSY RABAT
AMEMBASSY TUNIS
AMEMBASSY TRIPOLI
AMEMBASSY SANAA
AMEMBASSY NOUAKCHOTT
AMEMBASSY TOKYO
AMEMBASSY NEW DELHI
AMEMBASSY KABUL
AMEMBASSY TEHRAN
AMEMBASSY ISLAMABAD
INFO AMEMBASSY AMMAN
AMEMBASSY KHARTOUM
USMISSION USUN NEW YORK
AMCONSUL JERUSALEM
AMEMBASSY MOSCOW

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETARY

SECRET

Department...

# TELEGRAM

SECRET

PAGE 02   STATE 047847

S E C R E T STATE 047847

EXDIS

E.O. 11652: ADS, DECLAS. DEC. 31, 1981
TAGS: PINS, XF, XO, US
SUBJ: ARAB GOVERNMENT SUPPORT FOR BLACK SEPTEMBER ORGANIZA-
TION
REF: STATE 42486: 44811: 46941

1. QUESTION OF LINK BETWEEN BLACK SEPTEMBER ORGANIZATION
(BSO) AND FATAH HAS BEEN SUBJECT OF MUCH PUBLIC DISCUSSION
SINCE MURDER OF U.S. DIPLOMATS IN KHARTOUM. FATAH LEADER
ARAFAT HAS DISAVOWED CONNECTION WITH BSO, AND MANY IN ARAB
WORLD AND ELSEWHERE HAVE POINTED TO ARAFAT'S DISAVOWAL AS
JUSTIFICATION FOR CONTINUING FINANCIAL AND OTHER SUPPORT
FOR FATAH.

2. AS STATED IN REFTELS, USG HAS INFORMATION THAT FATAH
IS IN FACT PARENT BODY OF BSO. FOLLOWING IS INTELLIGENCE
BRIEF PREPARED BY DEPARTMENT AND CIA. THOUGH BRIEF ORI-
GINALLY WAS SLUGGED NO FOREIGN DISSEMINATION, AGENCY HAS
AGREED TO ITS BEING USED WITH SELECTED FOREIGN GOVERNMENT
OFFICIALS IN OUR EFFORTS TO PERSUADE THEM CEASE SUPPORT
FOR OR TOLERATION OF BSO AND OTHER TERRORIST GROUPS. THIS
BRIEF SHOULD NOT BE ATTRIBUTED TO CIA IN ANY WAY, AND OWING
TO EXTREME SENSITIVITY OF INFORMATION IT SHOULD BE CON-
VEYED ORALLY ONLY:

BEGIN TEXT: THE BLACK SEPTEMBER ORGANIZATION (BSO)
IS A COVER TERM FOR FATAH'S TERRORIST OPERATIONS EXECUTED

BY FATAH'S INTELLIGENCE ORGANIZATION, JIHAZ AL-RASD. THE
COLLAPSE OF FATAH'S GUERRILLA EFFORTS LED FATAH TO CLANDES-
TINE TERRORISM AGAINST ISRAEL AND COUNTRIES FRIENDLY TO IT.
FATAH FUNDS, FACILITIES, AND PERSONNEL ARE USED IN THESE
OPERATIONS. THERE IS EVIDENCE THAT THE "BSO" OPERATION
IN KHARTOUM WAS CARRIED OUT WITH SUBSTANTIAL HELP FROM
FATAH'S KHARTOUM OFFICE AND APPLAUDED BY FATAH RADIO
STATIONS IN CAIRO AND BEIRUT. IN ADDITION, FATAH DEPUTY
CHIEF SALAH KHALAF, CHIEF OF "BSO", GETS AN INDEPENDENT

TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRETAR

SECRET

**TELEGRAM**

SECRET

PAGE 03   STATE   047847

SUBSIDY FROM THE LIBYAN GOVERNMENT.

FOR ALL INTENTS AND PURPOSES NO SIGNIFICANT DIS-
TINCTION NOW CAN BE MADE BETWEEN THE BSO AND FATAH,  FOUR
OF FATAH'S 18-MAN GENERAL COMMAND, INCLUDING KHALAF, THE
PLANNER AND DIRECTOR OF THE MUNICH AND KHARTOUM OPERA-
TIONS, ARE IDENTIFIED AS "BSO" LEADERS.  FATAH LEADER
YASIR ARAFAT HAS NOW BEEN DESCRIBED IN RECENT INTELLI-
GENCE AS HAVING
GIVEN APPROVAL TO THE KHARTOUM OPERATION PRIOR TO ITS
INCEPTION.

ARAFAT CONTINUES TO DISAVOW PUBLICLY ANY CONNECTION
BETWEEN FATAH AND TERRORIST OPERATIONS.  SIMILARLY, FATAH
MAINTAINS ITS PRETENSE OF MODERATION VIS-A-VIS THE ARAB
GOVERNMENTS, A POSE WHICH MOST OF THESE GOVERNMENTS FIND
CONVENIENT FOR THEIR PUBLIC POSITION TOWARD THE PALESTIN-
IAN CAUSE.  IT SEEMS CERTAIN ALSO THAT SOME ELEMENTS WITH-
IN FATAH ARE OPPOSED TO TERRORISM, AND THE CHAOTIC STATE
OF THE WHOLE FEDAYEEN MOVEMENT ASSURES FACTIONALISM,
POWER STRUGGLES, AND UNCLEAR LINES OF COMMAND.  NONETHE-
LESS, THE FATAH LEADERSHIP INCLUDING ARAFAT NOW SEEM
CLEARLY COMMITTED TO TERRORISM. END TEXT

3.   BELIEVE INFORMATION RE BSO-FATAH LINK SHOULD BE MADE
AVAILABLE TO SELECTED OFFICIALS ALL EUROPEAN AND ARAB
CAPITALS WHICH WERE ACTION ADDRESSEES REFTELS, BUT LEAVE
TO DISCRETION ALGIERS AND TRIPOLI WHETHER THIS ADVISABLE
IN CASE OF ALGERIA AND LIBYA.

4.   FOR TOKYO, NEW DELHI, KABUL, TEHRAN, ISLAMABAD:
DEPARTMENT REPEATING STATE 46941 TO YOU FOR INFO.  BELIEVE
IT WOULD  BE USEFUL FOR YOU TO FILL IN APPROPRIATE HOST
GOVERNMENT OFFICIALS ON LINK BETWEEN BSO AND FATAH AS PER
ABOVE.  ROGERS

NOT TO BE REPRODUCED WITHOUT THE AUTHORIZATION OF THE EXECUTIVE SECRE

# PUBLIC PAPERS OF THE PRESIDENTS

## OF THE UNITED STATES

# Jimmy Carter

## 1979

(IN TWO BOOKS)

### BOOK II—JUNE 23 TO DECEMBER 31, 1979



UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON : 1980

the physical, biological, mathematical, or engineering sciences." To date, 133 Medals have been awarded, beginning in 1962. Each President beginning with Kennedy has awarded Medals. President Carter presented the most recent awards on November 22, 1977.

The presentation of the award to the 1979 recipients will occur in the near future.

## Decontrol of Marginal Oil Wells

*Executive Order 12187.  December 29, 1979*

### BASE PRODUCTION CONTROL LEVEL FOR MARGINAL PROPERTIES

By the authority vested in me as President by the Constitution and statutes of the United States of America, including the Emergency Petroleum Allocation Act of 1973, as amended (15 U.S.C. 751 *et seq.*), and notwithstanding the delegations to the Secretary of Energy in Executive Order No. 11790, as amended by Executive Order No. 12038, and in order to delay the decontrol of marginal oil wells, it is hereby ordered as follows:

1–101. For purposes of the pricing regulations adopted pursuant to the Emergency Petroleum Allocation Act of 1973, with respect to months commencing after December 31, 1979, the base production control level for marginal properties shall equal 20 percent of the total number of barrels of old crude oil produced and sold from the property concerned during calendar year 1978, divided by 365, multiplied by the number of days during the month in 1978 which corresponds to the month concerned.

1–102. For purposes of this Order, the term "marginal properties" has the same meaning as that term under the crude oil pricing regulations adopted pursuant to

the Emergency Petroleum Allocation Act of 1973, as amended.

1–103. The Secretary of Energy may, pursuant to Executive Order No. 11790, as amended by Executive Order No. 12038, adopt such regulations as he deems necessary or appropriate to conform the crude oil pricing regulations to this Order.

JIMMY CARTER

The White House,
  December 29, 1979.

[Filed with the Office of the Federal Register, 12:45 p.m., December 31, 1979]

NOTE: The text of the Executive order was released on December 31.

## Export Controls for Foreign Policy Purposes

*Letter to the Speaker of the House and the President of the Senate.  December 29, 1979*

*Dear Mr. Speaker:  (Dear Mr. President:)*

In accordance with the authority contained in section 6 of the Export Administration Act of 1979 (Public Law 96–72 of September 29, 1979; hereinafter "the Act"), I hereby extend export controls maintained for foreign policy purposes as specified in Enclosure 1. In accordance with section 6(e) of the Act I hereby notify Congress of this extension.

I am also submitting, as Enclosure 2, my conclusions with respect to: the criteria set forth in section 6(b) of the Act; the nature and result of alternative means attempted to achieve the purposes of these controls or the reasons for extending them without attempting any such alternative means; and the ways in which such controls will further significantly the foreign policy of the United States or will further its declared international obligations.

Pursuant to section 6(k) of the Act, the countries and the goods and technologies

listed in Enclosure 1 will be clearly iden-
tified in Export Administration Regula-
tions published in the FEDERAL REGISTER
as being subject to export controls for
foreign policy purposes.

With reference to section 4(c) of the
Act, adequate evidence has been pre-
sented demonstrating that, notwithstand-
ing foreign availability, the absence of
these controls would prove detrimental
to the foreign policy of the United States.

Revisions of the regulations are being
issued with an effective date of Jan-
uary 1, 1980, to comply with section 6(a)
(2). They will be reissued in final form
later in 1980, in order to take into con-
sideration public comments received pur-
suant to section 13(b) of the Act.

Sincerely,

JIMMY CARTER

[Enclosure 1]

EXPORT CONTROLS FOR FOREIGN POLICY
PURPOSES EXTENDED FOR THE PERIOD
JANUARY 1 THROUGH DECEMBER 31,
1980

I. All countries except members of the
North Atlantic Treaty Organization, Ja-
pan, Australia, and New Zealand:

A. A validated license is required for
the export of crime control and detection
instruments, equipment, and related tech-
nical data.

B. Applications for validated export li-
censes will generally be considered favor-
ably on a case-by-case basis unless there
is evidence that the government of the im-
porting country may have violated inter-
nationally recognized human rights and
that the judicious use of export controls
would be helpful in deterring the develop-
ment of a consistent pattern of such vio-
lations or in distancing the United States
from such violations.

II. South Africa and Namibia only:

A. A validated license is required for
the export of:

1. All U.S.-origin commodities and
technical data for military and po-
lice entities;

2. Aircraft and helicopters and items
controlled pursuant to the South
African arms embargo for all con-
signees; and

3. Computers for government con-
signees exceeding performance levels
permitted for shipment at national
discretion under multilaterally
agreed security export controls.

B. Applications for validated export li-
censes will:

1. Be denied for military or policy en-
tities except, on a case-by-case basis,
for medicines, medical supplies, and
medical equipment not primarily
destined to military or police en-
tities or for their use; and

2. Generally be considered favorably
on a case-by-case basis for:

a. Aircraft and helicopters for which
adequate written assurances have
been obtained against military, para-
military, or police use; and

b. Computers which would not be
used to support the South African
policy of apartheid.

III. Libya, Iraq, People's Democratic
Republic of Yemen, and Syria only:

A. A validated license is required for the
export of aircraft valued at $3 million or
more and helicopters over 10,000 pounds
empty weight.

B. Applications for validated export li-
censes will generally be considered favor-
ably on a case-by-case basis for such air-
craft and helicopters for civil use if is-
suance of the licenses would be consist-
ent with the policies set forth in subsec-
tions 3(4), 3(8), and 3(10) of the Act
and subject to the requirement in sub-

2291

section 6(i) of the Act to notify Congressional committees.

IV. Libya only:

A. A validated license is required for off-highway wheel tractors of carriage capacity of 10 tons or more.

B. Applications for validated export licenses will generally be considered favorably on a case-by-case basis for such tractors in reasonable quantities if for civil use, such as transportation of oil field equipment.

V. North Korea, Vietnam, Kampuchea, and Cuba only:

A. A validated license is required for all commodities and technical data except:

1. Technical data generally available to the public and educational materials;

2. Personal baggage, crew baggage, vessels and aircraft on temporary sojourn, ship stores, and plane stores;

3. Foreign-origin items in transit through the United States;

4. Shipments for U.S. Government personnel and agencies; and

5. Gift parcels not exceeding $200 of commodities such as food, clothing (non-military), and medicines.

B. Applications for validated licenses will generally be denied. Exports on a non-commercial basis to meet emergency needs will be considered on a case-by-case basis.

VI. USSR only:

A validated license is required for the export of petroleum equipment.

VII. All countries:

A. A validated license is required for the export of the following commodities and related technical data:

1. Commodities which could be of significance for nuclear explosive purposes; and

2. Any commodities which the exporter knows or has reason to know will be used directly or indirectly for:

a. Designing, developing, or fabricating nuclear weapons or nuclear explosive devices;

b. Devising, carrying out, or evaluating nuclear weapons tests or nuclear explosions;

c. Designing, constructing, fabricating, or operating the following facilities or components for such facilities:

　　i. Facilities for the chemical processing of irradiated special nuclear or source material;

　　ii. Facilities for the production of heavy water;

　　iii. Facilities for the separation of isotopes of source and special nuclear material; or

　　iv. Facilities for the fabrication of nuclear reactor fuel containing plutonium.

B. In reviewing applications for validated licenses pursuant to sub-paragraph VII A above, the following considerations are among those which will be taken into account:

1. The stated end-use of the component;

2. The sensitivity of the particular component and its availability elsewhere;

3. The types of assurances or guarantees given in the particular case; and

4. The non-proliferation credentials of the recipient country.

[Enclosure 2]

CONCLUSIONS WITH RESPECT TO CRITERIA, ALTERNATIVE MEANS, AND FURTHERANCE OF FOREIGN POLICY OR INTERNATIONAL OBLIGATIONS

I. *Crime Control and Detection Instruments and Equipment*

*Administration of Jimmy Carter, 1979*

These controls continue in effect pursuant to section 6(j) of the Act.

No country has been formally determined to have a government engaging in a consistent pattern of gross violations of internationally recognized human rights. Therefore, except for the embargoes on North Korea, Vietnam, Kampuchea, Cuba, and the South African police and military, the validated license requirement for these items does not constitute a presumption that an application for such a license would be denied. However, where a consistent pattern of such violations appears to be developing, either positive or negative use of export controls might help to deter such development.

II. *South Africa and Namibia*

Prohibition of the export of virtually all items to military and police entities and controls on the export of aircraft and helicopters to all consignees and on the export of specified computers to government consignees are intended to distance the United States from the practice of apartheid, strengthen the effect of the United Nations arms embargo, and support racial justice throughout Africa.

There has been no movement toward fundamental social and political change in South Africa. Not extending controls would adversely affect the credibility of our South African policy in the minds of both the South African Government and black African nations.

The United States has attempted to influence the South African Government through public expressions of dissatisfaction with its social and political systems and reduction of diplomatic and other relationships. These other means have been insufficient to serve as an adequate alternative to export controls.

Regarding enforcement, it is recognized that it is extremely difficult, if not impossible, to prevent the South African

military and police from acquiring U.S. goods indirectly. On the other hand, we believe that U.S. firms have been conscientious in complying with the controls. Foreign firms with no U.S. ties are probably less zealous in adhering to U.S. regulations, especially for items exported to them under general license and for U.S. components or technology incorporated in foreign manufactured products.

Most types of equipment and technology affected by the controls are available from foreign sources. However, Australia recently restricted sales of aircraft to South Africa.

The effects of the controls on U.S. exports can be only roughly estimated. Factors other than export controls affect the overall export picture.

In general terms, the U.S. share of the South African market dropped from 13 percent in 1977 to 11 percent in 1978. If the 13 percent share had been maintained, U.S. exports would have been $400 million higher in 1978. In 1977 the United States had the largest market share; in 1978 the United Kingdom and Germany had larger shares. Significant decreases in U.S. market shares occurred from 1977 to 1978 in pharmaceuticals, tires, chemicals, trucks, locomotives, motor vehicle components, and computers. For the first five months of 1979 the U.S. share of the market had recovered to 12.8 percent. There have been substantial U.S. sales since May.

Although it is difficult to determine whether losses are the result of the embargo or of other factors, examples reported by individual U.S. firms include the following:

—loss to a Japanese firm of a $45 million order for a commodity for which previous orders alternated between U.S. and German suppliers;

—inability of a U.S. company to provide technical data to its South African

subsidiary, which resulted in the loss of $1 million in annual royalty payments and ultimately led to divestiture of the subsidiary;

—loss to a British firm which stresses U.S. export controls in its marketing efforts of three contracts for about $10 million and of estimated follow-on sales of about $26 million;

—placement with a non-U.S. firm of a $50 million order by a South African company which had previously purchased exclusively from U.S. companies;

—sourcing by a U.S. project manager of $500 million worth of contracts in 1979 without U.S. participation;

—damage to reputation as a reliable supplier because of inability to supply parts and servicing for previously sold equipment;

—loss of exports because of the difficulty of determining whether an insignificant portion might reach the military or police; and

—additional administrative expenditures in order to comply with U.S. regulations while attempting to meet existing contractual and servicing agreements.

## III. *Terrorism*

The listing of Libya, Iraq, People's Democratic Republic of Yemen, and Syria in the heading of part III of Enclosure I of this notification constitutes the determination, pursuant to subsection 6 (i)(1) of the Act, as to which countries have repeatedly provided support for acts of international terrorism.

Exports to these countries of crime control and detection instruments and equipment (which include vehicles designed to military specifications), aircraft valued at $3 million or more, and helicopters over 10,000 pounds empty weight are controlled pursuant to section 6(i) of the Act.

Syria and Iraq have not made major purchases of U.S. aircraft since 1976. The People's Democratic Republic of Yemen trades largely with the USSR and exports of aircraft to that nation have been minimal. Libya, however, has the potential to continue to be a significant market for U.S. aircraft and helicopter manufacturers.

Controls on the export to these countries of U.S.-origin aircraft valued at $3 million or more and helicopters over 10,000 pounds can be effectively enforced.

Large transport aircraft are available from French, German, and British companies as well as from the Soviet Union. Helicopters are produced by the same countries, as well as by Israel and Japan.

Examples of consequences attributed to these controls by individual U.S. firms include the following:

—U.S. helicopter manufacturers report that they have not pursued inquiries from or marketing efforts in these four countries because of the uncertainties caused by the U.S. controls; and

—a major U.S. aircraft manufacturer may lose a $186 million sale of aircraft to Libya because of application of this control.

## IV. *Libya*

Controls on the export to Libya of large tractors further the foreign policy objective of regional stability and are consistent with our policy on military sales to that country. Libyan troops have been directly involved in three countries in the past year (Chad, Uganda, and the Central African Republic) and are on a high state of alert along the border with Egypt, where a brief border war broke out in 1977.

Large tractors could be used to transport tanks and other outsized military vehicles, thereby enhancing the mobility of Libya's sizable armored force.

This type of vehicle is available from foreign suppliers in adequate quantities to serve the Libyan market. However, U.S. controls prevent an American contribution to Libyan military activity.

Controls of sales of off-highway tractors of carriage capacity of 10 tons or more can be effectively enforced.

Discontinuation of the controls would be seen by other friendly countries as a United States contribution to strengthening Libyan capability to mount hostile actions along its borders.

The controls supplement other means designed to influence Libyan behavior, including numerous demarches on issues such as Libyan activity in Uganda. There are very few alternative means available to the United States. For example, Libya has no need for U.S. economic or military assistance.

In 1977 the U.S. exported to Libya 330 vehicles of this type with a value of $7.1 million; these figures dropped in 1978 to 14 vehicles at $0.3 million. A sale of about $60 million was lost to a foreign firm in 1978. Industry representatives estimate a potential Libyan market of about $50 million. There is also some indirect adverse effect on exports to other markets.

### V. *Embargoes of Communist Countries*

The embargoes on exports to North Korea, Vietnam, Kampuchea, and Cuba are administered not only under the Export Administration Act but also under the Trading With the Enemy Act. The latter authority continues by virtue of sections 101(b) and (c) and 207 of Public Law 95–223, and has been extended twice pursuant to national interest determinations, the most recent being from September 14, 1979, to September 14, 1980.

These embargoes were originally imposed for security reasons. During the Korean conflict we imposed an embargo against North Korea. During the Vietnam war we embargoed trade with communist controlled portions of that country and, when the communists took over complete control in 1975, this embargo was extended to all of Vietnam and to Kampuchea. The embargo against Cuba came at a time when Cuban actions presented a serious threat in the Western hemisphere.

The circumstances which prompted imposition of these embargoes have changed over the years. However, it would be irresponsible to discard them on that basis alone. Ending a virtually total embargo is a dramatic action with significant policy ramifications.

North Korea is still technically in a state of war with the United States, the Republic of Korea, and the United Nations. It is expanding its offensive military and subversive potential and suppressing human rights. It recently rejected U.S. overtures for tripartite discussions on ways to ease tensions on the Korean peninsula.

In the case of Vietnam, we announced our willingness some time ago to end the embargo at such time as normal diplomatic relations are established and Ambassadors are in place. Subsequent Vietnamese invasion and occupation of Kampuchea have blocked progress.

Controls on exports to Kampuchea should be similar to those affecting Vietnam, particularly in light of the present occupation. The United States is making a major exception to the embargo of Kampuchea in the form of humanitarian aid to the people.

Full normalization of trade and diplomatic relations with Cuba hinges upon Cuban willingness to address, among other issues, restraint in other countries and compensation for American citizens whose property was expropriated by the Cuban Government.

The controls on North Korea, Vietnam, Kampuchea and Cuba are understood and generally supported by the public, so there is little difficulty in enforcing them.

Other countries are not formally cooperating with the United States in these embargoes. However, third country exports to North Korea are minimal because that country is in default on its international trade payments, there is very little trade of any kind with Kampuchea, and Vietnam and Cuba now largely orient their former trade with the United States toward the USSR.

All of the OECD countries combined exported only $435 million to Vietnam in 1977. Even without the embargo, the Vietnamese would probably have turned elsewhere whenever possible, buying from the United States only when it was in their particular interest to do so. The most notable loss has been the replacement of U.S. firms by European firms in oil and gas exploration activities in and offshore Vietnam.

In 1959, U.S. firms supplied 64 percent of Cuba's total imports. If the embargo were lifted, the USSR would probably continue to be Cuba's major trade partner, but U.S. exporters, with the advantage of proximity, could be expected to replace some Japanese, Canadian, and European firms currently exporting to Cuba.

In aggregate value, U.S. exports to Cuba would likely not exceed $300 million annually over the medium term and would probably reach no more than $100–150 million in the first year if trade were resumed.

Because Cuba does not represent a substantial incremental market for any specific U.S. industries, the embargo has not retarded the ability of any U.S. economic sectors to compete in world trade. Exporting to Cuba would not, therefore, substantially raise production levels or efficiency in any industries.

## VI. Petroleum Equipment to the USSR

The control on the export of petroleum equipment to the USSR provides a flexible foreign policy tool. When necessary and appropriate it can be used to sensitize the Soviets regarding actions which are damaging to United States foreign policy interests.

The United States supports the improvement of bilateral economic relations with the Soviet Union as an element in our effort to improve overall relations. At the same time it is recognized that improvement in one sector of the bilateral relationship cannot be long sustained if it is not accompanied by improvements in other areas. Discontinuation of this control would represent a change in policy not warranted by existing circumstances in our relationship with the USSR.

Among the various means of furthering U.S. objectives vis-a-vis the Soviet Union, this control continues to be useful.

While the United States Government can effectively control exports of U.S.-produced petroleum equipment, for most items adequate quantities of similar equipment are available from foreign sources. There is only limited foreign availability of some deep submersible pumps and seismic equipment.

The effect of the controls on U.S. exports can be only roughly estimated since other factors affect the data. Although no license applications have been denied since the control was imposed in August 1978, some exports have been lost.

U.S. exports of petroleum equipment to the USSR average about two percent of total U.S. petroleum equipment exports. The U.S. share of the Soviet market had been generally increasing until the third

quarter of 1978. In 1974, U.S. suppliers received 13.6 percent of all Soviet oil and natural gas machinery orders placed with Western manufacturers. The 26.9 percent U.S. share of the 1977 Soviet market for petroleum equipment increased markedly to 55.5 percent in the first quarter of 1978 and to 51.1 percent for the third quarter. It dropped to 8.0 percent for the last quarter, bringing the figure for all of 1978 down to 44.6 percent. The U.S. shares for the first three quarters of 1979 were 23.5, 20.0, and 9.7 percent.

Although it is difficult to determine whether losses are the result of the controls or of other factors, reports by U.S. firms include the following:

—loss to foreign competition of contracts for gas lift equipment valued at about $70 million (plus larger anticipated follow-on sales) because of delays and uncertainty in the U.S. licensing process;

—expenditures in the range of hundreds of thousands of dollars attributable to late delivery penalties and other costs related to the licensing process;

—use of the U.S. license requirement by foreign companies as leverage to obtain sales, since U.S. companies must schedule delivery to allow time for a license review and U.S. firms are never certain that the license will be granted.

VII. *Nuclear Non-Proliferation Controls*

Section 17(d) of the Act and section 309(c) of the Nuclear Non-Proliferation Act of 1978 (Public Law 95–242 of March 10, 1978), are interpreted as intending that:

a) nuclear non-proliferation controls do not expire on December 31, 1979, and a determination to extend them is thus not required; and

b) the criteria and other factors set forth in sections 6 (b) and (e) of

the Act are not applicable to these controls.

The Congress is therefore notified that these controls continue in force.

Nuclear non-proliferation controls further significantly the foreign policy of the United States and its declared international obligations.

NOTE: This is the text of identical letters addressed to Thomas P. O'Neill, Jr., Speaker of the House of Representatives, and Walter F. Mondale, President of the Senate.

## Economic Compact Between New York and New Jersey

*Statement on Signing H.R. 4943 Into Law. December 31, 1979*

H.R. 4943 grants approval to the interstate compact between New York and New Jersey, providing for increased economic and industrial development in the New York City and northern New Jersey metropolitan region. While this bill is only a small part of the Port Authority's bold program, I take great personal pleasure in signing it.

Congressman Peter Rodino and the other Members of Congress from these two great States deserve considerable credit for expediting the passage of this legislation. I also extend my congratulations to Governors Carey and Byrne, Mayor Koch, and Alan Sagner and Peter Goldmark of the Port Authority of New York and New Jersey.

As I have emphasized throughout the past 3 years, the most effective remedy for the problems of our older urban centers—and of the Northeast in general—is to restore the private economic base of our inner cities. The steps taken in this direction by the Port Authority serve as a fine

# Intelligence Appraisal

# LIBYA:

# TERRORIST APPARATUS(U)

PREPARED BY



This is a Department of Defense Publication
Produced by the Defense Intelligence Agency

## Summary

Libya's involvement in dissident and terrorist activities has increased progressively since Chief of State Col Muammar Qadhafi came to power in 1969. This effort has served as an outlet for his frustrations at being rejected by the Arab World as its paramount leader, and such activities have gradually evolved into a significant foreign policy tool. Over the past several years, the Libyan leader has been consistent in his condemnation of "terrorism," and he has been equally emphatic in defending Libya's right to use "revolutionary violence." While the statements may appear to be an exercise in semantics, from the Libyan perspective, they serve as a moral justification for the country's actions under circumstances where no other options appear viable.

Since the Libyan Revolution on 1 September 1969, the country has developed a sophisticated terrorist training apparatus.

Over the years, a fairly effective unconventional warfare command and control structure has also evolved.

Qadhafi's terrorist apparatus is considerably less a threat to Israel and the US than it is to Arab states that seek a peaceful resolution of Arab-Israeli differences. If the volatile Arab-Israeli situation is calmed, Qadhafi's potential for exploiting Arab-Islamic nationalist frustrations would be greatly reduced. Even with a settlement, however, Qadhafi would continue to present a threat to Western interests because of his belief that the West, the US in particular, seeks to reimpose a colonial status on the region. He also rejects Western materialism, which he believes is corrosive to fundamental Islamic values.

## Discussion

### Background

On 1 September 1969, Muammar Qadhafi, a 27-year-old signal corps captain, led a bloodless coup that overthrew the monarchy and established the Libyan Republic. The proclamation of the new Republic, issued the same day, clearly reflected a Libyan-Arab-Islamic nationalist ideology. To accomplish his lofty objectives, Qadhafi had to obtain support in a country characterized by regional, tribal, racial, and ethnic differences and that had historically been apathetic toward government in general. The unifying element in his appeal was Islam, a theme that had been espoused by the deposed Sanusis, but which called for a new religious and political activism.

Libya's revolution was born in the ideas of Egyptian leader Jamal Abd al Nasser and the nationalist sentiments his speeches and ideas stirred in young Qadhafi, then a secondary student in Sebha, Libya. By 1959 Qadhafi had organized his first "study" cell at Sebha. The clandestine net continued to grow as Qadhafi set up cells in the secondary school at Misurata, which he attended following

expulsion from Sebha in 1961 for political activities. The clandestine organiza-
tion, which became known as the Free Officer's Movement, grew during Qadhafi's
year at the University of Libya and subsequently at the Libyan Military Academy.

After the revolution, the new government moved rapidly to consolidate its
power. As trusted Free Officer members took over sensitive military and political
positions, potential opposition leaders were jailed or driven into exile. Despite the
internal focus, however, Qadhafi continued to support dissident Muslim Chadian
tribesmen who had been backed by the deposed monarchy. He also initiated a new
income tax of up to 3 percent, which was used to assist the Palestinians.

## Dissident and Terrorist Training

Because of Qadhafi's tribal links to Sebha, the southern extremity of
his tribe and a traditional meeting point of Arabs, Tuareg (Berber), and Toubou
tribes, he had developed an intense interest in Libya's Muslim neighbors. This was
also in keeping with Libya's Sanusis tradition, since its missionaries had spread
their puritanical brand of Islam among these peoples. As a result, Qadhafi
supported the Muslim Toubou as well as other Muslim tribes against the French-
backed Christian-controlled government in Chad after the revolution.

Qadhafi also backed Tuareg tribesmen in Algeria in their effort to
remain autonomous in the face of expanding central government controls. Libya's
involvement with the Algerian Tuareg tribes probably began as a result of Libyan
dissatisfaction with the 1955 Franco-Libyan Treaty, which shifted the Algerian-
Libyan border in Algeria's favor. Libya has a Tuareg population of about 7,000
which provides a natural link to Algeria's 30,000 Berber Tuaregs. The Tuaregs also
appear to figure prominently in Qadhafi's dream of establishing a Pan-Saharan
Islamic States that would span North Africa.

In 1970, Qadhafi set up two general training areas for Toubou and
Tuareg activities. The one at Sebha was apparently involved in training and
supporting the Tuareg, while the other at Kufra supported the Toubou. All of the
training was accomplished under the auspices of the Libyan Army, which provided
the training cadre, logistics support and equipment. The training and support,
however, was very decentralized and was apparently conducted at a number of
satellite locations near Sebha and Kufra.

In 1972, the Libyans opened three of their military installations to
train Palestinians. The camp at Tarhunah provided basic military training, while
the sites at Tukra and Ras al Hilal were more specialized and conducted frogman,
sabotage, and possibly assassination-type courses. By about 1976, training camps
had sprung up across Libya, teaching the full spectrum of unconventional military
activities to a wide array of Arab and international students.

Initially, Libya's dissident and terrorist training had been a result of
its interests in its Muslim neighbors and the Arab-Israeli confrontation. As
Qadhafi's various pan-Arab unity efforts failed and his attempts to assume the

dominant leadership role in the Arab World were rejected, he turned increasingly hostile toward the conservative Arab states. He believed their attitudes and actions were traitorous to the Arab cause and that their continuation in power only benefited Israel and the US. As a result, he made a major increase in his dissident-terrorist activities by supporting groups working for the downfall of conservative "pro-Western" Arab governments as well as a wide array of European and Third World elements.

**DISSIDENT TRAINING ACTIVITY**



BEST COPY
AVAILABLE



# Research Study

## International and Transnational Terrorism:
## Diagnosis and Prognosis

PR 76 10030
April 1976

Approved for Release
Date 11 MAR 1985



This publication is prepared for the use of U.S. Government officials. The format, coverage and contents of the publication are designed to meet the specific requirements of those users. U.S. Government officials may obtain additional copies of this document directly or through liaison channels from the Central Intelligence Agency.

Non-U.S. Government users may obtain this along with similar CIA publications on a subscription basis by addressing inquiries to:

Document Expediting (DOCEX) Project
Exchange and Gift Division
Library of Congress
Washington, D.C. 20540

Non-U.S. Government users not interested in the DOCEX Project subscription service may purchase reproductions of specific publications on an individual basis from:

Photoduplication Service
Library of Congress
Washington, D.C. 20540

# FOREWORD

The primary goals of this study are to cast the problem of internationalized terror into clear perspective and to provide the reader with a framework for a more systematic grasp of the subject. Terrorism is, however, a particularly controversial and complex phenomenon. Hence, it must be emphasized that the approach adopted and the judgments advanced are those of the author, David L. Milbank. So, too, are the basic definitions. And although it is analytically useful for the purposes of this paper, the distinction made between international and transnational terrorism is bound to draw some critical comment—if only because the former term has acquired so broad a currency in academic and journalistic literature.

The statistics presented also break new ground. This is because the author was able to draw on a comprehensive new data bank called ITERATE (International Terrorism: Attributes of Terrorist Events) that was developed for the Office of Political Research by Edward F. Mickolus during the summer of 1975 as a related but separate project.

Despite this advantage, however, several words of caution about the figures and statistical inferences that are set forth in this study are in order. In the first place, there are many significant gaps in our knowledge about specific incidents and groups—and even those terrorist organizations and actions on which there is considerable reliable information do not always fit neatly into the typologies that have been created for them. Moreover, the universe of incidents under review is small enough that unintended omissions (of which there are undoubtedly many) or erroneous classification of borderline events could have a statistically significant impact.

Comments or questions concerning this study (which does not represent a CIA position) will be welcomed. They should be addressed to the Director, Political Research.

# CONTENTS

FOREWORD ................................................................ *Page*

SUMMARY AND KEY JUDGMENTS ............................................ 1

THE DISCUSSION ......................................................... 1

  I. THE OBJECTIVES AND BOUNDARIES OF INQUIRY ..................... 7

  II. ESTABLISHING AN ANALYTICAL FRAMEWORK ......................... 7

    Definitions ......................................................... 8
    Method ............................................................. 8

  III. THE PHENOMENA IN RETROSPECT ................................ 9

    What, Where, and When? ............................................. 10
    Why? ............................................................... 10
    How Cost Effective? ................................................ 18
    How Disruptive? .................................................... 22
    What International Constraints? ..................................... 23
    ........................................................................ 26

  IV. THE OUTLOOK ................................................... 28

    International Terrorism ............................................. 28
    Transnational Terrorism ............................................ 29

  V. IMPLICATIONS .................................................... 32

APPENDIX A: Significant Variables ...................................... 35

APPENDIX B: Statistical Trends and Patterns in Terrorist
       Activity ......................................................... 39

APPENDIX C: Noteworthy Groups ................................. *fold-out*

## SUMMARY AND KEY JUDGMENTS

### I. DEFINITIONS

For the purposes of this study, *international* and *transnational* terrorism are defined as follows:

*Common Characteristics*: The threat or use of violence for political purposes when (1) such action is intended to influence the attitudes and behavior of a target group wider than its immediate victims, and (2) its ramifications transcend national boundaries (as a result, for example, of the nationality or foreign ties of its perpetrators, its locale, the identity of its institutional or human victims, its declared objectives, or the mechanics of its resolution).

*International Terrorism*: Such action when carried out by individuals or groups controlled by a sovereign state.

*Transnational Terrorism*: Such action when carried out by basically autonomous non-state actors, whether or not they enjoy some degree of support from sympathetic states.

### II. T*  PHENOMENA IN RETROSPECT

e has been a marked and enduring upsurge in *transnational terrorism* since 1967 that has been characterized by:

- --A substantial increase in the number of terrorist groups involved as well as in the number of countries in which they are operating;

- —A trend toward greater international contact and cooperation among terrorist groups;

- —A trend toward bolder and more dramatic actions;

- —The general popularity of American targets; and

- —A number of significant regional differences in the intensity and nature of such violence.

This upsurge is attributable in part to the dynamics of the Middle East conflict, an imbroglio which affects the interests of a large number of nations and is attended by particularly deep-seated feelings of bitterness and frustration. But the problem of transnational terrorism

would not have mushroomed to its present dimensions were it not for the concurrent convergence and acceleration of a number of changes in the global environment that had begun to take shape much earlier, e.g.:

— The technological advances that have provided terrorists with new mobility, new weaponry, and (through the introduction of TV-capable satellite communications) the near certain prospect that their more dramatic actions will receive prompt and worldwide publicity;

— The growth, fed by modernizing change, of global and regional ties, dependencies and obligations that have both provided terrorists with a host of new and potentially highly disruptive targets for attack (e.g., power grids and jumbo aircraft) and fostered a reactive upsurge in nationalism and ethnicity;

— An increasingly permissive political environment born of the challenge raised to the postwar order by the developing nations of the Third World, the "maverick" Communist regimes, various dissatisfied second rank powers, and a broad array of social forces fired, with differing degrees of responsibility, by a new sense of "social conscience;"

— The persistent if uneven behavior of those states, less than a score in number, that have formed practicing or potential terrorists with funds, arms, training, documentation and other operational support; and

— Changes in the overall economic environment that have fanned local dissidence and fed the communities of emigre workers that can provide terrorists with cover, recruits, and various forms of operational support.

There has not, however, been a parallel upsurge in *international terrorism*. Although there has been a good deal of such activity associated with the Middle East conflict over the past decade, the dimensions of the problem are essentially no greater today than they were in 1968.

Another significant difference stems from the fact that resort to *international terrorism* is just as likely to result from calculations concerning the relative efficacy of alternative methods of bringing national power to bear in a given situation as from an outright dearth of national resources. Hence, such behavior has not been the special province of any particular category of state. In contrast, as an option more congenial to urban than to rural groups, *transnational terrorism* has been characteristically spawned by societies at a mid to advanced stage of socio-economic development.

2

For its practitioners, terrorism's principal drawback is that its consequences are to a considerably degree unpredictable. As demonstrated in Jordan in 1970 and in Uruguay between 1971 and 1972, even what seem to be dramatic tactical successes can lead to strategic reverses of major proportions. All told, however, the record to date shows that the personal risks that have been incurred by international and transnational terrorists have been relatively low, and that their chances of achieving at least some of their near-term objectives have been strong. Moreover, because the impact of their activity has been magnified by the publicity it has received and by its interaction with other destabilizing trends and forces, its disruptive effects have been grossly disproportionate to the resources employed by the terrorists as well as to the actual damage done in terms of the cost to life and property.

With the exception of a number of bilateral agreements of proven utility (most notably the US-Cuban accord of 1973), the international response to terrorism has been relatively weak and ineffective. The principal obstacles to greater progress in this field have been the controversy over justifiable versus illegal political violence, a broad resistance to such further infringement of national sovereignty as would be implied in any inflexible curtailment of the right to grant political asylum, and a natural reluctance on the part of many states to commit themselves to any course of action that might invite retribution—either by terrorist groups or by states sympathetic to the terrorists' cause.

## III. THE OUTLOOK

*International terrorism* seems unlikely to pose much more of a threat to world order or US interests in the decade ahead than it does today.

—Even in its currently rather fluid condition, the international system subjects states to a host of legal obligations and practical constraints that they can ignore only at considerable risk.

—The potential implications of the various state-sponsored terrorist incidents that have been associated with the Middle East conflict notwithstanding, it seems likely that the employment of terrorist groups in a surrogate warfare role will continue to be more the exception than the rule for some time to come.

Despite the potentially salutary impact of some recent or likely developments (including the tougher stance toward terrorists that has been adopted by a number of states and the probability that technical innovations in the security field will make terrorism a more risky affair), the outlook for *transnational terrorism* is considerably less

3

encouraging. Specifically, the following factors and trends hold promise of aggravating the problem:

— The combined effects of technological advance, modernizing social and economic change, and growing interdependence will probably generate further increases in (1) divisive ethnicity and nationalism, (2) urban unrest, (3) terrorist capabilities, and (4) societal vulnerabilities.

— The widespread erosion of established institutions of authority — manifested in multiple challenges to the postwar international order and the increasing difficulties of governance encountered at the national level — that has both invited and facilitated terrorist activity in recent years seems likely to persist throughout much of the decade ahead.

— Since the net thrust of the forces at work within the international community promises to remain more centrifugal than centripetal, it seems unlikely that efforts to combat terrorism through funding world-wide conventions will prove to be much more effective than in the past.

— The likelihood that (1) national liberation and leftist revolutionary formations will continue to receive both moral and material support from a wide variety of transnational and international organizations and (2) transnational contact and cooperation among terrorist groups will gain further momentum holds forth the ominous prospect of the emergence of a complex support base for transnational terrorist activity that is largely independent of — and quite resistant to control by — the state-centered international system.

— Under such circumstances, any governmental assistance rendered to terrorist groups could have an even more deleterious impact than in the past, for it would risk simply increasing the recipients' potential for autonomous action.

— The problems of (1) extensive and sometime sympathetic publicity for terrorist acts and (2) the diffusion of terrorist-adaptable technological know-how are likely to persist in most parts of the world and thus to reinforce the risks associated with the wholesale deployment of sophisticated (and in many cases, man-portable) weaponry and the race to sell nuclear technology and modern armaments to developing countries.

The prospect of nuclear-armed terrorists can, in fact, no longer be dismissed. But because of the major problems that would be involved in the acquisition, storage, transport, and employment of a nuclear device, a more likely scenario — at least in the short term — would be a terrorist

4

who are at a nuclear weapons storage facility or a nuclear power plant to exploit the publicity and the bargaining power inherent in the attendant threat of radiological pollution.

A more pressing threat, however, would seem to be in the field of chemical, biological, and radiological agents of mass destruction. Not only are many of these agents relatively easy to acquire, but (because small—sometimes minute—quantities are usually all that are needed for potentially devastating effects) they also tend to be easy to conceal, easy to transport, and easy to introduce into the target area.

All told, transnational terrorism promises to pose a continuing and potentially gravely unsettling problem for the world community until such time—possibly years hence—that the international system gets into new and generally accepted contours. Although the frequency and intensity of violence in some current trouble spots will probably decline, it seems likely that:

— The overall number of terrorist groups engaged in transnational terrorist activity will, at best, remain at about the present level;

— The number of countries in which these groups are operating will increase;

— Because of their symbolic value, their availability, and the embarrassment they can create, the popularity of American targets will remain high;

— The world will witness steadily greater and more widespread sophistication in terrorist targeting, execution, and weaponry; and

— Although most terrorist groups will probably continue to be deterred by both moral considerations and calculations of the risks involved, the danger that a fanatic few might resort to weapons of mass destruction will increase accordingly.

## IV. IMPLICATIONS

The phenomenon of widespread internationalized terror is not only likely to persist for at least the next several years, but also to evolve in ways that could pose a more substantial threat to US interests—and, under certain circumstances, to world order—than in the recent past.

— Whether or not weapons of mass destruction are actually brought into play, the odds are that the impact of transnational terror will be more sharply felt in the US in the years just ahead—primarily as the result of periodic increases in attacks on American targets abroad, but possibly through more frequent terrorist demands on the US Government and

occasional operations on US soil by foreign-based groups as well.

— Even if the problem of internationalized terror is not brought closer to home in the ways suggested above, it promises to impinge more directly on US interests and options with respect to a broad range of critical issue areas, including both East-West and North-South relations, the politically and economically sensitive questions of arms sales and the transfer of advanced technology, and the resolution of problems associated with the dependence of Western industrialized countries on foreign energy sources.

The importance of factors that are likely to affect the objective capabilities and options of terrorist groups in the years ahead is obvious. But in the final analysis, it is man's subjective perception of "reality" that serves as the primary determinant of his political behavior. Hence, those variables (e.g., cultural heritage credo, and changes in the overall political environment) that can shape or alter the prisms through which the terrorists concerned view the world around them will bear equal attention.

Indeed, although the dimensions of the threat posed by internationalized terror should not be overdrawn, the factors bearing on this phenomenon and its potential ramifications are so numerous and cut across so many jurisdictional and disciplinary lines that the development of more effective national and international countermeasures is likely to be a particularly demanding task. Sadly, there are no sure guidelines for endowing any given government's approach to the problem of terrorism with the qualities required to meet this challenge. But while any number of alternative courses of action could prove equally effective, it bears emphasis that together with *timely intelligence* and *sound multi-disciplinary analytical support*, *flexibility* and *extensive coordination* (both intra- and inter-state) would seem to be critical to devising and implementing a counter-terrorist strategy that is both internally consistent and minimally disruptive to national values and foreign policy objectives in terms of "hidden" social, political, and economic costs.

# THE DISCUSSION

## I. THE OBJECTIVES AND BOUNDARIES OF INQUIRY

Political violence predates recorded history. As a distinctive form of political violence sporadically employed by rulers and ruled alike, terrorism is probably not much younger—albeit it owes its name and subsequent conceptual floruit to the French Revolutionary Terror (1793-1794). Nor is the spillover of terrorist activity onto the international stage a particularly recent development: witness it, stir caused by various anarchist groups operating in Europe and North America in the late 19th and early 20th centuries as well as by the behavior of a few of their more self-interested political contemporaries. Some 70 years ago, for example, a renegade Moroccan chieftain foreshadowed a tactic favored by a number of terrorist groups today by kidnapping two hitherto businessmen (one English, the other of dubious American citizenship) in a successful effort to get Europe and the US to pressure France into forcing the Sultan to accede to a long list of demands—including a substantial ransom, the release of a large number of prisoners, the cession of two territorial districts, and the arrest of a few key enemies.

But despite historical precedents and parallels, modern-day terrorism is very much a function of our times. Advances in technology and growing world interdependence have afforded terrorists new mobility, new targets, new weaponry, and the near certain prospect that their more dramatic acts will receive prompt and world-wide publicity. Moreover, recent changes in the overall political and economic climate have provided terrorists with a somewhat more hospitable environment in which to operate.

Indeed, there has been such an upsurge of terrorist activity in recent years that some observers have warned that we may be entering a veritable age of terrorism. Among other things, there has been a marked increase in the number of active terrorist groups as well as in the number of countries in which they are operating. Internal and international cooperation among terrorist groups has also risen notably. There has been a trend toward bolder and more dramatic actions, with an accompanying escalation of casualties, damage, and demands. And most important, perhaps, there has been a quantum jump in terrorist incidents affecting the interests of more than one state.

Not surprisingly, these developments have generated unprecedented interest in terrorism as a subject for serious research and analysis. In sharp contrast with the situation which prevailed only a decade or so ago, existing literature—both open and classified—now offers a wide range of useful insights into the root causes, logic, and characteristic attributes of political terrorism as well as a substantial number of detailed case studies.

The trouble is that the picture which emerges is still confused and incomplete. For one thing, there is as yet no generally accepted definition of terrorism per se, much less of its international or transnational variants. For another, much of the work that has been done on terrorism suffers from the limiting effects of narrowly focused tactical concerns or of particularistic institutional and personal biases. And, largely because of these differing perspectives and priorities, little progress has been made toward development of a comprehensive and readily accessible data base. In short, we are still hard put to explain the current state of affairs or to venture firm predictions about the future.

Of necessity, therefore, this study is an exercise in both synthesis and innovation. It is confined to an examination of international and transnational terrorism as defined in Section II below (with primary emphasis on transnational terrorism as, in the short term at least, potentially the more injurious to US interests). Its principal underlying assumptions are three. The first is that the basic societal problems and tensions that can give rise to political violence—and thus to terrorism—are likely to prove particularly intractable in this era of rapid change, growing nationalism and ethnicity, and world-wide economic strains. Such irritants may, in fact, be treated as "givens" in the global environment for many years to come. The reader is forewarned that because of this, and because they have already received considerable

## II. ESTABLISHING AN ANALYTICAL FRAMEWORK

### Definitions

As a first step, it is necessary to cut through some of the semantic and value-generated fog which currently

## Method

the author's preliminary assumptions and hypotheses
and to indicate other trends and patterns that could be
significant.

## III. THE PHENOMENA IN RETROSPECT

### What, Where, and When?

As previously indicated, international and
trans-national terrorism were not yet matters of much
official or academic concern in 1965. In contrast to
other forms of political violence, there simply had not
been very much of either since the close of World War
II—at least not of the sort that made headlines.
Moreover, much of what there was had been
associated with—and overshadowed by the more
important consequences of—clear-cut adversary
relationships stemming from either the Cold War or
the anti-colonial struggle. For the most part,
noncombatant third parties had been left unmolested.

It is true, of course, that two brief flurries of
skyjacking had already drawn attention to a potential
new problem area. But, for the most part, neither had
involved more than a few actions that would be
classified as terrorism under the definition employed
here. The first, in the early 50s, had been comprised
almost entirely of Eastern European aircraft
commandeered for the sole purpose of escape to the
West. And while the second, which extended from the
late 50s to the early 60s, had been climaxed by the first
postwar hijackings of American airliners (thereby
prompting the US to press for a comprehensive
international convention covering crimes committed
on civilian aircraft engaged in international aviation),
it too had been attributable primarily to individuals
seeking personal advantage—e.g., expedient transport
to or from Cuba or outright extortion—rather than
political leverage or impact.

In any event, skyjackings tapered off again in 1963.
The overall level of international and transnational
terrorist activity remained relatively low through
1966, then turned upward against the backdrop of
intensified Palestinian guerrilla activity that preceded
the 1967 Arab-Israeli war. Admittedly, the record up
to that point is sketchy. For one thing, the mass media
still lacked either the incentive or the technical means
for systematic and comprehensive coverage of
terrorist incidents—and many undoubtedly went
unreported. But even if Figure 1 below substantially
understates the number of international and
transnational terrorist incidents that occurred in the
1965-1967 period, the international impact of such
activity was negligible. Indeed, when the qualitative

dimension is added in, 1968 emerges as a watershed
year. At that juncture, a combination of Palestinian
initiatives and the cumulative impact of the broader
environmental trends discussed below seems to have
finally sensitized dissident groups throughout the
world to their latent and growing potential for
effective transnational terrorist activity.

From 1 January 1968 through 31 December 1975,
there were at least 913 recorded international and
transnational terrorist incidents.* Of these, 123 were
kidnappings; 31 were barricade and hostage episodes;
375 entailed the use of explosive devices of one type or
another; 95 were armed assaults or ambushes; 137
involved the hijacking of an aircraft or other means of
transportation; 59 fell under the category of
incendiary attack or arson; 48 constituted
assassination or murder; and 45 were characterized by
other forms of violence. All told, more than 140
terrorist organizations—including a number of
fictional entities created to shield the identity of the
perpetrators of some particularly shocking or
politically sensitive acts—from nearly 50 different
countries or disputed territories (e.g., Palestine) have
thus far been linked to this activity, and there may
have been more.**

Figure 2 portrays the overall geographic
distribution of international and transnational
terrorist incidents for the 1965-1975 period. A more
informative breakdown of 1968-1975 statistics by type
of event and other operational criteria is provided in
Appendix B.

Despite the widespread and continuing popularity
of certain "traditional" forms of violence (e.g.,
assassinations and highly discriminate bombings), the
picture which emerges from these assorted charts and
tables underscores a number of marked regional and
time-related variations in the frequency and nature of
transnational terrorist incidents.*** Sub-Saharan
Africa and large parts of Asia have, for example,

---

*This figure excludes terrorist attacks on US and allied personnel and
installations in Indochina. It also excludes most of the myriad
assassination efforts and cross-border operations associated with the
Arab-Israeli conflict. The only exceptions in this regard are incidents
that either victimized noncombatant nationals of states outside the
principal arena of conflict or were of such a nature that they became the
object of international controversy.

**There are relatively few political groups in the world that are totally
dedicated to terrorist violence. As used here, the term terrorist
organization simply denotes a group that has employed terrorist tactics.

***Although international and transnational terrorist incidents are
lumped together in these charts, the former were outnumbered by the
latter by more than 20 to 1 and thus had little impact on the patterns
reflected therein.



International and Transnational Terrorist Incidents



Geographic Distribution of International and Transnational Terrorist Incidents, 1965-75

Total 951

| | |
|---|---|
| Transregional | 1 |
| Pacific and Australia | 8 |
| USSR-Eastern Europe | 22 |
| Sub Saharan Africa | 34 |
| Asia | 43 |
| Middle East and North Africa | 122 |
| North America | 126 |
| Latin America | 260 |
| Western and NATO Europe | 333 |

been relatively free of such activity. So too has the Soviet-East European region. Latin Americans have demonstrated a particular affinity for kidnapping foreign diplomats and businessmen. On the other hand, except for skyjackings, seemingly indiscriminate and potentially bloody spectaculars—e.g., mass hostage episodes, large bombs in public places, Lod Airport type massacres of innocent bystanders, and the destruction (or attempted destruction) without warning of passenger-carrying aircraft—have most frequently been the province of extremist formations from the Middle East, Europe, and Japan.

For its part, skyjacking reached near epidemic proportions in 1970 only to taper off sharply thereafter. There were, in fact, fewer recorded terrorist skyjackings in all of 1975 than there were in an average month just five years earlier. The dramatic decline in popularity of this particular form of terrorist violence has, however, been partially offset by a rise in equally unsettling barricade and hostage episodes.

Another point brought home by the data presented in Appendix B is that although transnational terrorists have, until recently at least, rarely sought to wring concessions from Washington, American targets—whether human or physical, official or private—have consistently been among the most popular for attack. For example, between mid-1972 and early 1973 (when tightened security and the implications of the US-Cuba agreement made American planes seem less attractive), US aircraft figured in about 30 percent of all skyjackings. Moreover, this ratio is relatively modest in comparison to US experience with some other forms of terrorist activity, especially kidnapping. *Indeed, the available data suggests that over the past eight years, US citizens or US facilities have been victimized in at least one-third of all transnational terrorist incidents.*

The hard fact is that substantial pockets of popular opinion in many parts of the world are prone to identify the US with reaction, intervention, and "neo-colonial" exploitation. Hence, American targets have a high symbolic value for "anti-imperialists" of both



**A Classic Example of the Threat to Americans Abroad**

On 4 August 1975, a group of Japanese Red Army terrorists seized the adjoining offices of the US Embassy's consular section and the Swedish Embassy in Kuala Lumpur in a successful bid to secure the release of several other terrorists who were then in Japanese custody. The photo shows some of the hostage diplomats being herded onto a bus bound for the waiting JAL jetliner that eventually carried the JRA gunmen and their newly freed compatriots to Libya.

nationalistic and ideological persuasion. Moreover, such targets also tend to have a high "embarrassment quotient" in relation to the governments of the countries in which the attacks occur and, if different, the governments against which the terrorists levy their demands.

Despite their summary nature, the group profiles set forth in Appendix C serve, in part, to document the three additional trends—beginning with the proliferation of active terrorist groups in recent years—that were cited as particularly significant at the outset of this study. For example, even though the criteria employed for selecting the groups included in Appendix C (relative levels of activity or prominence) tended to favor long-lived formations, the majority of the organizations listed therein are less than eight years old. Less evident from the profiles but perhaps more significant is the instability and ephemeral quality that have been characteristic of many if not most of the organizations that have engaged in transnational terrorism over the past decade. The net growth in their numbers has, in fact, been as much attributable to the splintering of old groups as to the emergence of entirely new ones.

The next-mentioned trend—that toward bolder actions—has been uneven. Moreover, its precise contours defy precise definition for they depend on

unavoidably subjective judgments concerning the relative difficulty, risk, and shock value associated with often quite dissimilar incidents. Nevertheless, the inherent dynamics and logic of a campaign of terrorist violence are such that it has a natural propensity to escalate over time. Globally, this has found reflection in the adoption and spread of aggressive new tactics. Locally, it has been manifested in the tendency of



Debris flies through the air as the PFLP commences destruction of the three airliners—worth a total of $20 million—that it hijacked to Dawson Field, Jordan in early September 1970.

13

cell on groups to probe the effective limits of any such concession that it is elect to employ before scaling back on its and on their associated demands. Thus we have witnessed

— the multiple skyjacking operation staged by the Popular Front for the Liberation of Palestine in September 1970 which capped the wave of aircraft seizures that had begun two years earlier.*

— the ill-timed record for multiple and cumulative diplomatic kidnappings established by the Tupamaros between mid-1970 and early 1971 in their effort to secure the release of about 150 imprisoned collaborators; and

— the escalation of the amount of ransom demanded by Argentine terrorists for the release of kidnapped multinational corporation executives from $62,500 in 1971 to a reported figure of over $60 million in 1975.**

Because of the complexity of the relationships involved, the sensitive nature of much of the available information, and the questions which are raised with respect to the past and present role of various state actors, the third trend—that toward more extensive international cooperation among terrorist groups—deserves detailed examination in a separate research study. Indeed, although a number of notations concerning known or suspected transnational links have been included in the material presented in Appendix C, the broad scope of this paper precludes more than a brief overview of the problem.

So far, at least, the efforts of various terrorist groups to promote broad regional and inter-regional coordination through the holding of periodic conferences and the formation of such umbrella organizations as Latin America's Revolutionary Coordination Junta (JCR) seem to have generated

more smoke than fire.* But at a lower level, a growing network of overlapping and bilateral alliances and mutual assistance arrangements have added an ominous new dimension to the terrorist threat.

Although terrorist groups in the Western Hemisphere seem to have been entering the picture more often of late, this phenomenon has been most evident in Europe and the Middle East where the advantages that can be derived from transnational cooperation have brought together some strange bedfellows indeed. For example, support rendered by individuals associated with the anarchist Baader-Meinhof Gang facilitated preparations for the attack on the Israeli Olympic team which was staged by the extremist but relatively non-revolutionary Palestinian Black September Organization in the fall of 1972. Not only have the Popular Front for the Liberation of Palestine (PFLP) and the Japanese Red Army (JRA) teamed up in a number of dramatic ventures, but—as suggested by the fact that the three Japanese gunmen who executed the Lod Airport massacre in May 1972 carried papers forged in Germany and weapons that they had picked up in Italy—both organizations have received assistance from a number of other terrorist groups in various parts of the world. The Turkish People's Liberation Army has used Palestinian training camp facilities in Syria and has reciprocated by attacking Israeli targets in Turkey. The Irish Republican Army (IRA) has developed links with a number of terrorist organizations outside the UK and Northern Ireland, including separatist groups in France and Spain as well as some Palestinian formations in the Middle East.

Overall, more and more groups throughout the area have begun providing each other with arms, safe housing, and other forms of support. In fact, there is evidence that a European-based terrorist "service industry" has emerged in the form of organizations devoted primarily or exclusively to providing training, documentation, and other specialized assistance to revolutionary and national liberation movements in all corners of the world. Just how complicated this web of interrelationships has become is well illustrated by France's celebrated—but still murky—"Carlos Affair" and its recent dramatic sequel in Vienna (see pages 16-17).

---

*See photo on p. 13. In a series of well-coordinated actions (all but one of which were staged during the course of a single day; in September 1970, the PFLP hijacked four airliners and attempted to seize a fifth. One plane was flown to Cairo, where it was destroyed as soon as the passengers and crew had disembarked. The other three aircraft were diverted to a landing strip in the Jordanian desert. These were blown up on 12 September, but some of their passengers were held hostage for another 13 to 18 days.

**In the latter case, the Montoneros organization kidnapped Jorge and Juan Born, executives and directors of Bunge and Born Ltd., in September 1974 and held them for nine months. An additional condition for their release—which also was met—was the publication in several leading Western papers of a full-page political "announcement" drawn up by their captors (see Figure 3).

*The JCR is composed of Argentina's Revolutionary People's Army (ERP), Bolivia's National Liberation Army (ELN), Chile's Movement of the Revolutionary Left (MIR), Paraguay's National Liberation Front (EREPALINA), and the remnants of Uruguay's National Liberation Movement (MLN/Tupamaros). Backed by the ERP's overflowing coffers, it has grown more active in recent months and has the potential for becoming an effective and dangerous organization.

Figure 3. The notice inserted in the Washington Post by Bunge and Born Ltd. as a condition for the release of Jorge and Juan Born

## THE SAGA OF CARLOS

Guided by a Lebanese guerrilla-turned-informer named Michel Moukarbel, three French counterintelligence agents in Paris attempted to bring in a suspected terrorist—a man known to them only by his cover name of Carlos—for questioning on the evening of 27 June 1975. Inexplicably, they were unarmed. Carlos was not. He escaped in a blaze of gunfire that left Moukarbel and two of the French security officers dead at the scene. The third French agent was gravely wounded.



A French police photo of Carlos in Paris

Carlos vanished—leaving a thoroughly shaken French security service behind him—only to reappear as the leader of the group of terrorists that successfully took almost all the delegates to an OPEC ministerial-level conference in Vienna hostage on 21 December 1975. He remains something of a man of mystery. But during the months between his hasty exit from Paris and his dramatic return to the limelight, enough evidence documenting—or hinting at—remarkably extensive terrorist activities and connections was uncovered to make him seem like a real life "Jackal." The first piece in the jigsaw puzzle was furnished by a chance break in London that enabled the British to identify Carlos as Illich Ramirez-Sanchez, the 25-year-old son of a wealthy and staunchly Communist Venezuelan lawyer who had dispatched his family to London in 1966.

Carlos' early political career was highlighted by a brief stint at the Patrice Lumumba University in Moscow—from whence he was reportedly expelled for dissolute living and improper attitudes in early 1970. Little is known of Carlos' movements in the wake of his unscheduled departure from the USSR. In any event, more than a year was to pass before he returned to London, and he apparently spent at least part of this period in the Middle East. At some point in the early 1970s, he became a member of the extensive terrorist network operated by the Popular Front for the Liberation of Palestine (PFLP)—a fact openly acknowledged by a PFLP spokesman in July 1975 with the boastful addition that Carlos and Moukarbel had been planning a series of dramatic new actions when the French authorities finally closed in on them.

Painstaking investigation of Carlos' known associates subsequently revealed that, in addition to Moukarbel (described by the PFLP as its "Paris paymaster"), he had been working with a mixed entourage of dedicated revolutionaries that included several Latin Americans. One of the latter has been further identified as a member of the secretariat of the Colombian Communist Party. Carlos had also been provided with shelter and other helpful services by a number of women friends, including at least two European nationals, who probably had little knowledge of what he was really doing.

Charged, in general terms, with striking at "Zionism and imperialism," the Carlos organization had apparently been given latitude to operate over a wide geographic area embracing not only the UK and much of Continental Europe but, according to plans recovered by British authorities, parts of the Middle East as well. Moreover, evidence in the form of records that had been maintained by Moukarbel and the nature of some of the weapons that Carlos had left for safekeeping with friends in England and France established that the group had been cooperating, in keeping with PFLP policy, with a number of other terrorist groups—most notably the Japanese Red Army (JRA) and the German Baader-Meinhof Gang. It now seems certain, for example, that Carlos and Moukarbel were deeply involved in the planning of the JRA seizure of the French Embassy in The Hague in September 1974.

16



ABOVE. The Soviet-made RPG-7 rocket launcher used by members of Carlos' group in their abortive attack on an El Al plane at Orly airport outside Paris on 13 January 1975

BELOW. A French policeman points to the hole in the fuselage of the Yugoslav airliner that was hit by one of the rocket grenades fired at the El Al plane



Other headline incidents to which Carlos has been linked since his near arrest in France include an assassination attempt against J. Edward Sieff (a prominent English Jew and clothing-store magnate) in December 1973; the bombing of a popular Paris Left Bank hangout, Le Drugstore, in 1974; two attacks against El Al aircraft at Orly Airport in January 1975; and an assassination attempt against a Yugoslav consular official in Lyons in March 1975. Extras or principals from other terrorist organizations were involved in some of these as well. To what extent, if any, that state actors may also have taken a hand is

unknown. But Cuban officials had been maintaining contact with members of the ... rlos group in both England and France, and the ... ch were sufficiently suspicious of this activity to send three of Havana's diplomats packing in the wake of Carlos' escape.

Since 1974, at least, the group that Carlos had headed in Paris had generally identified itself as the "Mohammed Boudia Commando." When he reappeared in Vienna in December 1975, it was at the head of a seemingly new formation with a different name (the "Arm of the Arab Revolution") and, possibly, a different principal sponsor. (The PFLP has denied responsibility for the OPEC operation; so too has Libya, but the Egyptians, among others, have openly accused Colonel Qaddafi of being behind it.) In any event, the composition of Carlos' Vienna attack force (believed to have consisted, in addition to its Venezuelan leader, of two Germans and three Palestinians) provided solid new evidence of the trend toward closer cooperation among terrorists of different nationalities.

As of this writing, Carlos' whereabouts are again unknown. Nor are the returns on his December venture as yet all in. It remains to be seen, for example, just what new international countermeasures—if any—will result from that action. Nevertheless, the immediate outcome of Carlos' OPEC operation (including safe haven for the terrorists and massive publicity for their objectives)—coupled with his boast that he currently controls some two-score seasoned professionals—suggests that the world will hear from him again before too long.



The hostages taken in Carlos' attack on the OPEC ministerial-level conference in Vienna on 21 December 1975 board the Austrian Airlines DC-9 that flew them and their captors to Algiers (with a side trip to Tripoli)

**Why?**

The commonalities, differences, or changes in patterns of behavior that have been described thus far are, of course, attributable to the interplay of a host of variables. Only a few of these, i.e., the ones that seem to have had the greatest direct bearing on the timing, scope, and nature of the *internationalization* of terror, are addressed at any length below. No attempt is made to develop some sort of model or overarching theory with respect to this phenomenon. Far more modest, the objective here is simply to ascertain to what extent the current rash of transnational (and, to a lesser degree, international) terrorist activity is attributable to broad regional and global trends and developments as opposed to unique and possibly transitory local problems and circumstances.

A few general observations—some of them, perhaps self-evident—are needed to set the problem in perspective and to lay the groundwork for further analysis. First of all, *transnational terrorism* is by nature more congenial to urban than to rural-based groups and is thus characteristically spawned by societies at a mid to advanced stage of socio-economic development. Resort to *international terrorism*, on the other hand, is just as likely to result from calculations concerning the relative efficacy of alternative methods for bringing national power to bear in a given situation as from an outright dearth of national resources. Hence, such behavior is not the special province of any particular category of state.

Modern-day practitioners of transnational terrorism have benefited from a generally permissive international environment—a point which will be elaborated below. For the most part, therefore, the *constraints* on their behavior have either been a function of local environmental factors affecting their objective capabilities, opportunities, and alternatives or have been self-imposed for practical or philosophical reasons.

These latter restraints are, of course, uncertain, for personal predilections can be overshadowed by frustration or desperation. Nevertheless, as evidenced by the data presented in Appendices B and C, *cultural heritage* has been a key factor affecting individual terrorist groups' perceptions of the limits beyond which the level or intensity of violence is likely to become counterproductive. Moreover, although generalization is difficult because the ideological mix is different in almost every case, so has what is here termed the group's *credo* or *ethos*. The sharp differences in behavior between the two wings of the

IRA and among the various Palestinian terrorist groups are evidence enough of this. But far more research is needed before confident judgments will be possible with respect to just what combinations of beliefs are most likely to foster repeated resort to extreme and indiscriminate forms of violence.

Since the extent and efficacy of internal security controls bear heavily on the frequency, form, and domestic impact of transnational terrorist incidents in any given country, the proliferation of this form of political violence has both contributed to and fed upon the recent trend toward more widespread resort to various forms of authoritarian rule. On one hand, open societies and weak or permissive authoritarian regimes are particularly vulnerable to such activity—and to its domestic ramifications. On the other, rigid and forceful authoritarian rule can foster transitional terrorism by forcing dissidents to operate abroad.

Together with earlier references to the basic societal problems that can give rise to various forms of political violence, the foregoing observations focus on the human and local environmental factors affecting the extent, nature, and domestic impact of transnational or international terrorist activity in different parts of the world. The question remains, however, as to just why there has been such a marked and enduring upsurge in transnational terrorism over the past eight years. In part, this phenomenon is attributable to a war-punctuated regional conflict affecting the interests of a large number of nations and attended by particularly deep-seated feelings of bitterness and frustration. But it would not have grown to its present dimensions were it not for the concurrent convergence and acceleration of a number of changes in the global environment that had been taking shape much earlier.

These trends are difficult to disaggregate. Technological advance, growing global interdependence, and the increasing urgency attached to ... draft modernization in many parts of the world are, for example, closely interrelated. But each bears brief comment.

The impact of *new technology* on terrorist capabilities with respect to weapons, mobility, and tactical communications has already been cited. As evidenced by the development of ever more sophisticated letter bombs, the occasional employment of missiles, and the staging of coordinated actions in widely separated locations, it has been significant. But whatever the nature of a

terrorist act or the means of its execution, it must be remembered that the role of the media is critical to the spreading and intensification of its psychological impact. Hence, among all the technological advances in recent years, the development of satellite communications, and in particular, their upgrading in 1968 to include a television capability have unquestionably been among the most important in making transnational activity seem attractive to terrorist groups.

The advent of satellite communications has also fed and underscored the thickening network of political, economic, and technological dependencies and obligations now commonly subsumed under the rubric of interdependence. Whether or not this term has been abused of late, the growth in both the numbers and importance of international, transnational, and (as a consequence of the centralizing imperatives of local modernization efforts) subnational linkages over the past decade has had at least a two-fold impact on the worldwide potential for terrorism. On the one hand, it has created a host of new, vulnerable, and potentially highly disruptive targets for terrorist attack (e.g., commercial and communications centers, transportation hubs, international power grids and pipelines, super tankers, and jumbo aircraft). On the other, it has generated a sort of identity crisis that has been reflected in a troublesome countervailing upsurge of nationalism and ethnicity.

For their part, the many other strains and dislocations associated with *the process of modernizing change* have swelled the ranks of the alienated in many parts of the world. They have also added millions of emigre workers to the international pool of political exiles and refugees which terrorists can exploit for cover, recruits, and various forms of operational support.

The upsurge in transnational terrorism has also been aided and abetted by a *"revolutionary"* turn in *the overall political environment* somewhat reminiscent of that experienced about 200 years ago. The postwar order has, in fact, come under challenge from all sides: from the developing nations of the Third World; from "maverick" Communist regimes; from dissatisfied second rank powers; and from a broad array of social forces fired, with differing degrees of responsibility, by a new sense of "social conscience."

By late 1967, the potential for a general escalation of political violence was clear. Viewed in this context, the Palestinians' dramatic entry into the air piracy

business in 1968 becomes something of a logical if unexpected extension of a chain of developments that had included the emergence of the newly born Left, a further proliferation of violence-prone splinter groups, and the first indications of the general post-Guevara shift in emphasis from rural to urban guerrilla warfare in Latin America.[*]

The characteristics and contours of this "revolutionary atmosphere" have undergone some change in the intervening years. The salience of some of the original contributory issues, e.g., Vietnam, has faded. But, as amply illustrated by the increasingly sympathetic treatment accorded to the Palestine Liberation Organization (PLO) in the United Nations General Assembly (UNGA) and other international forums over the past 18 months, that of the new moral, political, and economic standards championed by the Third World has not.[**] On the contrary, now backed by the new political clout of the Arab oil states, these values appear to be gaining in force. In short, the established postwar international political system has been cast into something of a state of flux—with all that that implies with respect to its effective order-keeping capabilities.

Terrorists have benefited from this overall state of affairs in many ways. Among other things, it has:

—Accorded an aura of legitimacy to the acts of any terrorist group claiming leftist revolutionary or national liberation movement status;

—Frustrated efforts to develop more effective international countermeasures;

—Facilitated transnational contact and cooperation among terrorist groups;

—Fostered a significant increase in the number of national, transnational, and international organizations providing national liberation movements and other "progressive" dissident

---

[*] With Guevara's demise and subsequent decline in stature as a revolutionary theorist and tactician, the works of such leading advocates of terrorist violence as Fanon, Sartre, and Marighela have assumed increasing importance as a major literary source of inspiration for ultra-militants in many parts of the world.

[**] The PLO is a political umbrella organization embracing several Fedayeen commando groups. It was accorded recognition as the sole legitimate representative of the Palestinian people (at the expense of Jordan) by the 1974 "Islamic nonaligned" and Rabat summit meetings. In November of that same year, it was granted observer status by the UNGA. All told, some 50 states have allowed the PLO to open offices in their capitals. In addition, five UN-affiliated international agencies (ILO, WHO, UPU, ITU, and UNESCO) have granted it observer status.

formations with various forms of direct and indirect support.

*The attitudes and behavior of supportive states—ranging from those willing to provide little more than kind words and occasional safe haven to those that regularly furnish practicing or potential terrorists with funds, arms, training, documentation, and other operational support—have constituted another key global environmental factor affecting the scope and nature of transnational activity during the period under review. Variable might be a better term, however, for the extent of such assistance has fluctuated with changing appreciations of broader interests on the part of the state actors involved. For example, 1975 witnessed a distinct downward trend in such support.*

In any event, if one excludes the simply indulgent or indifferent (including those liberal Western European states like France and Switzerland that, because of their strategic location and the extensive protection they accord to democratic rights and freedoms, have become involuntary hosts to all manner of foreign dissident groups) the list of nations in question dwindles to less than a score. Counting a few states that have recently retired—or partially retired—from the business, these "activists" include (but are not limited to) Libya, Cuba, the USSR, China, North Korea, Algeria, the People's Democratic Republic of Yemen, Tanzania, Congo, Zaire, Egypt, Syria, Iraq, and, however reluctant it has been to engage in such activity, Lebanon.

In some of these states, most of the support rendered to foreign revolutionary or guerrilla formations has been directed toward influencing the course of developments in one or two neighboring states or territories. And for many, perhaps most, the actual promotion of terrorist violence has been no more than a largely unintended byproduct of their activities. Nevertheless, in one way or another, all of them have directly contributed to the recent upsurge of transnational terrorism.

Two or three bear special mention. Take Libya, for example. The oil-rich Qaddafi regime has for some years been the world's most unabashed governmental proponent of revolutionary violence. And from the number of times that Libya has been linked to specific terrorist groups and incidents—including Carlos' raid on the OPEC meeting in Vienna—it would appear that Colonel Qaddafi has also been one of the world's least inhibited practicers of international terrorism.

Tripoli's focus has been on nationalist formations, whatever their ideological coloration or religious leanings. Thus, the recipients of its favors (in the form of various combinations of financial, logistical, and technical support) have been numerous and varied. In addition to some of the more militant Palestinian splinter groups, they have included the Irish Republican Army and a number of less widely known guerrilla movements based in the Philippines, Ethiopia, Somalia, the People's Democratic Republic of Yemen, Chad, Morocco, Tunisia, Thailand, and Panama.

This list is not exhaustive. Moreover, it bodes well to grow since, despite Tripoli's professions of reluctance to grant safe haven to the JRA terrorists who seized the American Consulate General in Kuala Lumpur in August 1975, there have as yet been no convincing indications that Colonel Qaddafi has undergone a change of heart.

Moscow's posture has been more ambiguous. Basically, the Soviets have had serious misgivings about the utility of transnational terrorist activity. They have repeatedly warned that excessive violence can tarnish the reputation of those involved and have stressed their belief that such tactics are not only generally unproductive but can lead to unforeseen and possibly uncontrollable adverse consequences. At the same time, however, the Kremlin's broader interests—including, importantly, those stemming from its continuing adversary relationship with Peking—have denied it the option of a straightforward hands-off policy. Thus, after a period of hesitancy, the Soviets began channelling funds, weapons, and other assistance to fedayeen groups through a number of intermediaries in 1969. All indications are that they continue to do so today.[*] Similarly, they have continued their long-standing program (the more innocuous aspects of which are publicly associated with Moscow's Patrice Lumumba University) of bringing young revolutionaries from all parts of the Third World to the Soviet Union for training and indoctrination. And like Carlos, some of these individuals have subsequently cropped up on the transnational terrorist scene.

There is also a considerable body of *circumstantial* evidence linking Moscow to various terrorist formations in Western Europe. That some linkages

[*]In their commentary on fedayeen activities, however, the Soviets have consistently been careful to distinguish between "permissible" attacks on "legitimate" targets inside Israel and "regrettable" incidents involving noncombatant third parties.

...ed may, in fact, be taken for granted, for the broad considerations cited above give the Soviets ample reason for selectively attempting to monitor, penetrate, and gain some influence over such groups. But for obvious reasons, they have had to be very circumspect. They seem, for example, to have relied more heavily there than anywhere else on the cooperation of intermediaries who, if exposed, can be plausibly represented as having acted on their own initiative. In any event, the only hard evidence of Warsaw Pact member assistance to individuals associated with the Baader-Meinhof Gang points to Pankow and Prague. The arms destined for the non-Marxist Provisional Wing of the IRA that were seized at Schiphol Airport in Holland in late 1971 were of Czechoslovak origin and had been handled by a Czechoslovak firm. Even in the original "Carlos Affair," Cuba was the state actor most directly implicated. In short, the true dimensions of Soviet involvement remain extremely difficult to ascertain.

Nonetheless, one thing is clear. However much the Soviets might wish otherwise, their efforts to gain some handle on extremist activity have, together with their pursuit of less congruent objectives, done more to aggravate than to contain the current rash of transnational terrorist activity. The hard fact is that it is difficult to translate assistance into leverage or control when there are other available sources of support. Indeed, as the Soviets should by now have learned, any assistance provided to an extremist group under these circumstances risks simply increasing the recipient's potential for autonomous action.

A third actor deserving of separate comment is Cuba—not so much because of the extent of Havana's past activities in support of revolution and rebellion, but because there is mounting evidence (such as the statement issued at the conclusion of the regional Communist conference which was hosted by the Cubans in June 1975) that Castro's ambiguous policies have finally undergone a fundamental change in this regard. After years of hedging, the Cubans have now publicly espoused Moscow's recommended *via pacifica* strategy with respect to revolutionary struggle in Latin America—a development which bodes ill for those smaller militant formations that still rely heavily on Cuban support. It would appear that they will have to fall in line or face the risk of extinction. But many of Latin America's more active proponents of armed struggle are less vulnerable to Cuban retrenchment. Some are already highly self-sufficient. Of the remainder, those who are unable to tap the enormous war chests that have been accumulated by Argentine

terrorist groups are likely to engage in more frequent ransom and resupply operations of their own. Partly because of this, and partly because Castro has made it abundantly clear that he does not intend to effect a parallel cutback in his support of armed revolutionary struggle outside of Latin America, the impact of Cuba's new posture on the overall level of transnational terrorism may be minimal.

The last and most elusive global variable to be addressed here is the *overall economic environment*. It can impact on the problem of terrorism in a number of subtle and, in some cases, countervailing ways. For example, *extra-cyclical world-wide economic strains*—such as those generated by the sudden quadrupling of oil prices—can so overtax the capabilities of local regimes as to incite domestic violence of a sort that could easily spill over national boundaries. Short of this, they can contribute to a general undercurrent of unrest by curtailing the resources that can be devoted to ameliorating societal ills.

Because the social and political effects of *cyclical trends* in the overall economic climate tend to be delayed and uneven, the potential consequences of short-term fluctuations do not lend themselves to generalization. Medium- to long-term trends, however, can affect both the potential and the opportunities for transnational terrorist activity in any given area. In so far as it affects industrialized countries, *rising economic prosperity* can, for example, facilitate the undetected movement of terrorist groups by fostering a heavy flow of tourist and commercial travel. It also attracts the large aggregations of emigre workers that not only make it easier for foreign terrorists to escape notice but provide a ready pool of manpower for their operational teams and support mechanisms. More broadly, a prolonged and general economic upturn can increase local potentials for political violence by causing popular expectations to far outpace governmental capacities to deliver. And in more affluent societies, at least, the attendant emphasis on materialistic values can alienate significant segments of the student and intellectual communities. Indeed, a combination of these last two destabilizing trends contributed, together with the factors cited earlier, to the emergence of a distinctly "revolutionary" political atmosphere in the late 1960s.

Conversely, *a prolonged economic decline* (something which some observers predict the world will experience for the next 20 years or more) has

generally tended to dampen revolutionary ardor.
Revolutionaries, in the nature of things, tend to
are preoccupied with the exigencies of day-to-day
existence. But the world has much changed since its
last broad economic slide. Whether the numbing
effects of generalized adversity will be felt as strongly
in the future is thus open to question. Their potential
impact on the level of transnational terrorist activity is
even more uncertain. The actors engaged therein are
scarcely representative of the general population.
They are few in number and elitist by nature. And
given the proven strength of their convictions, they are
likely to be among the most resistant to the
psychological effects of untoward changes in the
overall economic environment.

## How Cost Effective?

The answer to this question depends on the vantage
point of the observer. The achievement of
disproportionately large effects from the employment
of minimal resources is, of course, what political
terrorism is all about. Its most serious drawback is
that its consequences are, as the Soviets maintain, to a
considerable degree unpredictable. It can alienate
those groups whose sympathy was sought. Rather
than disorient the masses, it can rally them to a
previously unpopular government. It can galvanize a
weak or wavering government into forceful
counteraction. In short, tactical successes can, as in
Jordan in 1970 and Uruguay in 1970-72, lead to
strategic reverses of major proportions.

This risk is, however, easily accepted by those who
dispose of no effective alternative methods for
achieving their goals. Moreover, despite a number of
sobering experiences, the overall balance sheet thus
far provides the practitioners of transnational
terrorism with grounds for considerable optimism.

Briefly put, the record shows that both trans-
national and international terrorists have generally
been successful in avoiding capture (or, if caught, in
escaping punishment) and in meeting at least some of
their proximate objectives. For example, in a study of
63 major kidnapping and barricade operations
executed between early 1968 and late 1974, the
RAND Corporation concluded that such actions were
subject to the following probabilities of risk and
success:

—87 percent probability of actually seizing
hostages;

—79 percent chance that *all* members of the
terrorist team would escape punishment or death,
whether or not they successfully seized hostages;

would be met in situations where something
more than just safe passage or exit permission
was demanded;

—28 percent chance of full compliance with such
demands;

—83 percent chance of success where safe passage
or exit, for the terrorists themselves or for others,
was the sole demand;

—67 percent chance that, if concessions to the
principal demands were rejected, all or virtually
all members of the terrorist team could still
escape alive by going underground, accepting safe
passage in lieu of their original demands, or
surrendering to a sympathetic government; and

—virtually a 100 percent probability of gaining
major publicity whenever that was one of the
terrorists' goals.*

Such hostage operations have resulted in the freeing
of large numbers of prisoners, the payment of huge
ransoms, and in one case where Austria was targetted,
the changing of government policy. Until mid-1974, at
least, the record for skyjacking was fully comparable.
Out of 127 terrorist attempts to seize aircraft between
March 1968 and early July 1974, only a dozen were
abortive. Of the remainder, less than 10 are known for
certain to have ended in the death or imprisonment of
the terrorists. In a great majority of cases through
1972, the skyjackers were successful in securing full
compliance with their demands. Thereafter, however,
they generally received no more than safe haven, and
for the past year and a half, skyjacking has been a
distinctly losing proposition. Of the 6 attempts made
between late July 1974 and the end of 1975, 4 were
nipped in the bud and the other 2 brought sentences of
death or life in prison to the terrorists involved.

Terrorist acts lacking a bargaining dimension (e.g.,
bombings and assassinations) have generally entailed
a correspondingly lower degree of risk. All told, only
about 267 individuals associated with transnational
terrorist activity have been caught in the past five
years. Of these, 39 were freed without punishment, 58
escaped punishment by getting safe conduct to
another country, 16 were released from confinement

*As excerpted in *Terroristic Activity—International Terrorism*
Hearings Before the Subcommittee to Investigate the
Administration of the Internal Security Act and Other Internal
Security Laws of the Committee on the Judiciary, United States
Senate, Ninety-Fourth Congress, First Session, Part 4, May 14,
1975 (Washington: US Government Printing Office, 1975), p. 240.