# DATELINE:

## HIGHLIGHTS OF A YEAR-END
## AND INTERNATIONAL

● **2 DECEMBER:** South Molluccan Terrorists Seize a Dutch Train



South Molluccan terrorists pick up supplies outside the train that they held for 12 days before surrendering to Dutch authorities.

● **4 DECEMBER:** South Molluccan Terrorists Seize the Indonesian Consulate in Amsterdam

A blindfolded and tethered hostage is displayed on a third floor balcony of the Indonesian Consulate on 5 December—a full two weeks before his South Molluccan captors finally laid down their arms and surrendered.



# DECEMBER 1975

## UPSURGE IN MAJOR TRANSNATIONAL TERRORIST INCIDENTS

- **21 DECEMBER:** The Carlos-Led "Arm of the Arab Revolution" Attacks the OPEC Ministers' Meeting in Vienna



Wounded in the assault on OPEC's Vienna headquarters, a terrorist is carried off to the hospital. The following day, he was placed on board the plane that carried the rest of his group and 43 of their hostages to North Africa.

- **21 DECEMBER:** An American Employee of a US Firm is Kidnapped in Ethiopia by Eritrean Terrorists

- **23 DECEMBER:** A US Embassy Official is Gunned Down by Unidentified Terrorists in Athens

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

**22 Days of Terror:** The overlapping periods of direct terrorist violence associated with the five incidents cited here spanned almost the whole month of December.

themselves at least, toppled no governments, they have

— Embarrassed several governments and contributed to the effective collapse of a few (e.g., the initial Bordaberry Administration in Uruguay and the Isabel Peron regime in Argentina);

— Added an abrasive new dimension to both North-South and East-West relations;

— Contributed to the growing international status and fortunes of the PLO;

— Compelled some nations to temporarily abandon their law enforcement function (e.g., to release captured terrorists) out of fear of future retribution;

— Aggravated and accentuated the dilemmas generated within the existing international system by the emergence of a growing company of powerful non-state actors;

— Introduced strains in relations among those Western nations which, because of divergent national interests, feel constrained to adopt differing positions with respect to specific incidents or broader terrorist-related issues;

— Reinforced the currently pervasive sense of global flux and disorder;

— Caused a large number of nations, including the U.S., to divert substantial resources to defense against terrorist attacks;*

— Adversely affected the quality of life in many open or formerly open societies.

---

*In the U.S. this has been reflected most clearly in the installation of an effective but costly airport security system and, following the Khartoum incident of 1973, in a supplemental $20 million appropriation provided to the Department of State for the sole purpose of improving the security of American diplomatic and consular installations abroad. The construction of a special bombproof courthouse in which to try the captured leaders of the Baader-Meinhof Gang was one of the more notable extra expenses that have been incurred by Bonn. By the time these proceedings are over, it is estimated that they will have cost the West German taxpayer more than $6 million. Even the liberal Swedes have become nervous since incurring the wrath of the JRA in March 1975 by arresting two members of that group and deporting them to Japan. In any event, they chose to take no chances when they hosted the Chilean Davis Cup tennis team some six months later. They converted the fashionable coastal resort where the matches were held into a veritable fortress protected by floodlights, fences up to 35 feet high; and a 1,500 man police force equipped with gunboats, helicopters, scores of dogs, and some 40 horses.

In short, while scarcely cataclysmic, the spoiling effects of modern-day transnational and international terrorism have been substantial. Harking back to earlier discussion, this state of affairs is both a measure and, in large part, a consequence of increasing global interdependence. As the dimensions and complexity of the web of interstate and transnational linkages that together comprise the functional core of the "international system" have grown under the impact of technological advance, the reverberations of events—including terrorist attacks—which disturb or threaten its more important intersections have tended to become increasingly widespread and sharply felt. At the same time, the limits within which individual states can attempt to cope with such problems through unilateral action without risk of adversely affecting the interests of others have steadily narrowed. But, as previously observed, rather than encourage increasing interest in supranational solutions, the frustrations born of this *de facto* shrinkage of sovereignty have generated an unhelpful backlash of nationalism. And this, of course, has been one of the key factors that have affected the nature and effectiveness of the international community's response to the terrorist threat.

## What International Constraints?

With the exception of a number of bilateral agreements providing, *inter alia*, for a greater exchange of intelligence and technical assistance or, as in the memorandum of understanding concerning hijackers of aircraft and vessels that was signed by the US and Cuba in 1973, for the prompt extradition of specified categories of terrorists, the international response to terrorism has been relatively weak and ineffective.

The UN's problems in grappling with *transnational* terrorism were cited and illustrated at the outset of this study. *International* terrorism, however, has proved to be a somewhat less contentious issue. Indeed, the Declaration on Principles of International Law Concerning Friendly Relations and Cooperation Among States which the General Assembly adopted without vote on 24 October 1970 asserts at one point that:

Every State has the duty to refrain from organizing, instigating, assisting or participating in acts of civil strife or terrorist acts in another State or acquiescing in organized activities within its territory directed towards the commission

... of such acts, when the acts referred to in the present paragraph involve a threat or use of force."

But even as an essentially unenforceable admonition, this rule of behavior is weakened and clouded by the greater emphasis that the Declaration accords to the "principal of equal rights and self-determination of peoples." The language employed in this regard implies that it is the unending duty of all states to assist groups struggling for the realization of these rights in every way possible. For example, the Declaration avers that:

Every State has the duty to refrain from . . . forcible action which deprives people referred to above in the elaboration of the present principles of their right to self-determination and freedom and independence. In their actions against, and resistance to, such forcible action in pursuit of the exercise of their right to self-determination, such peoples are entitled to seek and to receive support in accordance with the purposes and principles of the Charter. [emphasis added]*

There have, in addition, been a total of five international conventions adopted over the past 12 years that have dealt with one or another aspect (in all cases rather narrow) of the terrorism problem. These are as follows:

— The Tokyo Convention (Convention on Offenses and Certain Other Acts Committed on Board Aircraft) Signed in September 1963, it did not come into force until December 1969. It is a very limited accord which does no more than to set a few jurisdictional ground rules and to require the contracting states to (1) make every effort to restore control of the aircraft to its lawful commander and (2) arrange for the prompt onward passage or return of hijacked aircraft together with their passengers, cargo, and crew. As of this writing, 77 countries have ratified it.

— The Hague Convention (Convention for the Suppression of the Unlawful Seizure of Aircraft) Signed in December 1970, it came into force 10 months later. Its principal feature is that it requires (albeit with important discretionary exceptions) contracting parties either to extradite or to prosecute skyjackers. Seventy-four countries have ratified it.

— The Montreal Convention (Convention for the Suppression of Unlawful Acts Against the Safety

of Civil Aviation) Signed in September 1971, it came into force in January 1973. Covering the sabotage or destruction of aircraft or air navigational facilities, it requires the contracting parties to make such offences subject to severe penalties and establishes the same extradition-or-prosecution system for offenders as in The Hague Convention. Sixty-three countries have ratified it.

— The Organization of American States Convention (Convention to Prevent and Punish Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion that are of International Significance) Signed in February 1971, it entered into force in October 1973 (the UN is a signatory, but not a party). With its emphasis on the prevention and punishment of crimes against persons to whom the state owes a special duty of protection under international law, it was a precursor of the UN convention concerning the protection of diplomats which is cited below. It also employs The Hague Convention extradite-or-prosecute formula. Only four of the thirteen signatory countries have ratified it.

— The United Nations Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons Including Diplomatic Agents Signed in December 1973, it has yet to come into force. It requires the contracting states to establish certain specified acts against protected persons (or against the official premises, private accommodations, or means of transport of such a person) as crimes under internal law. Once again, The Hague Convention on extradite-or-prosecute formula applies. So far, only nine countries have ratified it.

Although they reflect international concern and at least a slim majority consensus that something must be done, these conventions presently do not, singly or in combination, constitute much of an effective constraint on terrorist activity. In the first place, many states—including a high percentage of those that have been particularly active in supporting revolutionary or national liberation groups—are not yet parties thereto. Secondly, the conventions lack teeth in that all make the extradition or prosecution of terrorists subject to discretionary escape clauses and none provides for the application of punitive sanctions against states that simply refuse to comply at all. Finally, the exclusive focus on skyjacking and the

*Yearbook of the United Nations 1970 (New York, United Nations Office of Public Information, 1971), p. 790.

**Ibid., p. 791

protection will remain the product of unilateral activity outside the cognizance of international law.

But this, it would seem, is all the traffic will bear. The US has tried repeatedly to correct some of these deficiencies and has run into a stonewall of opposition on each occasion. For example, at the conclave sponsored by the International Civil Aviation Organization (ICAO) that formulated the final draft of The Hague Convention, the US delegation sought unsuccessfully to (1) limit drastically exceptions to extradition of hijackers, (2) establish hijacking as a common crime, and (3) exclude political motivation as a defense against extradition or prosecution of hijackers. Two years later, in September 1972, the US submitted a draft convention to the UNGA that was aimed at limiting the "export" of terrorism. But even though it established a number of restrictive criteria that would have to be met before its enforcement provisions became applicable, it was effectively stifled by opposition centering on the impermissibility of interference with the right of self-determination. The following summer, a proposal sponsored by the US and several other nations for a separate enforcement convention that would have backed the Tokyo, Hague, and Montreal documents with sanctions affecting the rights and services guaranteed under existing international and bilateral air service agreements was soundly defeated at the ICAO's Rome Conference and Assembly.

The obstacles which have blocked more effective international action are formidable. They have, as previously indicated, included the controversy over *justifiable* versus *illegal* political violence and broad resistance to such further infringements of national sovereignty as would be implied in any inflexible curtailment of the right to grant political asylum. Equally important, however, they have also included an understandable reluctance on the part of many nations otherwise ill-disposed toward terrorist activity to commit themselves to any course of action that might either invite direct terrorist retribution or provoke the application of sanctions by states that happen to be sympathetic to the terrorists' cause.

To make these observations is not, however, to imply immutability. It must be remembered, for example, that such progress as has been made in the field of multilateral countermeasures has, in each instance, been occasioned by reaction to some general or specific escalation of terrorist violence. (In this regard, hopes that Carlos' assault on the OPEC ministerial meeting in Vienna will have some sort of

salutary catalytic effect may yet be borne out in practice.) There are, moreover, a host of other factors which could alter the attitudes and behavior of any of the state actors concerned. Hence, whether or not all the obstacles to a more effective international response that have been cited thus far will retain their present force in the decade ahead is a valid question—and it is one that is addressed below.

## IV. THE OUTLOOK

### International Terrorism

Although it is possible that a few others may emulate the irresponsible behavior of Libya's Colonel Qaddafi, international terrorism seems unlikely to pose much of a threat to world order or US interests during the next few years. Even in its presently weakened state, the international system subjects states to a host of legal obligations and practical constraints that they can ignore only at considerable risk. The continuing force of these considerations is evidenced by the fact that international terrorism is no more prevalent today than it was in 1968.

Indeed, throughout the entire postwar era, both the weak and the musclebound have tended to view international terrorism as a policy tool to be used sparingly and (except when exercising their "right" of retaliation) discreetly when potentially effective alternative means are lacking. Moreover, while no apologia for such activity is intended, it should be noted that—with the exception of certain actions undertaken in connection with the Middle East conflict—its objectives have generally been defensive (e.g., the neutralization of hostile foreign-based groups or individuals) as opposed to the offensive and deliberately disruptive character of most transnational terrorism.

Nevertheless, the sporadic employment of government-controlled terrorist groups against Israeli targets both within and outside that country's borders raises some troublesome questions about what the 1980s may hold in store. And while their true sponsorship has yet to be firmly established, so do the recent Rejectionist Front-associated operations in Madrid and Vienna that were intended to bring pressure on moderate Arab regimes.

These questions center on the kind of adjustments in international behavior that may flow from ongoing changes in the distribution and component elements of national power and, no less important, from the growing array of economic, political, and technological restraints affecting the ways in which

latent power can be translated into effective leverage. Are Arab actions a precursor of things to come? Is it, in fact, likely that, lacking or despairing of more conventional means for defending or advancing their international interests, an increasing number of states will opt to engage in—or to sponsor—terrorist activity?

In assessing this possibility, some observers have noted that because of the expense, the risks, and the constraints deriving from the patron-client relationships that are now involved, high-intensity conventional warfare—even of the local variety—may be becoming obsolete. On the other hand, although it is "permissible" under current international ground rules, low-level protracted conflict of the Vietnam type is not, as they point out, a very attractive alternative. For these reasons, they suggest that there will be a strong temptation for governments to employ terrorist groups as means of waging "surrogate warfare" against other nations. Brian Jenkins has expressed this notion as follows:

> Terrorists, whatever their origin or cause, have demonstrated the possibilities of a third alternative—that of "surrogate warfare." Terrorism, though now treated as a legitimate mode of warfare by most conventional military establishments, could become an accepted form of warfare in the future. Terrorists could be employed to provoke international incidents, create alarm in an adversary's country, compel it to divert valuable resources to protect itself, destroy its morale, and carry out specific acts of sabotage. Governments could employ existing terrorist groups to attack their opponents, or they could create their own terrorists. Terrorism requires only a small investment, certainly far less than what it cost to wage conventional war. It can be debilitating to the enemy. Prior to the 1973 Yom Kippur War, a senior Israeli officer estimated that the total cost in men and money to Israel for all defensive and offensive measures against at most a few thousand Arab terrorists was at times that of the Six Days War in 1967. A secret backer of the terrorists can also deny sponsoring them. The concepts of subversion, sabotage, of lightning raids carried out by commandos, are not new, but the opportunities are.[*]

The case presented, however, is far stronger with respect to the probability of increasing resort to some form of surrogate warfare—which, as Brian Jenkins notes, is scarcely a new phenomenon—than for the corollary argument that this development is likely to be characterized by widespread adoption of terrorist tactics.[**] For one thing, the safety factor of deniability

would all but disappear if a state were to engage in such activity on a regular basis. For another, barring total collapse of world order and consequent international anarchy (something that no state actor has reason to promote), international terrorism is highly unlikely to gain acceptance as an admissible form of behavior in the foreseeable future.

All told, in fact, it seems likely that the employment of terrorist groups in a surrogate warfare role will continue to be more the exception than the rule for some time to come. And if this proves to be the case, it follows that while there may be a slight upward trend in the annual total of international terrorist incidents, the scope of the problem in 1985 should not be much more serious than it is today.

## Transnational Terrorism

On balance, the outlook with respect to transnational terrorism is less encouraging. On the positive side, the decline in the number of states willing to provide terrorist safe haven gives promise of being lasting.[*] It seems most doubtful that the currently shrinking aggregations of emigre workers will soon regain their former size, and this will probably have some small impact on the security and resources of terrorist groups operating in Western Europe. More importantly, political developments of a sort which presently seem to be at least possible could significantly reduce levels of terrorist activity in such current trouble spots as Northern Ireland, Argentina, and the Middle East.

But overall, the potential for domestic, international, and transnational terrorism is—as asserted at the outset of this study—almost certain to remain high. Furthermore, most of the broad environmental factors that have contributed to the feasibility, efficacy, and popularity of transnational terrorism in recent years will continue to operate with at least equal force in the decade ahead. The salience of some, in fact, seems bound to increase.

Barring some cataclysmic event which reduces mankind to a more primitive order of existence, technological advance, modernizing social and economic change, and growing global interdependence are, for example, essentially irreversible phenomena

---

[*] Brian Jenkins, International Terrorism: A New Mode of Conflict, op. cit., p. 21.

[**] It must be remembered that under the definitions employed in this study, there are many kinds of covert subversive activity—including support of insurgent paramilitary forces and even sponsorship of highly discriminate sabotage operations—that would not of themselves constitute terrorism.

---

[*] Although this trend has been evident for some time, it was underscored in August 1975 when the JRA terrorists who had seized the US Consulate in Kuala Lumpur not only had great difficulty in finding a state willing to grant them safe haven, but were even denied permission to transit nationally-controlled airspace by some Third World countries.

with an urgency and momentum which seems more likely to increase than to decline in the coming decade. And while their political consequences can, to a certain degree, be controlled by carefully-tailored policy decisions, they bode well to aggravate the terrorism problem by generating further increases in (1) divisive ethnicity and nationalism, (2) urban unrest, (3) terrorist capabilities, and (4) societal vulnerabilities.

In the political field, the widespread erosion of established institutions of authority that has both invited and facilitated terrorist activity in recent years shows no signs of abatement. For its part, the postwar international order seems likely to remain under challenge—and thus in flux—throughout the decade ahead. But the problem will probably continue to be most evident at the national level where increasing difficulties of governance hold forth the prospect of a further proliferation of ineffective and unstable regimes.

As a byproduct of the above, most non-state actors on the world stage will probably manage to escape significantly firmer national or international control for some time to come. Because of this, and because the values underlying the strong "social conscience" component of today's political environment seem likely to retain their current force, the chances are that national liberation and leftist revolutionary formations will continue to receive both moral and material support from a wide variety of transnational and international organizations as well as a potentially substantial flow of ransom and "insurance" payments from vulnerable multinational corporations.

At the same time, the trend toward greater international contact and cooperation among terrorist groups that has already markedly enhanced the operational capabilities of some of the organizations involved seems likely to gain further momentum. For one thing, lingering inhibitions born of sharply different goals and outlook are bound to decline in the face of continuing and widely-publicized proof of the advantages that can be derived from such a course. For another, the tough but scattered local counter-terrorist campaigns that are sure to dot the political landscape throughout the decade ahead will each provide compelling new incentives for transnational cooperation.

Ominously enough, therefore, the wave of the future seems to be toward the development of a complex support base for transnational terrorist activity that is largely independent of—and quiet resistant to control

by—the state-centered international system. This does not mean, however, that the behavior of supportive state actors will become increasingly irrelevant. On the contrary, it suggests that unless the principal patrons of subversion and revolutionary violence cut back on the assistance they are furnishing to practicing or potential terrorists more drastically than currently available evidence as to their intentions gives grounds to expect, the deleterious impact of their behavior may be considerably greater than in the past.

The problem of extensive and sometimes sympathetic publicity is another aggravating environmental factor that promises to persist in many parts of the world. Not only has all the attention that has been focused on terrorism made it increasingly newsworthy, but the coverage and capabilities of the world's satellite communications systems have been steadily upgraded since 1968. Moreover, radio, television, and the press are bound to continue to reach an ever larger audience.

Although most Western media officials, at least, are by now fully aware of the danger of playing into terrorist hands, competitive pressures are strong and the line between responsible and irresponsible reportage or commentary is very fine. In short, self-censorship is unlikely to work very well. On the other hand, the only potentially more effective alternative—firm governmental management of the news—is, in time of peace, virtually out of the question in most Western democracies.

Another aspect of the information explosion that promises to continue to be troublesome is the diffusion of terrorist-adaptable technological know-how and—to a lesser degree—of possibly inspirational speculation about new and potentially ultra-disruptive terrorist tactics. Although the objectives of such literature may be (and most often are) above reproach, it can scarcely help but aggravate the problems posed by the development and wholesale deployment of sophisticated (and in many cases, man-portable) weaponry; the world-wide proliferation of nuclear facilities; and the race, motivated by both political and economic considerations, to sell nuclear technology and modern armaments to developing countries. And these problems are serious enough as it is. Indeed, despite the attention that has been paid to nuclear safeguards and the physical security of sensitive installations and depots, the world seems to be moving toward a state of affairs in which the limits of any "technological escalation" of terrorist violence will depend more on the self-imposed restraints

affecting the behaviour of the groups involved than on lack of capability or opportunity.

It is, of course, the upper limits of the potential scale of terrorist violence that are of most concern Individual terrorist groups already have the capability of manufacturing or otherwise acquiring a variety of weapons or agents of mass destruction. More will be in a position to exercise this option in the future. Just how likely is it that they will do so?

That the threatened employment of such awesome ordnance would have profound political and psychological effects is undeniable. But it must be emphasized that there are major hazards that would be involved for the terrorists as well. The most important of these (and the one probably primarily responsible for the failure of terrorists to make more of an effort to exploit mass destruction technology in the past) is the high risk of adverse public reaction—particularly in the event that the group involved were to end up in a position where it felt compelled to make good its threat.

Although a few terrorist groups have, in fact, resorted to indiscriminate mass murder, such instances have been relatively rare, and in each case thus far the human toll has been negligible in comparison to the casualties that would result from the broadcast of only a few ounces or less of a highly toxic agent or the detonation of even a small nuclear device. Basically, terrorists are in business to influence people, not exterminate them. Moreover, those that aspire to some sort of political legitimacy—and this means most of them—are generally quite sensitive to the need to take some care to avoid alienating local and international opinion.

The fact remains, however, that weapons of mass destruction cannot help but hold considerable temptation for militants whose basic strategy of violence centers on wringing maximum political leverage from publicity and fear. Hence, it seems prudent to assume that sooner or later some group is bound to take the plunge.

Because their very mention strikes terror into the hearts of many, nuclear weapons come first to mind. But the practical problems facing the would-be nuclear blackmailer are numerous and complex. Although nuclear devices are clearly no longer beyond 'terrorist reach, their acquisition (whether through theft or manufacture) is still—and for a few years yet will probably continue to be—a relatively demanding task. Once in terrorist hands, their emissions present anti-detection shielding problems not only during

passive storage but, if deployed against specific targets, during the delivery and bargaining phases of the operation as well. Moreover, there is further room for trouble when it comes to establishing the credibility of the threat since the target authorities must be persuaded not only that the terrorists actually have a nuclear device but that it will probably work. Finally, all but the most fanatical terrorists might be given pause by the fact that if worst comes to worst, the destructive effects of such weapons are not manageable.

Thus, while the prospect of nuclear-armed terrorists can scarcely be dismissed, a more likely scenario—at least in the short term—would seem to be a terrorist seizure of a nuclear weapons storage facility or a nuclear power plant in a straightforward barricade operation. Such a group need not threaten a nuclear holocaust (although that possibility would be in the back of everyone's mind), just the destruction of the bunker or reactor with the attendant danger of radiological pollution. The threat would be inherently credible. The publicity would be enormous. And if their demands were to be denied, the terrorists would be in a position to tailor the amount of damage they actually inflicted to their appreciation of the existing circumstances.

A more pressing threat, however, would seem to lie in the field of chemical, biological, and radiological agents. In contrast to nuclear devices, many of these are presently relatively easy to acquire. Hence the danger that they could turn up in the hands of the sort of ultra-radical or psychopathic fringe group that would have the fewest compunctions about actually using them is very real. Moreover, since small—sometimes minute—quantities are usually all that are needed for potentially devastating effects, such agents also tend to be easy to conceal, easy to transport, and easy to introduce into the target area. Credibility poses few problems, for a small sample of the agent delivered by mail or left at some designated pick-up point should quickly dispel any doubts on this score. Finally, a number of these agents offer the additional advantage of being amenable to relatively selective targeting (e.g., the occupants of a single building or compound).

As implied in earlier discussion, any such dramatic escalation of terrorist violence as that suggested by these brief scenarios on weapons of mass destruction would be likely to touch off a new flurry of efforts to devise international countermeasures. Indeed, another convention or two would probably result. But just how

much practical effect this would have is open to serious question.

Simply put, the net thrust of the forces at work within the international community promises to remain more centrifugal than centripetal throughout the decade ahead. Indeed, all indications are that rising nationalism and ethnicity, the developing nations' fundamental challenge to the existing world order, and the related proliferation of subnational and other non-state actors will continue to render the international system increasingly complex and uncertain. Moreover, the attendant diffusion and erosion of political authority will tend to be self-reinforcing. And under these circumstances, the degree of consensus needed to adopt and enforce meaningful counterterrorist accords will be more elusive than ever.

It follows that the recent stiffening of a number of nations' policies toward terrorists is almost certainly more reflective of relatively narrow and quite disparate tactical calculations—with respect, for example, to such things as improved domestic security arrangements, the current state of play in the Arab-Israeli conflict, or the latitude of action that may now be afforded by Third World divisions and the general unpopularity of certain terrorist groups—than of any broad upsurge of interest in a global approach. Nonetheless, this development is encouraging for it opens up new possibilities for bilateral and limited multilateral counterterrorist undertakings of a sort that have, in combination with unilateral measures, proved relatively effective in the past.

In sum, although it is unlikely to trigger a collapse of world order, transnational terrorism promises to pose a continuing and potentially gravely unsettling problem for the world community until such time, possibly years hence—that the international system gels into new and generally accepted contours. The frequency and intensity of violence will decline in some areas. The cast of characters will be constantly changing. In all likelihood, technological and organizational innovations in the security field will make terrorism a more risky affair. Yet at best the overall number of terrorist groups seems unlikely to decline—and the number of countries in which they are active appears destined to grow. Furthermore, because of their symbolic value, their availability, and the embarrassment they can create, the popularity of *American targets* will probably remain high.

Ironically, there may well be fewer *people engaged in transnational terrorist activity* some five years hence than there are today. But this prospect is not as encouraging as it sounds. For even if changes in the political environment or partial satisfaction of their objectives do encourage some of the larger and more "responsible" formations to eschew transnational violence, their place on the international stage is likely to be quickly filled by more militant splinter groups—not to mention a smattering of total newcomers to the game. And since (as amply demonstrated by the JRA, Carlos and company, and the PFLP) small terrorist groups can, when properly connected, mount all manner of highly disruptive operations, such a development could—through the introduction of additional increments of fanaticism—provoke at least temporary increases in the intensity of terrorist violence.

In any event, it seems likely that the constraints on terrorist behavior will, through international default, continue to depend primarily on (1) the terrorists' subjective orientation and (2) the policies and resources of the individual countries in which they operate. Of necessity, however, the impact of these will be uneven. Remember, too, that the inherent dynamics and logic of a campaign of terrorist violence are such that it has a natural propensity to escalate over time. Moreover, all but the most isolated terrorist groups will be able to draw on a common and cumulative media-fed pool of experience and inspiration. Hence, even if the cited constraints do result in some tapering off in the frequency of transnational terrorist incidents during the next few years, we should expect to witness steadily greater and more widespread sophistication in targeting, execution, and weaponry. And while, as suggested earlier, most groups will probably continue to be deterred by both moral considerations and calculations of the risks involved, the danger that a fanatic few might resort to weapons of mass destruction will increase accordingly.

## V. IMPLICATIONS

Two basic messages emerge from the foregoing discussion. The first is that the phenomenon of widespread internationalized terror is not only likely to persist for at least the next several years, but also to evolve in ways that could pose a more substantial threat to US interests—and, under certain circumstances, to world order—than in the recent

past.* The second is that the factors bearing on this phenomenon and its political ramifications are so numerous and cut across so many jurisdictional and disciplinary lines that the development of more effective national and international countermeasures is likely to be a particularly demanding task.

Whether or not weapons of mass destruction are actually brought into play, the odds are that the impact of transnational and international terror will be more sharply felt in the US in the years just ahead. There is, for example, good reason to believe that at least a few foreign terrorist groups are planning to step up their attacks on American targets abroad in the near future. Moreover, the influx of foreign travellers and dignitaries expected in connection with such major US-sponsored events as the current Bicentennial celebrations and the 1980 Winter Olympics will inescapably afford a host of opportunities for dramatic terrorist action. Hence, despite the likelihood that the practical considerations that have so far generally deterred foreign-based terrorist groups from extending their areas of operation to US shores will retain their present force, there is a good chance that a few will succumb to the temptation to do so.** Finally, no matter how tough and well-publicized a "no concessions" policy the US Government maintains, it seems likely that Washington will be targeted by terrorist demands somewhat more frequently in the future—partly to probe more fully the limits of US resolve, partly for sheer publicity or other psychological effect, and partly to foster intergovernmental or domestic tensions.

More importantly, perhaps, even if the problem of internationalized terror is not brought "closer to home" in the ways suggested above, it promises to impinge more directly on US interests and options

with respect to a broad range of critical issue areas. For example, it is likely to:

—Figure as even more of an irritant in both East-West and North-South relations;

—Sharpen the dilemmas inherent in the politically and economically sensitive questions of arms sales and the transfer of advanced technology;

—Provide potential new grounds for strains in Washington's relations with its principal friends and allies;

—Reinforce some of the obstacles which currently impede efforts to find a mutually acceptable way to cope with the dependence of Western industrialized countries on foreign energy sources; and

—Impose burdensome new demands on limited human and material resources.

Although, as emphasized in earlier discussion, the dimensions of the threat posed by international and transnational terror should not be overdrawn, the picture outlined above is sobering. Among other things, it suggests that the machinery and guidelines that the US and its allies have so far developed for dealing with the problem bear careful review.

There is no magic formula for endowing any given government's approach to the problem of terrorism with the direction, breadth, and coherence required to marshal the remarkably disparate talents and resources that are needed and to weave its response into the overall fabric of its domestic and foreign concerns. Indeed, any number of alternative courses of action could prove equally effective. Nevertheless, it bears emphasis that together with *timely intelligence* and *sound multi-disciplinary analytical support*, *flexibility* and *extensive coordination* (both inter- and intra-state) would seem to be critical to devising and implementing a counterterrorist strategy that is both internally consistent and minimally disruptive to national values and foreign policy objectives in terms of "hidden" social, economic, and political costs.

Obviously, such a strategy cannot be framed in isolation. Among other things, its architects would need ready access to top policymakers in both the foreign and domestic fields as well as to the advice of a broad range of government and non-government experts or interested parties. Moreover, the necessity to maintain some freedom of maneuver (born of the fact that every new terrorist incident is likely to have its unique aspects) is a particularly delicate

---

*Despite the frequency with which terrorists have attacked American citizens and property overseas, the US has been lucky in many ways. For example, foreign terrorist groups have for the most part eschewed staging operations on American soil—and those transnational terrorist incidents that have been authored here by domestic groups have generally been relatively minor affairs. Furthermore, the US Government has, as previously indicated, rarely been the target of terrorist demands. Hence, except for extensive (and readily accepted) airport security measures, the quality of American life and democratic freedoms has been little affected. And Washington has so far been spared the agony of having the lives of key political leaders or large numbers of innocents, be they Americans or foreigners, hang on its decisions.

**While it bears note, the parallel danger that commonly perceived opportunities for action in connection with such events could result in growing contact and cooperation between US-based and foreign terrorist groups falls outside the purview of this study.

problem—and one that can easily contribute to unnecessary misunderstandings. Hence, routine pre-crisis coordination of terrorism-related policies and contingency plans with all the key domestic and foreign actors whose interests and options they could affect becomes all the more important.

## SIGNIFICANT VARIABLES

### Group Characteristics

—Name of the organization or, at least, of the political entity, if known, that is effectively controlling the action

—Country of origin

—Relationship to the government of that country

—Size and organization

—Leadership

—Composition (i.e., occupational and educational specialties of the weapon, and their age range)

—Underlying

### Ideological Typology

Territorial (ethnic, religious, linguistic, or regional)
Ideological (doctrinal or individual)
Strategic
Worldview
National Self (revolutionary, socialist, Trotskyist, Maoist, Titoist, anarchist, and some ideologically fringe groups)
Domestic Committed
Single Issue
Other
Para-Social

—Domestic ties (extent of popular sympathy and support, links with legitimate political organizations, and links with other domestic/foreign groups)

—Foreign ties (state or non-state organizations, with connections to legitimate international organizations, and with foreign governments)

—Life evaluation of hostages (could be general or committed or immediate action) and, if applicable, date of demise

### Case Characteristics

—Location of incident

—Scope of act

### Summary Typology

Attempted
Successful (actual harm or death, including those)

## APPENDIX A

## INTERNATIONAL AND TRANSNATIONAL TERRORISM: SIGNIFICANT VARIABLES

**Group Characteristics**

—Name of the organization or, if none, of the political, military, or bureaucratic entity controlling the actors

—Country of origin

—Relationship to the government of that country

—Size and organization

—Leadership

—Composition (the occupational and educational qualifications of the members and their age range)

—Credo/Ethos

### Elementary Typology*

Particularistic (ethnic, religious, linguistic, or regional)
Nationalistic (irredentist or anti-colonial)
Ideological
  Anarchism
  Radical Left (revolutionary socialists, Trotskyites, Maoists, Guevarists, Castroites, and other ultra-left fringe groups)
  Orthodox Communism
  Extreme Right
  Other
Pathological

—Domestic base (extent of popular sympathy and support, links with legitimate social or political organizations, and links with other domestic dissident groups)

—Foreign links (with other terrorist organizations, with international or legitimate transnational organizations, and with foreign governments)

—Life cycle (date of formation, period or periods of transnational or international activity, and, if applicable, date of demise)

**Event Characteristics**

—Location of incident

—Nature of act

### Elementary Typology

Kidnapping
Barricade and hostage
Bombing (any type of explosive charge or device, including letter and parcel bombs)

---

*Major categories are not mutually exclusive.

Armed assault or ambush (with or without sophisticated weapons)
Hijacking (aircraft, ship, or other means of transportation)
Incendiary attack or arson
Assassination or murder
Chemical, bacteriological, or radiological pollution
Other

—Number, status, and nationalities of human victims

—Nature and national association of physical target

—Number, nationality, and organizational affiliation of the perpetrators

—Nature of demands (publicity, prisoner release, ransom, political action or change, arms, or safe passage)

—Targets of demands (governments, corporations, or international organizations)

—Outcome (duration of incident, identity and posture of governmental and transnational actors participating in its resolution, extent to which terrorists' demands were satisfied, fate of human victims, fate of terrorists, extent of property damage, and, if applicable, identity of nations granting or facilitating safe haven)

## Local Environmental Characteristics

—Type, repressiveness, and effectiveness of government (representative democracy, authoritarian, or totalitarian)

—Societal traditions and attitudes with respect to authority and violence

—Homogeneity of the population

—Current levels of popular malaise and internal strife

—Current level of socio-economic development (including per capita GNP; levels of industrialization, urbanization, and literacy; and the proportion of the population possessed of higher education)

—Recent and current socio-economic growth rates (as above)

—Societal inequities (markedly unequal distribution of income, discriminatory practices, and systemic limits on social and political mobility)

## Global Environmental Characteristics

—Technological Advance

—Sophisticated man-portable weaponry (development, deployment, and international trade in such weapons)

—Proliferation of nuclear facilities

—Communications advances (developments affecting both media coverage and tactical communications)

—Mobility-related developments

--Interdependence

—New vulnerabilities (those links binding our increasingly interdependent world—e.g., commercial and communications centers, transportation hubs, international power grids and pipelines, super tankers, and jumbo

  aircraft—that presently, or that may in the future, offer feasible and potentially highly disruptive targets for terrorist attack

 —Reactive upsurge of nationalism and ethnicity

—Modernizing Social and Economic Change

 —Destabilizing local effects

 —Large emigre worker concentrations

—Political Environment

 —The "revolutionary" atmosphere highlighted by the challenge to the existing world order raised by the "have not" nations

  —The controversy over illegal versus justifiable political violence

  —Shifts in priorities and values and the emergence of a strong sense of "social conscience"

 —The dispersion and erosion of political authority

 —The proliferation of non-state actors and the parallel increase in the number of international and transnational organizations providing moral or material support to national liberation or leftist revolutionary formations

 —International agreements, treaties, and conventions relating to terrorist acts

 —The behavior of states providing direct and indirect support to terrorist groups

 —Transnational contact and cooperation among terrorist groups

—Significant international economic trends and developments

 —Extra-cyclical events

 —Cyclical fluctuations

# APPENDIX B

# STATISTICAL TRENDS AND PATTERNS

# IN

# TERRORIST ACTIVITY

## NOTEWORTHY GROUPS:

### The Past Decade's Most Active or Most Publicized Practitioners of International and Transnational Terrorism[a]

Region: Western and NA'

| Name, description, or category of group | Primary location | Parent country or territory | Ethos | | | |
|---|---|---|---|---|---|---|
| Cristo Rey: Guerrilleros del Cristo el Rey (Guerrillas of Christ the King) | Spain | Spain | Extreme Right | Yes | 1973 | A |
| ETA: Euskach Ta Askatasuna (Basque Nation and Liberty) | Spain, France | Basque Provinces | Particularist/Radical Left (Basque Separatist) | Yes | 1972 | A |
| FRAP: Frente Revolucionario Anti-Fascista y Patriota (Anti-Fascist and Patriotic Revolutionary Front) | Western Europe | Spain | Radical Left (Maoist) | Yes | 1973 | A |
| German Ultra-Leftist Groups: | | | | | | |
| Baader-Meinhof Gang[a] | FRG | FRG | Radical Left Anarchist | No | 1973 | b |
| Holger Meins Commando[a] | FRG | FRG | Radical Left Anarchist | No | 1973 | |
| Puig Antich-Ulrike Meinhof Commando[a] | FRG | FRG | Radical Left Anarchist | No | 1973 | An |
| 2nd of June Movement | FRG | FRG | Radical Left Anarchist | No | 1973 | An |
| IRA (Provo): Irish Republican Army, Provisional Wing | U.K., Ireland | Northern Ireland | Nationalist/Particularist (Catholic) | No | 1975 | Ad |
| Soldiers of the Algerian Opposition | Western Europe | Algeria | Unknown | No | 1973 | Ar |
| South Moluccan Extremists | Netherlands | Moluccan Islands (Indonesia) | Particularist (Separatist) | Yes | 1975 | Act |
| Swiss Ultra-Leftist Groups[a] | Switzerland | Switzerland | Radical Left Anarchist | Mostly No | 1975 | Ap |
| TPLA: Turkish People's Liberation Army | Turkey | Turkey | Radical Left (Maoist) | No | 1973 | Ad |

[a] Allegedly a free-lance vigilante group, Cristo Rey is generally believed to operate under the protection and possibly control
[a] Just how many such attacks were actually executed by Cristo Rey is, however, uncertain. At least some may have been the

# APPENDIX C



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| IRA (Provisional Irish Republican Army, Provisional Wing | U.K., Ireland | North in Ireland | North infind Pu'reshurms (Whifhsfin) | No | 1971 | Active | Yes | Yes ? |
| Fiahters of the Algerian Opposition | Western Europe | Algeria | Unknown | No | 1971 | Active | Unknown | Unknown |
| South Moluccan Extremists | Netherlands | Moluccan Islands - Indonesia | Particularist (Separatism | Yes | 1975 | Active | Unknown | Unknown |
| Swiss Ultra-Leftist Groups [4] | Switzerland | Switzerland | Radical Left American | Mostly No | 1975 | Active | Yes | Unknown |
| TPLA: Turkish People's Liberation Army | Turkey | Turkey | Radical Left (Marxist) | No | 1973 | Active | Yes | Unknown |

[1] Allegedly a freelance vigilante group, Ustra Sta is generally believed to operate under the protection and possibly control of Spanish police and sponsored Spanish organization which surfaced in July 1975 following the arrest of one of its members in southern France.

[2] Just how many such attacks were actually conducted by Ustra Sta is, however, uncertain. At least some may have been the work of ATE (Anti-ETA).

[3] Associated with the Basu Armas Faktion (Red Arm) Group.

[4] Includes Petra Krause Group and Lupus Marxists Revolutionaries (LMR).

## Region: Sub-Saharan Africa

| Name, description, or category of group | Primary location | Parent country or territory | Ethos | Established prior to 1968? | Does it enjoy external (foreign) support? | Current status | Population dispersed/divided? | Significance of group noted? |
|---|---|---|---|---|---|---|---|---|
| ELF (Eritrean Liberation Front) Factions: ELF – General Command PLF (Popular Liberation Forces) | Ethiopia | Eritrea | Particularist (Separatist) Radical Left | Yes | 1975 | Active | Yes | Yes |
| Popular Revolutionary Party | Zaire | Zaire | Radical Left | No | 1971 | Active | Unknown | Unknown |
| Tubon Rebels (self-styled "Armed Forces of the Chadian Revolution," believed to be associated with FROLINAT the National Liberation Front of Chad) | Chad | Chad | Particularist - Machine | Yes | 1971 | Active | Unknown | Unknown |

## Region: North America

| Name, description, or category of group | Primary location | Parent country or territory | Ethos | | | | | |
|---|---|---|---|---|---|---|---|---|

National (National Liberation Movement)
**MONTONEROS "Juan José Valle" Montoneros** — Argentina — Argentina — Popular Left (Present with Marxist leanings)

**OPR-33** (Organization of the Popular Revolution-33) — Uruguay — Uruguay — Radical Left Anarchist

**22nd of September Communist League** — Mexico — Mexico — Radical Left

**VPR: Vanguarda Popular Revolucionaria / Popular Revolutionary Vanguard** — Brazil — Brazil — Radical Left Castro

* Of reported significance as primary moving force behind the Revolutionary Coordinating Junta
* Established links with Argentine (other authorities)

**Region: Middle**

### Known or suspected transnational or international terrorist acts: 1 January 1968 - 31 December 1975

| | Kidnapping | Barricade and hostage | Bombing | Armed assault or ambush | Hijacking | Assassination | Incendiary attack or arson | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| length 11 | | 1 | 6 | 1 | 1 | | | | 23 |
| | move 1 | | | | | | | | 1 |
| | ested | | | | | | | | |
| | tion | | | | | | | | 1 |
| 1975 | | | | | | | | | |
| er | | | | | | | | | |
| ande | | | | | | | | | |

| Name, description, or category of group | Primary location | Parent country or territory | Line |
|---|---|---|---|
| **AUR: Arab Communist Organization** | Lebanon, Syria | Lebanon | Radical Left (from both Soviet and Chinese-style Communism) |
| **Al Fatah, Harakat Tahrir Falastin / Movement for the Liberation of Palestine** | Lebanon, Syria | Palestine | Nationalist, anti-Zionist, anti-Imperialist |
| **BSO: Black September Organization** | Lebanon, Syria | Palestine | Nationalist (extreme anti-Zionist, anti-Imperialist) |
| **Israel Military, Paramilitary, or Agent Personnel** | Israel | Israel | Nationalist |
| **People's Strugglers** | Iran | Iran | Nationalist, Muslim Traditionalist, nominal Marxist |
| **PFLP: Popular Front for the Liberation of Palestine** | Lebanon, Syria | Palestine | Nationalist, Radical Left (Eclectic Marxism) |
| **OANY: Organization of Arab Nationalist Youth for the Liberation of Palestine** | Libya | Palestine | Nationalist, Radical Left |
| **PFLP-GC: Popular Front for the Liberation of Palestine-General Command** | Lebanon, Syria | Palestine | Nationalist |
| **Saiqa: Vanguard of the Popular Liberation War** | Syria | Palestine | Nationalist, Leftist (Baathist) |

* Figures exclude bombing, shelling, and incursions by conventional forces as well as the sort of Israeli
* No actions under its own name in 1975, but PFLP has acknowledged responsibility for the active
* Benefits from Libyan support

**Region: 7**

### Known or suspected transnational or international terrorist acts: 1 January 1968 - 31 December 1975

| Kidnapping | Barricade and hostage | Bombing | Armed assault or ambush | Hijacking | Assassination | Incendiary attack or arson | Other | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |



| Name, description, or category of group | Primary location | Parent country or citizen | Labet | | Date of most recent organizational appearance to current act | Current status | Significant international impact |
|---|---|---|---|---|---|---|---|
| MONTONEROS "Juan José Valle" Montoneros | Argentina | Argentina | Popular Left / Peronist with Marxist leanings | Yes | 1975 | Active | Unknown |
| OPR-33 Organization / C. P. Pintat Resistance 33 | Uruguay | Uruguay | R. Ireland / L. Anarchist | No | 1974 | Inactive | Unknown |
| 22nd of September Communist League | Mexico | Mexico | Radical Left | No | 1975 | Active | Unknown |
| VPR Vanguarda Popular Revolutionaria Popular Revolutionary Vanguard | Brazil | Brazil | Radical Left / Castroite | No | 1974 | Inactive | Unknown |

† Of special significance as primary meeting base to hand the Revolutionary Coordinating Junta-JCR-see Transregional category.
‡ Established ties with Argentine police authorities.

## Region: Middle East and North Africa

| Name, description, or category of group | Primary location | Parent country or citizen | Labet | | Date of most recent organizational appearance to current act | Current status | Significant international impact |
|---|---|---|---|---|---|---|---|
| ASM Arab Communist Organization | Lebanon, Syria | Lebanon | Radical Left / Sunni both Marxist and Chinese-style Communism | No | 1975 | Dormant | Unknown |
| Al Fatah, Harakat Tahrir Falastin / Movement for the Liberation of Palestine | Lebanon, Syria | Palestine | Nationalist, anti-Zionist, anti-Imperialist | Yes | 1975 | Active | Yes |
| BSO, Black September Organization | Lebanon, Syria | Palestine | Nationalist / extreme anti-Zionist, anti-Imperialist | No | 1974 | Active | Yes |
| Israel Military, Paramilitary, or Agent Personnel | Israel | Israel | Nationalist | Yes | 1975 | Active | No |
| People's Strugglers | Iran | Iran | Nationalist, Muslim Traditionalists, nominal Marxists | No | 1975 | Active | Yes |
| PFLP, Popular Front for the Liberation of Palestine | Lebanon, Syria | Palestine | Nationalist, Radical Left / Exterior Marxism | Yes | 1975 ‡ | Active | Yes |
| OANY, Organization of Arab Nationalist Youth for the Liberation of Palestine | Libya | Palestine | Nationalist, Radical Left | No | 1974 | Active | Unknown |
| PFLP-GC, Popular Front for the Liberation of Palestine-General Command | Lebanon, Syria | Palestine | Nationalist | No | 1974 | Active | Yes |
| Saiqa, Vanguard of the Popular Liberation War | Syria | Palestine | Nationalist, Leftist (Baathist) | Yes | 1975 | Active | Yes |

† Figures exclude bombing, shelling, and incursions by conventional forces as well as the sort of localized cross-border operations and sabotage...
‡ No serious under its own name in 1975, but PFLP has acknowledged responsibility for the activities of the "Carlos" Group through mid...
§ Benefits from Libyan support.

## Region: Transregional

Region: North

| Name, description, or category of group | Primary location | Parent country or territory | Ethos | | |
|---|---|---|---|---|---|
| Accion Cubana | Cuba | Cuba | Nationalist, Anti-Communist | No | |
| El Marian The Scorpions | U.S. | Cuba | Nationalist, Anti-Communist | No | |
| El Poder Cubano Cuban Power | U.S. | Cuba | Nationalist, Anti-Communist | Yes | |
| FLNC: Cuban National Liberation Front | U.S. | Cuba | Nationalist, Anti-Communist | No | |
| FLQ Front de Liberation du Quebec Quebec Liberation Front | Canada | Canada  Quebec | Particularist Radical Left : French separatist, Marxist Maoist | Yes | |

Region:

| Name, description, or category of group | Primary location | Parent country or territory | Ethos | |
|---|---|---|---|---|
| Marumodo Marumo Youth League | Japan | Japan | Radical Left | No |
| Okinawa Liberation League | Okinawa | Okinawa | Particularist (Separatist) | No |
| Philippine Muslim Rebels (including Moro National Liberation Front) | Philippines | Southern Philippines | Particularist (Muslim) : Peasant groups | No |

| Name, description of subgroup of group | Primary location | Parent country or territory | Ethos | | | | |
|---|---|---|---|---|---|---|---|
| PFLP: Popular Front for the Liberation of Palestine | Lebanon, Syria | Palestine | Nationalist, Radical Left (Eclectic Marxism) | Yes | 1975 | Active | Yes | Yes |
| OANY: Organization of Arab Nationalist Youth for the Liberation of Palestine | Libya | Palestine | Nationalist, Radical Left | No | 1974 | Active | Unknown | Yes |
| PFLP-GC: Popular Front for the Liberation of Palestine—General Command | Lebanon, Syria | Palestine | Nationalist | No | 1974 | Active | Yes | Yes |
| Saiqa: Vanguard of the Popular Liberation War | Syria | Palestine | Nationalist, Leftist (Baathist) | Yes | 1974 | Active | Yes | Yes |

[1] Figures exclude bombing, shelling, and incidents in conventional forces as well as the cost of forward cross-border operations and selective assassinations.

[2] No actions under its own name in 1975, but PFLP has acknowledged responsibility for the activities of the "Carlos" Group through mid-1974 ...

[3] Benefits from U.S.S.R. support.

# Region: Transregional

| Name, description of subgroup of group | Primary location | Parent country or territory | Ethos | Established group in 1965? | Date of most recent transnational op.... national terrorist act | Current status | Significant transnational links? | Significant Soviet or Soviet-supported Data |
|---|---|---|---|---|---|---|---|---|
| Armenian Secret Terrorist Groups [1] | Western Europe, Middle East, and North America | Armenia | Nationalist | Present Groups, No | 1975 | Active | Unknown | Unknown |
| "Carlos" Group, AKA Mohammed Boudia Commando, AKA Arm of the Arab Revolution | Western Europe and Middle East | Multi-National | Radical Left (anti-imperialist, anti-Zionist) | No | 1975 | Active | Yes | Yes |
| JCM: Revolutionary Coordination Junta [2] | Latin America, Western Europe (Paris, Lisbon) | Multi-National (Latin America) | Radical Left | No | See member organizations | Active | Yes | Yes |
| JDL: Jewish Defense League | U.S., Israel, Middle East, Western Europe, Asia | Israel | Nationalist (Zionist) | No | 1975 | Active | No | Unknown |
| JRA: Nippon Sekigun (Japanese Red Army) | Middle East, Western Europe, Asia | Japan | Radical Left, eclectic mix of most extreme elements of Trotskyite, Maoist & Guevarist beliefs | No | 1975 | Active | Yes | Yes |
| Yugoslav Émigré Terrorist Groups [3] | North America, Western Europe, Latin America and Australia | Yugoslavia | Predominantly Particularist d'émit, Serb, Slovene, Macedonian ... ideologically varied from Stalinist to Fascist | Some groups, but mostly no | 1975 | Active | Yes, open... domestically among these others | See note |

[1] Includes so-called "Armenian Liberation Front" and "Secret Armenian Army."

[2] A multi-national grouping led by Venezuelan Illich Ramirez-Sanchez alias "Carlos" under aegis of PFLP with some support from Libya. The JCM is composed of Argentina's Revolutionary People's Army (ERP), Bolivia's National Liberation Army (ELN), Chile's Movement of ... (MIR), Uruguay's National Liberation Movement (MLN Tupamaros).

[3] Includes Croatian Illegal Revolutionary Organization (HIRO), Croatian Liberation Movement (HOP), Croatian National Resistance (HNO), Ustashe groups, the League of Serbian Volunteers (LSV), and the Union of Croatian Commandos Abroad.

[4] None except for possible Soviet or Soviet-sponsored assistance to a very few.

"Arabic groups considered to ...



19 MAR 1985

Thomas Kennedy
P.O. Box 788   113899
Mansfield, OH   44901

Dear Mr. Kennedy:

This is in regard to your letter of 15 February 1985 in which
you requested, under the Freedom of Information Act (FOIA),
records from the files of this agency concerning terrorism.

Enclosed is a copy of "International and Transnational
Terrorism: Diagnosis and Prognosis. (1976)"  We have no newer
unclassified edition.

Also enclosed is a computer printout of documents previously
released under the FOIA.  If you wish to receive any of this
material, please indicate that which you would like to receive.
Our reproduction charges for previously released material is $.10
per page.

Charges for reproducing the 60 pages of enclosed material
amount to $6.00.  Please remit a check or money order for this
amount, made payable to the Treasurer of the United States, and
send it to this office.  Please cite F85-0270 so that we can
properly credit your account.

Sincerely,

John H. Wright

John H. Wright
Information and Privacy Coordinator

Enclosures
IPD/CMR/ksk/12 Mar 85
Distribution:
Orig - Adse
    1 - Chrono  GLF
    1 - IPD PARTIAL  Fees due: $6.00
    1 - DECAL



International and Transnational Terrorist Incidents by Category, 1968-75

Total: 913

41

# Geographic Distribution of Terrorist Incidents by Category, 1968-75

**North America**
Total: 111

| Kidnapping | Barricade and Hostage | Bombing | Armed Assault or Ambush | Hijacking (Air and Non-Air) | Assassination | Incendiary Attack or Arson | Other |
|---|---|---|---|---|---|---|---|
| 3 | 1 | 7 | 21 | | 3 | 6 | 1 |

**Western and NATO Europe**
Total: 327

| | | 179 | | | | | |
| 13 | 14 | 30 | 19 | 20 | 33 | | 18 |

**Middle East and North Africa**
Total: 119

| | | 43 | | | | | |
| 8 | 7 | 25 | 19 | 7 | | | 10 |

**Sub-Saharan Africa** Total: 37

| 15 | 2 | 8 | 5 | 6 | 1 | | 2 |

**Asia** Total: 43

| 6 | 2 | 8 | 7 | 13 | 4 | 5 | |

**Latin America** Total: 250

| 78 | | 65 | | | | | |
| 5 | 19 | 44 | 13 | 14 | 12 | | |

**USSR/Eastern Europe** Total: 19

| | 2 | 1 | 15 | | | 1 | |

**Pacific and Australia** Total: 8

| 4 | 1 | | | | | | |

**Transregional** Total: 1

| 1* | | | | | | | |

*More letter bomb mailing

International and Transnational Terrorist Incidents Directly Affecting US Citizens, Corporations, or Institutions

| | Kidnap | H & H | Bomb | Ass'n | Hijack[1] | Assass | Incend | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| **1968-1975** | | | | | | | | | |
| Total incidents | 128 | 31 | 373 | 95 | 132 | 18 | 38 | 43 | 913 |
| US citizens or property known to have been victimized | 50 | 1 | 136 | 37 | 24 | 13 | 31 | 12 | 386 |
| US government target of terrorist demands[2] | 17 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| **1968** | | | | | | | | | |
| Total incidents | 1 | 0 | 21 | 2 | 8 | 1 | 0 | 0 | 32 |
| US citizens or property victimized | 1 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 5 |
| US government target of demands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **1969** | | | | | | | | | |
| Total incidents | 3 | 0 | 17 | 3 | 23 | 2 | 2 | 1 | 53 |
| US citizens or property victimized | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 16 |
| US government target of demands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **1970** | | | | | | | | | |
| Total incidents | 26 | 1 | 17 | 6 | 47 | 6 | 2 | 9 | 111 |
| US citizens or property victimized | 13 | 0 | 12 | 1 | 14 | 3 | 1 | 3 | 56 |
| US government target of demands | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| **1971** | | | | | | | | | |
| Total incidents | 18 | 1 | 15 | 5 | 11 | 3 | 6 | 4 | 63 |
| US citizens or property victimized | 1 | 0 | 12 | 1 | 7 | 0 | 5 | 4 | 36 |
| US government target of demands | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 |
| **1972** | | | | | | | | | |
| Total incidents | 11 | 3 | 34 | 6 | 18 | 1 | 3 | 5 | 84 |
| US citizens or property victimized | 1 | 0 | 18 | 2 | 3 | 0 | 1 | 1 | 26 |
| US government target of demands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **1973** | | | | | | | | | |
| Total incidents | 31 | 8 | 81 | 29 | 13 | 12 | 20 | 12 | 211 |
| US citizens or property victimized | 14 | 2 | 31 | 14 | 0 | 3 | 12 | 2 | 83 |
| US government target of demands | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **1974** | | | | | | | | | |
| Total incidents | 12 | 9 | 95 | 21 | 9 | 8 | 11 | 11 | 179 |
| US citizens or property victimized | 3 | 1 | 32 | 6 | 2 | 2 | 7 | 2 | 57 |
| US government target of demands | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **1975** | | | | | | | | | |
| Total incidents | 26 | 9 | 84 | 15 | 3 | 0 | 13 | 1 | 164 |
| US citizens or property victimized | 13 | 1 | 18 | 6 | 0 | 3 | 4 | 0 | 47 |
| US government target of demands | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

[1] Excludes numerous non-terrorist skyjackings, many of which victimized US planes or citizens.

[2] The figure does not, of course, reflect more than a score of cases in which ransom demands were levied on — or were eventually at least partially satisfied by — US corporations or private citizens.

## International and Transnational Terrorist Incidents by Regional Origin of the Perpetrators—1968–1975

| | Kidnap | B & H | Bomb | Ass'lt | Hijack | Assass. | Incend. | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| North America | 4 | 0 | 21 | 4 | 3 | 0 | 3 | 0 | 87 |
| Western and NATO Europe | 10 | 1 | 61 | 14 | 3 | 3 | 4 | 4 | 90 |
| Middle East and North Africa | 3 | 12 | 41 | 31 | 25 | 12 | 2 | 13 | 108 |
| Sub-Saharan Africa | 14 | 1 | 1 | 3 | 4 | 1 | 0 | 0 | 30 |
| Asia | 4 | 3 | 2 | 4 | 11 | 3 | 5 | 0 | 30 |
| Latin America | 53 | 3 | 45 | 0 | 12 | 10 | 3 | 0 | 30 |
| USSR-Eastern Europe | 0 | 1 | 3 | 1 | 15 | 3 | 0 | 0 | 130 |
| Uncertain or Mixed | 29 | 1 | 201 | 32 | 34 | 16 | 10 | 11 | 23 |
| **Total** | **124** | **31** | **375** | **85** | **1,7** | **48** | **39** | **45** | **913** |

## International and Transnational Terrorist Incidents—Fedayeen and Non-Fedayeen by Category of Event: 1968–1975

| | Kidnap | B & H | Bomb | Ass'lt | Hijack | Assass. | Incend. | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fedayeen or Fedayeen-related | 8 | 18 | 48 | 35 | 19 | 13 | 3 | 15 | 159 |
| Non-Fedayeen | 102 | 13 | 295* | 53 | 79 | 29 | 37 | 22* | 584 |
| Unknown | 13 | 0 | 28 | 7 | 39 | 4 | 19 | 8 | 170 |
| **Total** | **123** | **31** | **375** | **95** | **137** | **18** | **59** | **45** | **913** |

*Includes the sole transnational terrorist attack on a nuclear installation during the period under review—the 1975 bombing of a nuclear power facility in France by the Puig Antech-l Irike Meinhof Commando. It bears note, however, that Argentina's ERP did briefly occupy an unfinished Argentine nuclear power plant in March 1973, an act which falls in the category of domestic terrorism.

* Includes the only two incidents in which a chemical, biological, or radiological agent has been used to induce terror to date (the radio-active saline employed by the self-styled "Justice Guerrilla" in Austria in 1971).

## International and Transnational Terrorist Incidents—Fedayeen and Non-Fedayeen by Year: 1968–1975

| | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|---|---|---|
| Fedayeen or Fedayeen-related | 3 | 10 | 21 | 10 | 19 | 46 | 33 | 17 |
| Non-Fedayeen | 31 | 28 | 60 | 28 | 40 | 112 | 137 | 144 |
| Unknown | 3 | 17 | 33 | 25 | 27 | 53 | 9 | 3 |
| **Total** | **37** | **55** | **114** | **63** | **86** | **211** | **179** | **164** |

## Indiscriminate or High Casualty International or Transnational Terrorist Bombings and Armed Assaults by Regional Origin of the Perpetrators, 1968–1973

| | Randomly-Determined Innocent Parties Deliberately Victimized | | More than 10 Non-Terrorist Casualties | |
|---|---|---|---|---|
| | Bombing | Armed Assault | Bombing | Armed Assault |
| North America | 2 | 0 | 0 | 0 |
| Western and NATO Europe | 19 | 4 | 0 | 0 |
| Middle East and North Africa | 17 | 21 | 5 | 4 |
| Sub-Saharan Africa | 1 | 2 | 0 | 0 |
| Asia | 9 | 1 | 0 | 1 |
| Latin America | 7 | 3 | 3 | 0 |
| USSR/Eastern Europe | 1 | 0 | 0 | 1 |
| Pacific and Australia | 0 | 0 | 0 | 0 |
| Unknown or Mixed | 35 | 10 | 1 | 1 |
| **Total** | **102** | **40** | **17** | **7** |

## Indiscriminate or High Casualty International or Transnational Terrorist Bombings and Armed Assaults by Selected Groups 1968–73[1]

| | Randomly-Selected Innocent Parties Deliberately Victimized | | More than 10 Non-Terrorist Casualties | |
|---|---|---|---|---|
| | Bombing | Armed Assault | Bombing | Armed Assault |
| BSO: Black September Organization[2] | 4 | 2 | 0 | 0 |
| IRA (Provos): Irish Republican Army, Provisional Wing | 9 | 0 | 4 | 0 |
| JRA: Japanese Red Army | 0 | 1 | 0 | 1 |
| PFLP: Popular Front for the Liberation of Palestine | 1 | 3 | 0 | 1 |
| Mohammed Boudia Commando | 1 | 2 | 1 | 0 |
| PFLP-GC: Popular Front for the Liberation of Palestine—General Command | 0 | 1 | 0 | 1 |
| Yugoslav Émigré Groups | 2 | 1 | 1 | 1 |

[1] When these overall scored is taken into account, the listed groups appear to have been among the least inhibited with respect to the number, fate, or untroubled "guilt" of their victims.
[2] Although the incident is not reflected in these statistics, the BSO is perhaps best known for the Munich barricade and hostage operation it staged in connection with the 1972 Olympic Games in Munich.

## Indiscriminate or High Casualty International or Transnational Terrorist Bombings and Armed Assaults—Fedayeen and Non-Fedayeen 1968–1973

| | Randomly-Determined Innocent Parties Deliberately Victimized | | More than 10 Non-Terrorist Casualties | |
|---|---|---|---|---|
| | Bombing | Armed Assault | Bombing | Armed Assault |
| Fedayeen or Fedayeen-related | 50 | 24 | 5 | 5 |
| Non-Fedayeen | 50 | 16 | 12 | 1 |
| Unknown | 34 | 3 | 0 | 1 |
| **Total** | **102** | **40** | **17** | **7** |



**One Barricade and Hostage Operation That Went Awry**

On 24 April 1975, a group of West German terrorists identifying themselves as members of the Holger Meinz Commando seized the FRG Embassy in Stockholm in a bloody and abortive attempt to force Bonn to release 26 individuals associated with the Baader-Meinhof organization from jail. When their demands were refused, the terrorists dynamited the top story of the embassy building in an equally unsuccessful effort to cover their escape. The photo shows the embassy burning in the background as Swedish police carry off one of the captured terrorists.

on the demand of fellow terrorists. 50 were released after serving out their prison terms, and 104 were still in jails as of mid-September 1975. The average sentence meted out to those terrorists who have actually stood trial has been 18 months.*

### How Disruptive?

The human and material toll exacted by transnational and international terrorist violence over the past eight years has been relatively low. For example, although the total cost of such activity in terms of ransom payments and property damage has never been tallied, all indications are that it falls far short of the half billion dollars loss suffered to school vandals in the US each year.

Closer track has been kept of the human casualties involved. Latest estimates place these at about 800 killed and 1,700 wounded—including the losses incurred by the terrorists themselves. To put these

figures in better perspective, consider the fact that they fall somewhat short of the total casualties attributable to domestic terrorism in Northern Ireland alone during the same period or that Argentine terrorists and "counterterrorists" have managed to kill more than 1,000 of their countrymen since mid-1974. For a starker contrast, take Vietnam. There, in one year (1968), Viet Cong terrorists were credited with assassinating 6,000 people and wounding 15,000 more. Comparisons with "normal" levels of domestic violence in the US may also be useful. There were, for example, about 20,000 homicides—and more than 2,000 bombings—recorded here in 1975.

The juxtaposition of these statistics suggests that the dimensions of the problem posed by transnational and international terrorism are still quite small and that the increase in such activity since 1968, while marked, should have done little to undermine world order. But the disruptive impact of these terrorist incidents and campaigns has been magnified by the publicity they have received and by their interaction with other destabilizing trends and forces. Thus, while the terrorists have made no revolutions and, by

*"Terrorism 'Growing and Increasingly Dangerous'," (Interview with Robert A. Fearey, Special Assistant to the Secretary of State and Coordinator for Combatting Terrorism, *U.S. News and World Report*, 29 September 1975, p. 79.